1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
2                              EASTERN DIVISION

3     AL WILLIAMS,                )        Docket No. 08 C 6409
                                   )
4                     Plaintiff,   )        Chicago, Illinois
                                   )        March 29, 2011
5              v.                  )        1:45 o'clock p.m.
                                   )
6     CITY OF CHICAGO, et.al.      )
                                   )
7                    Defendants.   )

8                              VOLUME 1-B
                        TRANSCRIPT OF PROCEEDINGS
9           BEFORE THE HONORABLE JOAN LEFKOW, and a jury

10    APPEARANCES:

11    For the Plaintiff:          SHILLER PREYAR LAW OFFICES by
                                  MR. BRENDAN SHILLER
12                                MS. APRIL D. PREYAR
                                  4554 North Broadway
13                                Suite 325
                                  Chicago, IL  60640
14
      For the Defendants:         PUGH JONES JOHNSON & QUANDT PC by
15                                MR. WALTER JONES, JR.
                                  MR. JORGE V. CAZARES
16                                MS. UMA CHANDRASEKARAN
                                  180 North LaSalle Street
17                                Chicago, IL  60601

18
      Court Reporter:             GAYLE A. MCGUIGAN, CSR, RMR, CRR
19                                Official Court Reporter
                                  219 South Dearborn Street
20                                Room 1944
                                  Chicago, Illinois 60604
21                                (312) 435-6047

22

23

24

25

1                              I N D E X

2      WITNESS                                              PAGE

3      RICHARD COOPER
            Direct By Mr. Shiller ...............................32
4
       RICHARD COOPER
5           Cross By Mr. Jones .................................34

6      RICHARD COOPER
            Redirect By Mr. Shiller ...........................37
7
       RICHARD COOPER
8           Recross By Mr. Jones ..............................37

9      AL WILLIAMS
            Direct By Mr. Shiller .............................39
10
       AL WILLIAMS
11          Cross By Mr. Jones ................................77

12

13

14                          E X H I B I T S

15     NUMBER                                MARKED    RECEIVED

16     Plaintiff's  Exhibit

17         Nos. 13A, 13B                                66
           No. 14C                                      47
18         No. 14D                                      50
           No. 14H                                      53
19         No. 14I                                      54

20

21

22

23

24

25

```
 1          (Proceedings had in open court.  Jury out.)
 2               THE COURT:  I'm told we have a juror who needs to leave
 3     at 4:15, I guess, something like that, so ... today.
 4               MR. JONES:  That's a good juror.
 5               THE COURT:  You don't mind, do you?
 6          (Laughter.)
 7               MR. JONES:  Good juror.
 8               THE COURT:  Okay.
 9               MR. JONES:  Good one.
10               THE COURT:  Is anybody uncomfortable with the cold air
11     in here?
12               Yes, no?
13               MR. JONES:  Can we go to the Bahamas?
14               THE COURT:  You can if you want to.
15               Well, if there is a problem, let me know.  I wonder how
16     the jury is going to feel.
17          (Discussion held off the record.)
18          (Jury enters courtroom.)
19               THE CLERK:  Please be seated.
20               THE COURT:  Good afternoon, Ladies and Gentlemen of the
21     Jury.
22               I came out here, and I thought it was really chilly.
23     Are you -- does it seem cold?
24               Does anyone want to get a sweater or anything before we
25     get started?
```

1          Yes?

2          JUROR:  No, I'm good.

3          THE COURT:  Let me know.  If you're really

4   uncomfortable, we'll see if they'll come in and turn up the heat

5   and then it will be too warm so ... all right.

6          All of you are now in the jury box, have been sworn as

7   a jury to try this case.

8          By your verdict, you will decide the questions of fact

9   that arise during the trial.

10         It is important that you give careful attention to the

11  testimony and evidence as it is received and presented for your

12  consideration, but you should keep an open mind and should not

13  form or express any opinion about the case one way or another

14  until you consider your verdict, after having heard all of the

15  evidence, the closing arguments of the attorneys, and my

16  instructions to you on the applicable law.

17         You, as jurors, must decide this case based solely on

18  the evidence presented here within the four walls of this

19  courtroom.  This means that during the trial you must not

20  conduct any independent research about this case, the matters in

21  the case, and the individuals involved in the case.  In other

22  words, you should not consult dictionaries or reference

23  materials, search the internet, websites, blogs, or use any

24  other electronic tools to obtain information about the case or

25  help you to decide the case.  Please do not try to find out

1   information from any source, outside the confines of this

2   courtroom.

3           Until you retire to deliberate, you may not discuss the

4   case with anyone, even your fellow jurors.

5           After you retire to deliberate, you may begin

6   discussing with your fellow jurors, but you cannot discuss the

7   case with anyone else until you have returned a verdict and the

8   case is at an end.

9           I hope that for all of you the case is interesting and

10  noteworthy.

11          I know that many of you -- I've already told you about

12  the cell phones on the Blackberries, so we're not going to go

13  over that again.

14          If anyone has spoken to you or should speak to you

15  about this case or try to influence you in any manner before its

16  final disposition, directly or indirectly, it is your legal

17  responsibility to inform me immediately.  You may report any

18  such conduct to Mr. Dooley or my court reporter, who is sitting

19  right here, who will report it to me.  All of these precautions

20  are important to the integrity of the jury process.

21          You cannot begin to consider what your verdict is going

22  to be until you have heard all of the evidence that will be

23  offered.  You're going to have to keep open minds, minds that

24  have not been made up until you have heard all of the evidence

25  that is going to be presented in the case.

1         The plaintiff, having the burden of proof, is given the

2    opportunity to go forward first and present to the jury all of

3    the evidence he chooses to offer about the case.

4         After the plaintiff has finished, then the defendants

5    are given the opportunity to offer such evidence as they choose.

6         You must keep your mind open, free, and ready to

7    receive all of the evidence as it comes to you before you begin

8    to consider your verdict.

9         Your verdict must be one that is based only on the law

10   and the evidence in the case without regard to sympathy, bias,

11   or prejudice.

12        If you bring in a verdict that is based on the law and

13   the evidence without regard to sympathy, bias, or prejudice, it

14   will be a true verdict that brings justice to each of the

15   parties here in the courtroom.

16        During the trial, you may hear objections made by the

17   lawyers.  It is their duty to object when they think it should

18   be done.  It's a help to me, and the purpose is to keep the case

19   focused on issues and to keep out irrelevant matters.  As

20   jurors, you should not hold any motion or objection against

21   either the plaintiff or the defendants or feel that either side

22   is trying to keep something from you.  And do not hold it

23   against either side that I have sustained an objection, meaning

24   the witness is not to answer.  If a question is not answered

25   because I sustained an objection, do not speculate as to what

1   you think the answer might have been.

2          There are instances when the attorneys will make legal

3   arguments to the Court.  Because those arguments are not

4   evidence, it's not proper for the jury to hear them.  On those

5   occasions, I will ask the lawyers and the court reporter, who

6   can hear us, we'll be right over here as you've already seen, or

7   we may step outside the courtroom to confer.  These occasions

8   are called sidebars.  Sidebars are a necessary and normal part

9   of a jury trial and you should not be concerned by their

10  frequency or length nor should you draw any inference against

11  any party who calls for a sidebar.

12         During the course of the trial, you may encounter some

13  of the counsel or parties at one time or another in public

14  corridors or in elevators or during a noon recess in the

15  restaurants in the area or downstairs in the cafeteria.  If they

16  do not engage in discussion or conversation with you, please do

17  not be offended.  They're simply following the rules.  I ask you

18  also not to engage in conversation with the parties or counsel,

19  not even small talk.

20         At times, the jury may be excused from the courtroom or

21  I and the attorneys will confer in chambers while objections are

22  being discussed or for other reasons.  Under the law, various

23  matters must be heard out of the presence of the jury.

24         We will try to move everything along as expeditiously

25  as possible and resolve these things quickly, but I just would

1    ask for your patience when a case is recessed or adjourned for

2    such a purpose.  And if the trial doesn't begin promptly at the

3    designated time, the delay has been caused by the Court's other

4    duties, which cannot be put aside.

5              When a trial is interrupted or delayed for any of these

6    reasons, I ask that you be patient for the sake of the parties

7    who rely on you for a just verdict.

8              You may take notes if you believe they will help you

9    pay attention.  If you do take notes, I want you to leave them

10   here every evening and do not share them with any other juror.

11   The important thing is that you do your best to listen to all of

12   the evidence.

13             All right.  We'll talk now briefly about the order the

14   trial will follow.

15             In just a few moments, the lawyers for each of the

16   parties will be permitted to make what we call opening

17   statements.

18             The plaintiff is given the opportunity to go first

19   because the plaintiff has the burden of proof.

20             After both parties have given their opening statements,

21   the plaintiff will go forward with the calling of his witnesses

22   and the presentation of evidence during what we call the

23   plaintiff's case-in-chief.

24             When the plaintiff finishes presenting his

25   case-in-chief, the defendants will proceed with their witnesses

1    and evidence; and after that and within certain limitations, the

2    plaintiff will be -- may be permitted to again call witnesses or

3    present evidence in what we call the rebuttal phase of the

4    trial.

5            The plaintiff proceeds first and may rebut at the end

6    because the law places the burden of proof on the plaintiff, as

7    I will explain further to you as part -- in a few moments and

8    again as part of my final instructions.

9            When the evidence portion of the trial is completed,

10   the lawyers are then permitted to address you and make their

11   summations or final arguments in the case, after which I will

12   instruct you on the applicable law.

13           After you hear my instructions on the law, you will

14   then retire to the jury room, and for the first time you will

15   begin talking about the case.  That is, you will begin your

16   deliberations.  You will have kept an open mind, not reaching

17   any opinions or conclusions until you have heard everything

18   there is to hear and you've begun your deliberations in the

19   privacy of the jury room.  In that manner, you will have kept

20   the promise each one of you has made to me under oath.

21           As I mentioned to you earlier, not to talk about the

22   case, but you may of course tell your family and your employer

23   that you have been selected as a juror; and, second, you may

24   tell them what the schedule would be.  However, do not tell them

25   anything else.  Do not tell them the name of the case, who the

1    lawyers or witnesses are, the nature of the claim, or anything

2    about the case until it is completely over.

3         If you are having a problem with your employer or

4    expect a problem, please advise the Court by way of a note.  The

5    courtroom deputy provide a paper and pencil if you need one.  I

6    or someone on my staff will tell your employer that you must

7    appear as part of your civic duty, and it is not to be held

8    against you in any way.  A letter can also be sent explaining

9    this to your employer.

10        As I indicated earlier, the plaintiff has the burden of

11   proof.  That means that you must be persuaded, considering all

12   of the evidence in the case, that the proposition on which a

13   party has the burden of proof is more probably true than not

14   true.  That is the standard of proof you will use in deciding

15   this case.

16        In determining whether any proposition has been proved,

17   you should consider all of the evidence bearing on the question

18   without regard to which party produced it.

19        Evidence consists of testimony by witnesses and of

20   exhibits that are allowed into evidence.  A couple of additional

21   details you should be aware that it is not necessary for the

22   parties or representatives of parties in the case to attend the

23   trial at all times or at all.

24        Finally, you may at times observe that I am busy up

25   here doing things at the bench.  I may be working on other cases

1     or matters that I must attend to.  You are not to concern

2     yourself with that or think that I'm not listening because I am.

3          You must pay -- you must pay close attention to the

4     evidence because you are the ones who are deciding the facts of

5     the case.

6          All right.  With that, I thank you on behalf of our

7     court for being here and giving us your time, effort, and

8     experience.

9          We will now begin by affording the lawyers for each

10    side an opportunity to make their opening statements, in which

11    they may explain the issues in the case and summarize the facts

12    they expect the evidence will show.

13         As I said earlier, the statements that the lawyers make

14    now are not evidence and are not your instruction on the law.

15         Nevertheless, these statements are intended to help you

16    understand the issues and the evidence as it comes in as well as

17    the positions taken by each side.

18         So I ask you now to give the lawyers close attention as

19    I recognize them for purposes of opening statement.

20         We'll first hear from April Preyar for the plaintiff.

21         MS. PREYAR:  Thank you, your Honor.

22         When we think of police officers, we think of heroes.

23    They're the boys in blue we call when we're in trouble, when we

24    have a car accident or our houses or garages are broken into.

25    They're the ones we call for help.  They're the ones we expect

1    to keep us safe.  They're the ones who make us all very proud

2    just by doing their jobs on a daily basis.

3            Unfortunately for Mr. Al Williams, this was not his

4    experience with these particular defendant officers from the

5    Chicago Police Department:  Officers Rubald, Leck, and Corcoran.

6            Rather than serve and protect anyone that day, they

7    instead bullied and brutalized Mr. Williams.

8            Good afternoon.  My name is April Preyar.  And along

9    with fellow counsel, Jared Kosoglad, Brendan Shiller, and John

10   O'Brien, we collectively represent Mr. Al Williams, who is the

11   plaintiff in this matter.

12           We've brought several claims against defendant officers

13   Corcoran, Leck, and Rubald, under violations of both the

14   Fourth Amendment of the United States Constitution and various

15   state laws that offer additional protections.

16           We brought these claims because this is a case about

17   justice, about fairness, and what happens when an unjust and

18   illegal arrest is made.

19           On May 31st, 2007, Al Williams was on his way to visit

20   his Aunt Debbie.  Aunt Debbie lived not so far away from Al,

21   actually a few blocks away.  And Al is a furniture mover.  He's

22   never had a driver's license.  He doesn't own a car.  He

23   primarily uses the C.T.A. or walking in order to get wherever he

24   needs to go.

25           This particular day he took his bicycle.  He was just

1    going a couple of blocks away.  Aunt Debbie had told him that

2    there was a relative in town from out of state who wanted to see

3    Al.  So Al went over to Aunt Debbie's house to visit with the

4    cousin.

5            He went.  After he stayed for a few hours and laughed

6    and talked with family members, he told everyone goodbye.  He

7    hopped on his bicycle and rode up from 78th Street to 79th

8    Street.  Again, not a far distance.

9            Then he turned onto 79th Street, made a left.  And as

10   he was approaching -- traveling eastbound, he saw one of his

11   cousins who was waiting in front of a fast-food joint.  She had

12   placed her order, and she was waiting outside for them to call

13   her number or her order name so that she could go pick up her

14   food.

15           They talked for a couple of minutes.  He said I'll see

16   you tomorrow.  She threw up her hands, said goodbye.

17           Al proceeds to cross the street and continues traveling

18   eastbound.  This was the way to his house.

19           As he's traveling, all of a sudden he's blindsided and

20   knocked completely off of his bike.  And when I say blindsided,

21   I literally mean blindsided.

22           You see, Al Williams is completely blind in his left

23   eye.  He has no peripheral vision at all on the left side of his

24   body.  He had no idea what had hit him, who or what had hit him

25   or what had happened.

1          He fell to the ground and tried to get his bearings;

2     but as he tried to get up, he felt someone pulling at his arms

3     and at the same time someone pushing his body down.  He keeps

4     trying to turn his head so he can see who it is.  They approach

5     from behind.  He didn't know who it was.  He assumed he must be

6     getting robbed.  He doesn't know who it is, so he tries to

7     struggle to get away or turn around to fight, but he can't get a

8     clear view of anybody.  So his head is pushed down.  A knee is

9     pushed into his back, and next he feels a foot on his neck.  And

10    it's not until his arms are placed behind his back and handcuffs

11    are placed on him that he realizes that the people he thought

12    were robbers were actually cops.

13          As he's on the ground, the police officers never give

14    him an opportunity to get up.  In fact, as he's trying to get

15    up, he is struck in the head with some object.  To this day, he

16    doesn't know what it was.  It was cold, hard, and metal.  And he

17    starts to feel a lump developing on the side of his head.  But,

18    again, police officers never give him an opportunity to stand.

19    He stopped struggling.  And they pick him up like a rag doll.

20    They pick him up from his belt loops, from his shoulders, and

21    throw him head-first into the police car.

22          As he reaches the police car, he takes a sigh of

23    relief, he figures this abuse at least has ended.  But he only

24    has that relief for a moment or two because one of the officers,

25    defendant Officer Corcoran -- I'm sorry, Rubald, hops in the

1    back seat with him.  Sits next to him.  Al figures, okay, he's

2    going to ride next to me to the station to make sure I don't do

3    anything.  But instead Officer Rubald starts to punch him

4    repeatedly in his abdomen.  And he saves the very last punch for

5    the most crucial area, his groin.  Al cries out, but there's

6    nothing he can do.  He's handcuffed at this time.  He's in the

7    back of a squad car.  He doesn't really know exactly what just

8    happened.  He wasn't doing anything but riding his bicycle.

9            As this was going on, Al's cousin Erica, who he had

10   spoke to briefly down the street in front of the fast-food

11   place, she saw the commotion.  She ran down the street to see

12   what was going on, why was it they were stopping her uncle, why

13   was it they were hitting her uncle, why were they standing on

14   his neck, why did they hit him in the head with an object.

15           As she tries to approach, police officers say to her,

16   Get your black ass back before you get arrested, too.  So she

17   complies.  She's a small woman.  There wasn't much she could do.

18   So she did the one thing she knew to do, which was to tell a

19   neighbor kid, Run and get my mom.

20           They can't stop the arrest, but Erica stands there.

21   She waits for her mother Debbie.  And together they stand and

22   watch as Al is carried away.

23           Now you would think this would be the end of

24   Mr. Williams' nightmare, but instead this was the beginning of a

25   more than a year and a half long battle to prove his innocence.

1    Because at this point, Mr. Williams is being taken to the police

2    station.  He sustained injuries.  He has the big knot on his

3    forehead I mentioned before.  He has an almost identical knot on

4    his shoulder.  He has bruises and he has pain all over.

5         These police officers had taken him to the police

6    station.  He still doesn't know why.  Once he arrived at the

7    police station, he is finally told that he's being charged with

8    possession of a controlled substance.  He doesn't know what

9    controlled substance because he didn't have anything on him.

10        So at this point, Al decides, well, it's time to be

11   quiet, I've been beaten and bullied enough today, I'm just going

12   to be quiet.

13        And from that point, Mr. Williams -- the police

14   officers began their process.  They had made a mistake in

15   stopping Mr. Williams in the first place.  But rather than

16   correct their mistake, it snowballed, and they have to cover up

17   what they had done.  So one mistake was followed by another

18   action followed by another action.

19        So the police officers began their process.  They

20   filled out their reports.  They signed a complaint against

21   Mr. Williams, a criminal complaint, so that it could proceed in

22   court.  They faxed these materials over to the State's

23   Attorney's office.  A State's Attorney stood up at the bench and

24   told a judge the lies that the police officer had told him.

25        And, therefore, began the process of Mr. Williams

1    fighting his case for a year and a half.

2          The first 40 days of this battle, the first 40 nights

3    of this battle were spent in Cook County Jail because Al

4    Williams did not have the $2,000 bond that it took to be bonded

5    out of Cook County Jail.

6          It took 40 days for his family and friends to figure

7    out how they're going to scrape together the money to get him

8    out and they still weren't able to do it.  Al didn't have any

9    money.

10         So actually while he was in jail, he was assigned to a

11   free lawyer, a lawyer from the Public Defender's office took his

12   case.  And while the two of them crafted the way that they were

13   going to fight the case and talked and discussed their plans for

14   trying to take this to trial, his family reached out to his

15   employer, Mr. Cooper, who you will actually hear from today.

16   And Mr. Cooper felt that Al was so necessary to him that he will

17   put up the money in order to bond him out.

18         So after these 40 days, then Al was then able to fight

19   his case from out of custody.

20         And a year and a half almost later, in July of 2008, Al

21   Williams finally had his not one day, but two days in court.  He

22   had a jury trial, much like this.  But as the judge told you

23   before, it's a different standard in this courtroom than it was

24   in that one at 26th and California.  And after two days of --

25   two days of the jury trial -- and all three of the defendant

1    officers, Corcoran, Leck, and Rubald, all testified against

2    Mr. Williams.  Mr. Williams was the sole witness for the

3    defense.  And after the jury heard all of the evidence in the

4    case and the numerous witnesses who took the stand to say he had

5    drugs on him that day, no matter the fact that he kept disputing

6    that he ever had drugs on him that day, a jury came back and

7    returned a not guilty verdict against Mr. Williams.

8            They decided, after hearing all of the evidence, that

9    they believed Mr. Williams, not the three defendant officers.

10           Now, as the judge told you before, and I've told you as

11   well, this is not a criminal trial.  This is a civil trial.  So

12   there's a different burden here.  And as the plaintiffs in this

13   matter, we actually have the burden and we proudly carry the

14   burden, and we are convinced that we will meet that burden

15   today.

16           And as the judge suggested to you the burden, the

17   burden is by a preponderance of the evidence.  And she already

18   actually referred you to the scales of justice where you see

19   Lady Justice with the two scales and they're evenly balanced.

20           And one way to think of a preponderance standard is

21   placing a feather on just one side of that scale.  It's not as

22   high of a burden as the reasonable doubt standard, which is the

23   highest in the land, possibly the highest in the world.  It's

24   not that burden.  It's a much lower burden.  And the burden that

25   we carry is a preponderance of the evidence that it is more

1    likely than not that these police officers are liable for their

2    actions against Mr. Al Williams that day; that they're liable

3    for hitting him in the head; that they're liable for standing on

4    his neck; that they're liable for punching him in his stomach

5    and in his groin; and then for initiating and proceeding this

6    unlawful arrest; for going forward with the unlawful

7    prosecution, when they could have stopped at any various stages

8    along and said you know what, what's been going on here is

9    simply not right.

10           So what we're asking you to do is to do the right

11   thing, is to look at this as a matter of justice and fairness --

12           MR. JONES:  Judge, I would object.  This is arguing

13   now.

14           THE COURT:  Yes.

15           MS. PREYAR:  I'll move on, Judge.

16           THE COURT:  Okay.

17           MS. PREYAR:  And we're certain that after you hear all

18   of the evidence in this matter that you'll return the only

19   verdict that protects those liberties set forth in the

20   U.S. Constitution under the Fourth Amendment, the liberties that

21   allow us to be safe in our homes, persons, and effects at all

22   times from illegal searches and seizures, because Mr. Williams

23   simply was not that day.

24           And in conclusion, again, when we think about police

25   officers, we think about heroes.  And I'm sure we'd like to

```
 1    continue --
 2              MR. JONES:  Judge, I'm going to object.  This is
 3    argument.
 4              THE COURT:  I think it's pretty -- it can be argument.
 5    We'll say it's argument.
 6              MS. PREYAR:  Okay.  We're convinced that after you hear
 7    all of the evidence in this matter that you'll return the only
 8    verdict possible against these defendant officers Rubald,
 9    Corcoran, and Leck, and that is a finding of liability on all
10    counts.
11              Thank you.
12              THE COURT:  Thank you, Miss Preyar.  Sorry I
13    mispronounced your name.
14              Mr. Jones?
15              MR. JONES:  Yes, your Honor.
16              May it please the Court, Ladies and Gentlemen of the
17    Jury, Counsel.
18              It is my pleasure, along with Jorge Cazares, Uma
19    Chandrasekaran, to represent these police officers.
20              In fact, before I begin, I'd like to introduce these
21    police officers to you because each of these police officers is
22    going to testify.
23              First I'd like to introduce you to Officer Zachary
24    Rubald.  Thank you, Officer.
25              He will tell you when he testifies that he's a native
```

1    Chicagoan, who graduated from North Park College, and he's been

2    a police officer for nine years.

3            Second, I'd like to introduce to you Officer Scott

4    Leck.  Officer Leck will tell you that he hails from Wisconsin,

5    where he graduated from St. Xavier University.  In Wisconsin, he

6    was a police officer for one year before coming to Chicago,

7    where he's been a police officer all that time except for the

8    one year that he was stationed in Iraq as a United States

9    Marine.

10           Third, I would introduce you to Brendan Corcoran.  He

11   will tell you that he grew up on the south side of Chicago, that

12   he graduated from Eastern University Illinois, and has been a

13   Chicago police officer for ten years.

14           You know, by listening to us, you know from the outset

15   of this case, that we have emphatically asserted our innocence,

16   and that these police officers will tell you and the evidence

17   will --

18           MS. PREYAR:  Judge, that's not the standard.  It's not

19   a matter --

20           MR. JONES:  I'm telling what the officers are going to

21   tell them, Judge.

22           THE COURT:  I'm sorry?

23           MS. PREYAR:  My objection was that's not the standard.

24   He said we're asserting our innocence.  It's a matter of

25   liability, not guilt or innocence.

1          THE COURT:  All right.

2          MR. JONES:  However she wants to put it.  We're telling

3     you we didn't do it.  And the evidence will substantiate that.

4     And the evidence will substantiate that they didn't maliciously

5     prosecute anyone.

6          Now, just like Counsel said to you, before I begin this

7     in-depth review of the case, let me just give you this moment

8     perspective like Counsel did.

9          In deciding this case, you're not going to be asked to

10    retry the criminal trial.  I'll talk to you about that a little

11    bit later.

12         You are going to be asked to make two critical

13    assessments.

14         The first assessment that you're going to be asked to

15    make is:  Did the police officers have probable cause to arrest

16    Mr. Williams?  That is, did they have reasonable grounds to

17    believe that Mr. Williams committed those crimes, either one of

18    the two, either resisting arrest or possessing narcotics.

19         And the second assessment that you will be asked to

20    make is the allegation of malicious prosecution itself.  It is

21    the issue of malice.  You will have to determine is there any

22    evidence in this case that the police officers conspired to

23    bring these charges against Mr. Williams other than the belief

24    that he was guilty of the charges themselves.

25         We will tell you, and the evidence will show, that the

1    evidence amassed against Mr. Williams at the time of his arrest,

2    that you will be the people who will determine the credibility

3    this time, clearly establishes probable cause.

4         The evidence will show you that none of these witnesses

5    knew Mr. Williams on the day of the arrest.  None of them had

6    any ax to grind with Mr. Williams.  And in that context, there

7    will not be a shred of evidence that will show that they joined

8    in some conspiracy to violate Mr. Williams' rights.

9         Now, let's focus in depth on what happens this day,

10   May 31st, 2007.

11        On this evening, at 8:15, approximately 8:15,

12   Officers Rubald, Leck, and Corcoran, along with two other

13   officers who are not here, Officers Gentzle and Officer Jaros,

14   were assigned to the area on East 79th Street.

15        These officers belong to a special unit that rove from

16   day to day, depending upon the identification of spikes in crime

17   in their particular neighborhood.

18        Now, on this particular evening, these officers did

19   their tour of duty in two separate cars.

20        Officers Rubald and Officer Leck rode in their own

21   individual car.  Now, mind you, now I want you to keep in mind,

22   these cars were marked cars.  While these officers are here

23   today in suit and tie, they were in uniform that day.

24        Officer Corcoran rode with two other officers, Gentzle

25   and Jaros.  And what they did this particular day was they split

 1   the cars up, and they were in the same vicinity within radio

 2   operation of each other.

 3          Somewhere around 8:15, Officers Rubald and Leck drove

 4   north on a street called Greenfield.

 5          Now, they've got all kind of high-tech stuff in this

 6   courtroom; but as you notice, I'm the old guy and I'm old

 7   school, and I'll leave it up to the younger ones to put things

 8   on the board.

 9          But let me just show you -- the first exhibit I'm going

10   to show you is an exhibit Defendants' 3 -- let me turn it the

11   right way -- to show you what was going on on this particular

12   evening.

13          What Officers Leck and Rubald do is they are driving

14   north on Greenwood.  And somewhere in the middle of Greenwood,

15   about 30 -- let's say about 30 feet before they get to 79th

16   Street, a concerned citizen, a black woman comes up to them,

17   while Officer Leck is driving, Officer Rubald is in the

18   passenger side, and she says to them, Officers, there's someone

19   up the street on 79th Street who is serving.  Now, this thing

20   "serving" is a term that's used in the neighborhood meaning that

21   he's serving narcotics.  And the woman describes it, she says,

22   Look, he is a black guy, he's got on a red shirt, and he's on

23   a -- he's got a bicycle.

24          So Officers Leck and Rubald -- the reason they're

25   traveling up the wrong side of the street is because it's good

1    police procedure.  It catches the bad guys off guard.  So they

2    go up to 79th Street.  They immediately look both ways.  They

3    look east 79th Street, they look west 79th Street.

4           And what do they see?  They see over here on the east

5    side of 79th Street, they see Mr. Williams, whose got a big red

6    shirt that I'm going to show you in a second, and is on a

7    child's bicycle, and they see him crossing the street.

8           And what they do is -- they see him crossing the street

9    over -- this is a large sidewalk.  And so they immediately take

10   their car all the way from 79th Street, they travel west on 79th

11   Street.  They come up right behind right here on this sidewalk

12   because they see him coming.  And they want to block his path

13   because this woman has told them, there's somebody serving on

14   79th Street.

15          Let me show you Defendant's Exhibit 4 so you get a

16   better idea of what's going on here.

17          Now, this is Greenwood that they're coming up.  This is

18   the sidewalk right here as they were traveling.

19          What they do is they take their cars and they put the

20   car on the sidewalk.  And what they do is they block it

21   diagonally so that Mr. William -- so that they can block his

22   getting around them.  Right there on the sidewalk.  As you can

23   see, this sidewalk can hold a couple of cars.  But they put it

24   right about here, and they block it diagonally so as to attempt

25   to stop Mr. Williams.

1          But what does Mr. Williams do?

2          Mr. Williams, who is riding that bicycle, instead of

3   stopping -- and mind you, Officer -- Officer Rubald is almost as

4   close as I am to you, Ladies and Gentlemen.  He's close

5   enough -- he's got that bicycle to almost put his hands out and

6   reach it.

7          But what Mr. Williams does is he tries to scoot around

8   the officers riding that bicycle.

9          And what happens to him is he bangs into this pole.

10  And when he bangs into that pole, out of his hands drops the

11  first packet, which is a clear plastic bag that looks like to

12  the officers that it's crack cocaine.  So while he's stopped

13  there, Officer Rubald jumps out of the car.  Officer Leck also

14  jumps out of the car.  And they immediately -- they pick up the

15  packet.  They take Mr. Williams by his arm back over to the car.

16  They turn him around and they said, Look, you're under arrest

17  and we're going to put the handcuffs on you.

18         Now, Ladies and Gentlemen, that's when all hell breaks

19  out because what Mr. Williams will not allow them to do is he

20  will not allow them to handcuff him.

21         Now, he starts stiffening his arms.  He starts flailing

22  his arms.  He absolutely will not do that.

23         Now, let me tell you this.  There's an account here,

24  we're going to show you, there's no excessive arrest here

25  because the officers never hit him.  Now you take a look at

1    these officers.  Now, if they really wanted to stop him, they

2    would have knocked him out.  They would have done -- never did

3    any of that.

4            What Officer Rubald decides that he has to do, because

5    he will not be handcuffed, is Officer Rubald manages to trip him

6    so that they can finally put the cuffs on him.

7            And what -- and what happens in the interim -- and mind

8    you, this whole thing only takes about a minute and a half.

9    That's it.  I mean, there is no guns are ever drawn on him.

10   He's never punched out there in the street.  There were a lot of

11   ways if he wanted to be excessive to bring him down, but they

12   didn't do that.  No guns were ever drawn on him.  And

13   Officer Corcoran, who is in another car, Officer Leck calls, to

14   the other guys in the car, and he calls -- Officer Corcoran

15   comes running up.  By the time Officer Corcoran gets there, they

16   finally got the cuffs on him.

17           And what you're going to hear is the reason they do all

18   of this is that nothing was ever done to him except trying to

19   put those cuffs on him.

20           Now, Mr. Williams finally is subdued and he is --

21   finally the cuffs are finally put on him, but he still won't

22   stop fighting.  He won't get into the squad car.  He won't let

23   his legs be put in.  And they're finally trying to get him in,

24   and they finally do.

25           The only injury that Mr. Williams suffers is an injury

1    to his forehead, which is an abrasion.

2              Now let me show you this.  This is Mr. Williams on

3    May 31st, 2007.

4              Excuse me for a second while I clean this up.  All

5    right.

6              The only issue -- the only injury, and we'll talk about

7    this, the only injury he suffers is an abrasion to the forehead.

8    And he would not have gotten that abrasion to the forehead if he

9    had not been struggling with the police or refused to submit.

10             At the station, Mr. Williams was processed by an

11   independent group of police officers that you're going to hear

12   in this trial from.

13             And those police officers, they fingerprinted him, they

14   photographed him, and they made observations around -- about the

15   abrasion on his forehead.

16             And significantly, Ladies and Gentlemen, they ask him

17   whether he wanted medical treatment of any kind.  And I'm going

18   to talk a little bit later about that because it goes to the

19   crux of their case.  Mr. Williams refused any medical treatment.

20             Now, we'll tell you this, that the crack cocaine -- oh,

21   I forgot one other thing, that when they stood Mr. Williams up,

22   as they were wrestling, they finally got him to the car.

23   Officer Rubald reached into his other pants pocket and came out

24   with another envelope, a little -- that plastic containing crack

25   cocaine, had total pieces of crack cocaine, 1.5 grams totaling

1    somewhere between $3300 street value.  And the crime laboratory

2    in this particular case found that it was crack cocaine.

3           Now, I want to get to Counsel's point, and I'll tell

4    you what the evidence is going to show.  There's no question,

5    yes, in this particular case, this jury acquitted him of the

6    crack cocaine.  He was never tried, I might say, for resisting

7    arrest.  I say to you that, yes, acquittal, however, doesn't

8    mean that he didn't do it or that he was innocent.  And while it

9    is --

10          MS. PREYAR:  Judge, that's argument.

11          THE COURT:  All right.

12          MR. JONES:  All right.  Well, it's not our burden in

13   this case -- I'll tell you what, we're going to put enough

14   evidence on in this case to show you that he did.

15          Now, just remember that in this case we've talked

16   about -- we're going to do that despite that the legal burdens

17   are different.  Here all we have to do is show that the officers

18   had probable cause to make the arrest.

19          Now, as Counsel for the defense has told you, they

20   premised this whole case on this fact:  They say to you somehow

21   that when these officers got to the station that they decided

22   that Mr. Williams' injuries were so severe that they had to make

23   up this whole story, that somehow because his injuries are so

24   severe that they had to plant cocaine on him.

25          The evidence will show you that this is absolutely

1   absurd.

2            First, the only injury suffered was an abrasion.  You

3   will hear that that injury was never bandaged, it was never

4   stitched, it was never x-rayed.  There was never, because the

5   injury was so minor, there was never anything done with this

6   particular injury.

7            Now, the officers -- to show you, as the evidence will

8   show that this is absurd, as I said, the officers had never met

9   Mr. Williams prior to May 31st, 2007.  By his own admission,

10  they were not attempting to get evidence out of him.  Nobody

11  ever tried to jump on him and say we're going to make you

12  confess to something.  None of that happened.

13           Better yet, the evidence will show that Mr. Williams

14  knew that he hadn't received any injuries.

15           First, when he got to the station, he was asked by

16  Officer Rubald whether he wanted any medical treatment.

17           Officer Rubald documented in the reports that he said,

18  no, he didn't want to.

19           But even better than that, Ladies and Gentlemen of the

20  Jury, we're going to bring in, this case, we're going to bring

21  in two officers who were in the lock-up.  And significantly

22  there's no issue of race here.  These two officers, who didn't

23  know these three white officers from Adam, happened to be

24  African-Americans, and these two officers are going to tell you

25  that they remember Mr. Williams because he was cursing and

1    having such -- he was so outlandish, but they remember him, and

2    they specifically noted in their notes, they asked him whether

3    he wanted any medical treatment, and he said no.

4            And then, thirdly, we're going to bring in to this

5    trial, so that you can get all the facts, we're going to bring

6    in the watch commander who was there that night, Officer

7    Brundage, who goes back into Mr. Williams' cell and asks him do

8    you want any medical treatment of any kind?  And of course he

9    refuses for the third and fourth time.

10           And even when Mr. Williams is sent over finally to the

11   Cook County Jail, they take a look at his injuries.  They come

12   up -- the only thing they put -- they don't treat him for

13   anything.  They say he's got an abrasion to the forehead.

14   You'll see those records.

15           We will say to you and we believe clearly that the

16   evidence will show during the course of this trial that

17   Mr. Williams' claims are false; that he has lied, repeatedly;

18   and that the officers in this case were absolutely correct and

19   that they had probable cause to effectuate his arrest.

20           At the conclusion of this case, we're going to ask you

21   to come in and find the three of my clients not liable for any

22   of the claims that he has made.

23           Thank you, your Honor.

24       (Clerk conferring with Judge Lefkow.)

25           THE CLERK:  Would anybody like a notebook?

```
 1          (Clerk distributing notebooks.)

 2               MR. SHILLER:  Your Honor, plaintiffs call Richard

 3     Cooper.

 4               THE COURT:  Just a moment here.

 5          (Witness enters courtroom.)

 6               THE COURT:  Step up here to the witness stand.  And

 7     before you sit down, we'll ask that you raise your right hand

 8     and be sworn.

 9          (Witness duly sworn.)

10               THE CLERK:  Thank you.  Be seated.  Right there, the

11     black seat.

12               THE COURT:  Right there.

13                 RICHARD COOPER, PLAINTIFF'S WITNESS, SWORN

14                          DIRECT EXAMINATION

15     BY MR. SHILLER:

16     Q   Good afternoon.  Can you state your name and spell it for

17     the court reporter?

18     A   Richard D. Cooper.  R-I-C-H-A-R-D.  C-O-O-P-E-R.

19     Q   How old are you, Mr. Cooper?

20     A   How old am I?

21     Q   Yes.

22     A   82, sir.

23     Q   And what do you do for a living?

24     A   I'm in the moving business.

25     Q   Okay.  By being in the moving business, what does that mean?
```

Cooper - Direct

1  What do you do?

2  A   I do moving.

3  Q   Okay.  Do you own the business?

4  A   I'm one of them, yeah.

5  Q   What's the name of the business?

6  A   Cooper's Movers.

7  Q   Okay.  Do you know Al Williams?

8  A   Do I what?

9  Q   Do you know Al Williams?

10  A   Yes, sir.

11  Q   How do you know him?

12  A   Well, he works for us.

13  Q   Okay.  How long has he worked for you?

14  A   Oh, for about ten years or better or so.

15  Q   Okay.  Was he working for you in May of 2007?

16  A   Yes, he was, sir.

17  Q   Okay.  Did something occur in May of 2007 that prevented him

18  from working for you for a little while?

19  A   Well, I think he was in jail.  He got locked up temporarily.

20  Q   Okay.  Do you have an estimation on how much in lost wages

21  Mr. Williams lost when he was locked up?

22  A   Oh, I'd say 4 or $500.

23  Q   Okay.  And do you know -- do you know how Mr. Williams

24  eventually got out of jail?

25  A   How is that?

Cooper - Direct

1   Q   Do you know how Mr. Williams eventually got out of jail?

2   A   Yes, sir.

3   Q   How?

4   A   I put up a bond for him.

5   Q   Okay.  I just want to ask a couple other questions.

6       Do you have any payroll records for Mr. Williams?

7   A   No, sir, I don't.

8   Q   Why not?

9   A   Well, we don't -- we don't -- we don't -- we -- we're not

10  adequate enough to keep records.  We're not that big.

11  Q   So is it fair to say you paid Mr. Williams in cash?

12  A   Yes, sir.

13  Q   Okay.

14      MR. SHILLER:  Can I have one moment, your Honor?

15      (Counsel conferring.)

16      MR. SHILLER:  I have nothing further.

17      MR. JONES:  Just a second, Judge.

18                  CROSS-EXAMINATION

19  BY MR. JONES:

20  Q   Good afternoon, Mr. Cooper.

21  A   Yes, sir, how are you?

22  Q   Fine.  How are you today?

23  A   Good.

24  Q   Well, let me see if I got this right.

25      As I understand it, you don't have any records that

Cooper - Cross

1    would verify that Mr. Williams ever worked for you a day in his

2    life; is that correct?

3    A    No, sir, we don't have any records.

4    Q    Don't have any.

5              In fact, let's just cut through this.

6              You don't have any records indicating the hours or the

7    days he ever worked, right?

8    A    No, sir.  We don't -- we don't -- we don't keep records.

9    We're not adequate to --

10   Q    No, just listen to my question because I'm going to go

11   through them all with you.

12   A    Ah-ha.

13   Q    You don't have any records regarding ever giving this man a

14   W-2, do you?

15   A    No, sir.

16   Q    In fact, it would probably be safe to say you never gave him

17   a W-2, right?

18   A    That's right, sir.

19   Q    In fact, the truth of the matter is you don't have any

20   records indicating he ever got a 1099, right?

21   A    That's right, sir.

22   Q    All right.  You have no records indicating any application

23   for employment, do you?

24   A    No, sir.

25   Q    You don't have any records indicating payroll records for

Cooper - Cross

1   this man, do you?

2   A    That's right.

3   Q    You don't have any records that would talk to you about what

4   his job description was, do you?

5   A    That's right, sir.

6   Q    And this moving business that you say that you own, sir, you

7   don't even have a receptionist at this business, do you?

8   A    Not now, sir, no.

9   Q    And even -- you know, you gave a deposition in this case,

10  you remember that?

11       You remember you were brought in and you had -- it

12  wasn't me, but you probably had to talk to one of my lawyers,

13  probably Uma Chandrasekaran, do you remember that?

14  A    Yes, sir.

15  Q    And you even admitted that the truth of the matter is that

16  Mr. Williams seldom worked for you, isn't that what you told us?

17  A    Yes, sir.  Ah-ha.

18  Q    And you also told us that if Mr. Williams worked for you two

19  days a week, that was doing good; isn't that what you told us?

20  A    Yes, sir.

21  Q    And because you don't have any records of any kind regarding

22  Mr. Williams, you can't tell us what days he worked, if any,

23  during 2007, can you?

24  A    No, sir, I can't.

25  Q    And I got to, because you don't keep payroll records and the

Cooper - Cross

1   rest of that, you can't even really pay taxes yourself, can you?

2   A   That's correct, sir.

3            MR. SHILLER:  Objection.

4            THE COURT:  Sustained.

5            MR. JONES:  One second, Judge.

6       (Counsel conferring.)

7            MR. JONES:  I don't have anything further, Judge.

8            THE COURT:  All right.

9            MR. SHILLER:  Just one question.

10                      REDIRECT EXAMINATION

11  BY MR. SHILLER:

12  Q   Mr. Cooper, counsel asked you if you had any records to show

13  Mr. Williams' job description.

14            What was Mr. Williams' job description?

15  A   How is that, sir?

16  Q   What was Mr. Williams' job description?

17  A   What was his job?

18  Q   Yeah.

19  A   He helped us move furnitures.

20  Q   Okay, thank you.  I have no --

21            MR. JONES:  I do have a question then, Judge.

22                      RECROSS-EXAMINATION

23  BY MR. JONES:

24  Q   So at best, Mr. Williams would be what you would call a

25  helper, right?

Cooper - Recross

1   A   Yes, sir.

2   Q   Under no stretch of the imagination would you call him a

3   professional mover, would you?

4   A   Well, he knows how to move, sir.

5   Q   Well, would you call him a professional mover?

6   A   He's a good mover.

7   Q   Whenever it was that he worked.

8   A   Yes, sir.

9   Q   All right.  I don't have anything further, Judge.

10          MR. SHILLER:  Nothing further, your Honor.

11          THE COURT:  All right then.  Mr. Cooper, thank you for

12   coming in and giving us your testimony.

13          THE WITNESS:  Yes, ma'am.

14          THE COURT:  You're excused.

15          THE WITNESS:  Thank you, Judge.

16      (Witness excused.)

17      (Counsel conferring.)

18          MR. SHILLER:  Your Honor, we call Al Williams.

19          THE COURT:  All right.

20          Good afternoon, sir.

21          Raise your right hand and be sworn.

22      (Witness duly sworn.)

23          THE COURT:  You can sit down.

24              AL WILLIAMS, PLAINTIFF'S WITNESS, SWORN

25                      DIRECT EXAMINATION

                          Al Williams - Direct

1    BY MR. SHILLER:

2    Q    Can you state your name and spell it for the court reporter,

3    please?

4    A    Al Steve Williams.  A-L.  S-T-E-V-E.  W-I-L-L-I-A-M-S.

5              THE COURT:  Mr. Williams, you might want to adjust that

6    a little so it's more comfortable.  And if your chair -- if you

7    want to stand up to move your chair, just make sure that --

8              THE WITNESS:  Thank you.

9              THE COURT:  -- you're not distracted by -- there, that

10   looks a lot better.

11   BY MR. SHILLER:

12   Q    How old are you, Al?

13   A    39.

14   Q    Where were you born?

15   A    Chicago.

16   Q    Where did you grow up?

17   A    Inside of 79th Street.

18   Q    Okay.  Where do you live now?

19   A    7937 South Kimbark.

20   Q    Okay.  And what do you do for a living?

21   A    Move furniture.

22   Q    And what's your educational level?

23   A    Tenth grade.

24   Q    Okay.  And what's your marital status?

25   A    I'm single.

Al Williams - Direct

1   Q   Okay.  Are you -- do you have a girlfriend?

2   A   Yes.

3   Q   Okay.  What's her name?

4   A   Joyce Floyd.

5   Q   Do you have any children?

6   A   Yes.

7   Q   What are their names?

8   A   Al Clark.  Antonio Clark.  Isaiah Clark.  And Chianti

9   (phonetic) Adams.

10  Q   How old is Al Clark?

11  A   21.

12  Q   How old is Antonio?

13  A   20.

14  Q   I'm sorry, what was the third child?

15  A   Isaiah.

16  Q   How old is Isaiah?

17  A   19.

18  Q   And, I'm sorry, what was the fourth child?

19  A   Chianti.

20  Q   How old is Chianti?

21  A   13.

22  Q   Okay.  And you got any brothers and sisters?

23  A   One brother.

24  Q   What's his name?

25  A   David Williams.

Al Williams - Direct

1   Q   Got any cousins?

2   A   A lot of them.

3   Q   Okay.  You got any cousins who are here with you today in

4   this building?

5   A   Yes, sir.

6   Q   Who is that?

7   A   Erica Rucker.

8   Q   Okay.  And you got any aunts or uncles?

9   A   Yes.  Debbie Williams.

10  Q   Besides the one that's here in the building with you

11  today --

12  A   A lot of them.

13  Q   Okay.  Do you have a driver's license?

14  A   No, sir.

15  Q   Have you ever had a driver's license?

16  A   No, sir.

17  Q   Do you have a bank account?

18  A   No, sir.

19  Q   You already heard the testimony about Cooper -- how -- how

20  did you used to get paid?

21  A   By cash.

22  Q   Did you file taxes?

23  A   Yes, I did.

24  Q   So you reported that?

25  A   Yeah.

Al Williams - Direct

1   Q   And do you have any health insurance?

2   A   No, sir.

3   Q   Okay.  Do you have any physical problems?

4   A   I'm blind in my left eye.

5   Q   How did you get blind in your left eye?

6   A   During October the 31st of 2006, I was coming from the

7   grocery store and I was headed home, and someone rode up in a

8   car and shot me in the eye with a paintball gun.

9   Q   Let's slow down.  That was Halloween 2006?

10  A   Yes, sir.

11  Q   So it was about six months before this incident we're here

12  for today?

13  A   Yes.

14  Q   And you had -- and where did this happen at?  Where did you

15  get shot in the eye at?

16  A   79th and Dobson.

17  Q   Okay.  Where is Dobson relative to Ellis?

18  A   A block, a block after Ellis.

19  Q   A block which way, do you know?

20  A   A block -- a block going east.

21  Q   Okay.  Where is Dobson relative to Greenwood?

22  A   A block going east.

23  Q   Of what?

24  A   79th Street.

25  Q   Greenwood is a block goes east of what?  Dobson?

Al Williams - Direct

1   A    Yes.

2   Q    Okay.  Where is Kimbark relative to all three of these

3   streets?

4   A    Kimbark is maybe four -- four or five blocks from Dobson and

5   Greenwood.

6   Q    Okay.  Briefly, before we start talking about May 31st,

7   since you lost your eye in October -- on Halloween of 2006, did

8   that have any impact on your ability to see?

9   A    Yes, sir.

10  Q    Did it have an impact on your depth perception?

11  A    Yes, sir.

12  Q    Explain that impact.

13  A    Well, mostly, you know, I can't see out of this eye, so I

14  can't see nothing on this side.  Only I can see basically

15  forward ahead or to the right.

16  Q    Okay.  Did it have an impact on -- strike that.

17        What were you doing May 31st, 2007, when the day

18  started?

19  A    I was at home with my girlfriend, Joyce.

20  Q    Okay.  And where was home at that time?

21  A    1049 East 80th Street.

22  Q    Okay.  1049 East, what's the next closest major street to

23  that?

24  A    Greenwood.

25  Q    Is it safe to say 80th Street is one block away from 79th

Al Williams - Direct

1   Street?

2   A   Yes.

3   Q   Did you get up and leave at some point in the day?

4   A   Yes, I did.

5   Q   Why?

6   A   I got a phone call from my Auntie Debbie telling me that my

7   cousin was in town from Minnesota, and she wanted to see me

8   before she left.

9   Q   Okay.  What's your cousin's name?

10  A   Renee Johnson.

11  Q   So what did you do?

12  A   I got on my bike and I told Joyce I was going over to Debbie

13  house.

14  Q   Okay.  Where was Debbie's house, sir?

15  A   78th and Ingleside.

16  Q   Where is Ingleside relative to Ellis?

17  A   Ingleside is the next block from Ellis.

18  Q   The next block in which direction?

19  A   Going west.

20  Q   Okay.  So just correct me if I'm wrong, it goes Ingleside,

21  Ellis, Dobson, Greenwood.

22  A   Yes.

23  Q   Going from west to east?

24  A   Yes.

25  Q   And -- and, I'm sorry, where did you say she was at?  78th

Al Williams - Direct

1   and Ingleside?

2   A    Yes, sir.

3   Q    So how long were you at your Aunt Debbie's house?

4   A    Couple of hours.

5   Q    What were you doing?

6   A    Sitting there talking, you know, talking about the days when

7   we grew up and everything.

8   Q    Who all was there?

9   A    My aunt.  Her husband.  And all her children.

10  Q    Okay.  Did you leave at some point in time?

11  A    Yes.

12  Q    Where were you going?

13  A    Back home.

14  Q    Okay.  Did you do anything before you left?

15  A    No, not really.  I told them I was going to go home and I'd

16  talk to them the next day.

17  Q    Okay.  Did you call anybody?

18  A    I called Joyce and told her I was on my way home.

19  Q    Okay.  Do you know about what time that was?

20  A    Around about 5:00 or 5:15.

21  Q    Okay.  And then after you called Joyce, what did you do?

22  A    I got on my bike and I left out of the house to go home.

23  Q    Okay.  Initially I'm going to show you -- I'm going to show

24  you -- it's not -- just you can see it for now.  Exhibit 14C.

25         Do you recognize that, what that picture -- can you see

Al Williams - Direct

```
 1   it on your screen?  Can you see it on the screen?
 2   A   No, sir.
 3            MR. SHILLER:  Judge, how do I --
 4            THE COURT:  Let me see if I can figure it out here.
 5            MR. SHILLER:  I can approach.  I was just trying to use
 6   the courtroom technology.
 7        (Brief pause.)
 8            THE COURT:  Now it should be available only to the
 9   witness.
10            MR. SHILLER:  Is it?
11            THE COURT:  Yes.
12   BY MR. SHILLER:
13   Q   Can you see it on the screen, Al?
14   A   Yes.
15   Q   Do you recognize that?
16   A   Yes.
17   Q   What's that a picture of?
18   A   That's the corner, north side of 79th and Ingleside.
19   Q   Okay.  Does that picture -- I'm sorry, which direction is
20   that looking in?  Do you know?
21   A   It's looking going towards east.
22   Q   Okay.  And does that picture truly and accurately depict the
23   north side of Ingleside and 79th looking east as it was in May
24   of 2007?
25   A   Yes, sir.
```

Al Williams - Direct

1     MR. SHILLER:  We would ask to admit and to publish

2  Exhibit 14C for a second.

3     MR. JONES:  Judge, we don't have any objection.

4     THE COURT:  All right.  Exhibit is received in

5  evidence.

6     (Plaintiff's Exhibit 14C received in evidence.)

7     THE COURT:  You may publish.

8     (Said exhibit published to the jury.)

9     MR. SHILLER:  They got this little high-tech thing on

10  this computer.  I believe you can actually touch and make lines.

11  BY MR. SHILLER:

12  Q   Can you point out to the jury which direction you were

13  coming from when you were coming up Ingleside on your bike?

14  A   This -- put on the screen you say?

15  Q   I think if you touch the screen and you draw your finger

16  along it, it will actually make a line.  Or maybe not.

17     THE COURT:  He hasn't touched it yet.

18  BY MR. SHILLER:

19  Q   Are you touching the screen?

20  A   Uh-hum.

21  Q   Okay.  It's not working?

22     Can you -- well, can you describe, were you going --

23  describe going from left to right or right to left which

24  direction were you coming from?

25  A   Came from the 78th side of Ingleside to 79th and made a left

Al Williams - Direct

1   going east.

2   Q   Okay.  Is it safe to say that you came up this direction

3   like this, on Ingleside to 79th?

4   A   Yes.

5   Q   Okay.  And then after you did that, you made a left to go

6   down --

7              MR. JONES:  Objection.  Leading, Judge.  Let him tell

8   us what he did.

9              MR. SHILLER:  I'm sorry, I was --

10             THE COURT:  You see, there is a mark on the screen now

11  so ...

12             MR. SHILLER:  Can I have him step down and point out on

13  the screen since I can't have him use the technology on the

14  computer?

15             THE COURT:  Yes.  It was working though.

16             MR. SHILLER:  Can you step down?

17      (Witness complies.)

18  BY MR. SHILLER:

19  Q   Can you show the jury, pointing on the picture, the

20  direction you took coming from 78th and Ingleside to this

21  corner?

22  A   Came from 78th and Ingleside to this corner here, and I made

23  a left, going straight up on the sidewalk, towards -- towards

24  the east, north side of the street.

25  Q   Okay.  And that direction, going into the picture, that's

Al Williams - Direct

1   going east?

2   A    Yes, sir.

3   Q    Okay.  Have a seat.  I'm going to grab another picture.  And

4   we'll just keep doing it that way.

5        (Witness complies.)

6   Q    Okay.  When you were going east, you were on the sidewalk?

7   A    Yes, sir.

8   Q    Was there any particular reason you were traveling on the

9   sidewalk?

10  A    Due to the injury to my eye, I can't see well, so I was

11  trying to be careful instead of riding in the streets.

12  Q    Okay.  And were there any people on the sidewalk?

13  A    Yes, there was a few people.

14  Q    Okay.  And, I'm sorry, what did you say is the next street

15  after -- the next street after Ingleside going east?

16  A    That would be Ellis.

17  Q    Okay.  I'm showing you --

18       (Counsel conferring.)

19  Q    I'm showing you what was previously marked as 14D.

20           Do you recognize that -- what that's a picture of?

21  A    Yes.

22  Q    What is that a picture of?

23  A    That's showing the front of 79th Street.

24  Q    Looking in what direction?

25  A    Going -- looking in the west direction.

Al Williams - Direct

1   Q   Okay.  What's the -- what's the biggest street you see

2   there?  If any.

3   A   79th Street.

4   Q   Okay.  What's the biggest north-south street you see, if

5   any?

6   A   That would be -- can you ask that question again, please?

7   Q   Sure.

8           Can you tell what that north -- what the street is with

9   the lights on it?

10  A   It would be Ellis right there.

11  Q   Okay.  And does this pictures truly and accurately depict

12  79th by Ellis as it was in May of 2007?

13  A   Yes, sir.

14          MR. SHILLER:  I'd ask that the picture be admitted and

15  published to the jury.

16          MR. JONES:  I don't have any objection, Judge.

17          THE COURT:  All right.

18      (Plaintiff's Exhibit 14D received in evidence.)

19          THE COURT:  You may publish.

20          Let's see here.  Turn it on.

21      (Said exhibit published to the jury.)

22          MR. SHILLER:  Can the witness step down, please?

23          THE COURT:  Yes.  Would you put your finger on there

24  and see if it works now, if you just mark it?

25          THE WITNESS:  (Indicating.)

Al Williams - Direct

1              THE COURT:  Yeah, I think it will work.

2    BY MR. SHILLER:

3    Q    Al, which direction is this picture looking?

4    A    West.

5    Q    Okay.  And what was on the -- at this time, in May of 2007,

6    what was on the northwest corner of 79th and Ellis?

7    A    That would be a small mini-mart store and a fast-food

8    restaurant called Billy Boy's.

9    Q    Okay.  Can you point to where the mini-mart store was at?

10   A    Right at the corner, right there, where the first red --

11   where my finger there, where the red and yellow sign right there

12   on the corner.

13   Q    Can you point to where the Billy Boy's --

14   A    On the opposite sign, where the other sign at, on here.

15   Q    Okay.  On 79th itself?

16   A    Yes.

17   Q    Okay.  And can you show the route you took in that picture

18   when you turned onto the sidewalk from Ingleside and started

19   going east?

20   A    Yes.  I came straight up on the north side of -- I came

21   straight up on the north side of -- on the side of the street,

22   and I crossed the street at the light, right here on the corner

23   from this store.  Came across, by where the bus is.  I came

24   across the other side of the sidewalk.

25   Q    Okay.  Did you do anything before you crossed the street and

Al Williams - Direct

1    came across to the sidewalk?

2    A   Yes.

3    Q   What was that?

4    A   I saw my cousin Erica standing by the fast-food restaurant,

5    and I spoke to her for two minutes.

6    Q   Okay.  And then what -- and then what did you do?

7    A   I told her I'll see you tomorrow and proceed to head home.

8    Q   And after you crossed there at the sidewalk, then what route

9    did you take?

10   A   At that -- after I crossed at the sidewalk, to the south

11   side of the street, I was headed east, but I didn't make it that

12   far.

13   Q   Okay.  Before we go there, I'm going to show you a couple

14   other pictures, and then we're going to come back to this

15   picture, okay?

16         I just want to show you one or two other pictures and

17   then we'll come back.

18      (Counsel conferring.)

19   Q   I'm showing you what was previously marked as 14H.

20         We're doing this out of order just to make everybody's

21   life confusing -- I'm sorry, you want -- you've got to turn off

22   the screen.

23         THE COURT:  (Indicating.)

24   BY MR. SHILLER:

25   Q   Can you tell what that's a picture of?

Al Williams - Direct

1   A    Yes.

2   Q    What is that a picture of?

3   A    Showing picture of the south side of 79th Street.

4   Q    79th and what street?

5   A    That's between Dobson and Greenwood.

6   Q    Okay.  And does that truly and accurately depict the corner

7   of 79th and -- 79th between Dobson and Greenwood as it was in

8   May of 2007?

9   A    Yes, sir.

10             MR. SHILLER:  Okay.  I'd ask that it be admitted and

11  published.

12             MR. JONES:  Not a problem, Judge.

13             THE COURT:  All right.

14        (Plaintiff's Exhibit 14H received in evidence.)

15        (Said exhibit published to the jury.)

16  BY MR. SHILLER:

17  Q    What is that big space that's on the left side of that

18  picture?

19  A    Pardon me?

20  Q    What is that big space that's on the left side of that

21  picture?

22  A    That's a vacant lot.

23  Q    Was that vacant lot there in May of 2007?

24  A    Yes.

25  Q    Okay.

Al Williams - Direct

1              MR. SHILLER:  Can you turn that off for a minute, your

2    Honor, please?

3              THE COURT:  All right.  (Indicating.)

4    BY MR. SHILLER:

5    Q   I'm showing you 14I.  What's that a picture of?

6    A   Picture of 79th Street right off of Greenwood.

7    Q   Okay.  Does that picture truly and accurately depict 79th

8    right off of Greenwood as it was in May of 2007?

9    A   Yes, sir.

10             MR. SHILLER:  I ask that be admitted and published.

11             MR. JONES:  Yes, your Honor.

12             THE COURT:  All right.

13        (Plaintiff's Exhibit 14I received in evidence.)

14        (Said exhibit published to the jury.)

15   BY MR. SHILLER:

16   Q   Is that just a closer picture of the same corner we just

17   looked at?

18   A   No.

19   Q   Okay.  Well, is that vacant lot on the right-hand side of

20   that picture the same vacant lot we saw on the left-hand side of

21   the other picture?

22   A   Yes.

23   Q   Okay, thank you.

24             Now, just to be clear, how many streets are there in

25   between Ellis and Greenwood?

Al Williams - Direct

1  A    Three between Ellis and Greenwood.

2  Q    What -- how many -- how many streets are there between?

3  A    There's two.

4  Q    Okay.  There's two blocks or two streets?

5  A    Two blocks.

6  Q    Okay.  And what's the street that cuts off those two blocks?

7  A    That would be Greenwood, I believe.

8  Q    What's the street in between Ellis and Greenwood?

9  A    Oh, Dobson.

10 Q    Okay.  I'm going back to showing you what was previously

11 admitted and published, Exhibit 14D.

12      MR. SHILLER:  If we could republish that to the jury,

13 your Honor.

14      THE COURT:  All right.  (Indicating.)

15 BY MR. SHILLER:

16 Q    Now, you remember -- you described -- you said you came

17 across the street and you started to come east, which is towards

18 us in this picture?

19 A    Yes.

20 Q    How far did you get?

21 A    No farther than along by the black fence, before the fence.

22 Q    Okay.  What happened when you got to -- by the black fence?

23 A    Well, when I was rise -- something knocked me off my bike.

24 I didn't know what it was.

25 Q    Okay.  And where in this -- is it in this picture where you

Al Williams - Direct

1    got knocked off the bike?

2    A    Yes, sir.

3    Q    Point to where it is.

4    A    On the sidewalk right there on the side by the gate.

5    Q    Is there -- is there an opening in that area by that gate?

6    A    Yes.  It's an alley.  And on the parking lot on the side

7    where the cars park by a building and it's a alley.

8    Q    Okay.  Just to be clear, how fast were you riding your bike?

9    A    Not fast.

10   Q    Okay.  And where exactly on the sidewalk were you riding?

11   A    Say again?

12   Q    Where exactly on the sidewalk were you riding?  Closer to

13   the street or closer to the buildings?

14   A    I was basically closer to the buildings.

15   Q    Okay.  And how many people would you, if any, were on the

16   street that day?

17   A    Maybe 10 or 15.

18   Q    Okay.  And do you see in this picture those trees, were

19   those still there that day?

20   A    Yes.

21   Q    Okay.  So you said you got knocked off your bike.

22   Specifically what happened?

23   A    Someone knocked me off my bike from the back.

24   Q    And then what happened?

25   A    The next time -- when I was knocked off my bike, I was

Al Williams - Direct

1   wondering what was -- I fell to the ground, and I felt somebody

2   behind me, grabbing on me and pulling on me.

3   Q   Okay.  What did you think was happening at the time?

4   A   At the time, I thought I was being robbed.

5   Q   Okay.  And just to be clear, what were you wearing that day?

6   A   A red -- a red jersey and some blue shorts.

7   Q   Okay.  And did you have anything on you?

8   A   No, sir.

9   Q   Did you have a wallet?

10  A   No, sir.

11  Q   Did you have any money?

12  A   No, sir.

13  Q   Did you have any drugs?

14  A   No, sir.

15  Q   Had you had any drugs on you at all that day?

16  A   No, sir.

17  Q   Had you been selling drugs that day?

18  A   No, sir.

19  Q   So after you are on the ground and you're thinking somebody

20  is robbing you and you can't get up, then what happens?

21  A   As I struggle, when I was struggling to get up, I was pulled

22  up and, you know, I tried to defend myself.  I was trying to

23  look around 'cuz I can't see from that eye.  When I turned

24  around to look, it was like, bam, I was hit with a cold and hard

25  object.

Al Williams - Direct

1   Q   Okay.  And how did that feel?

2   A   It hurted real bad.

3   Q   Okay.  And then what happened?

4   A   I fell to the ground, back to the ground.

5   Q   And then what happened?

6   A   Then actually somebody had they knee in my back, and then I

7   start feeling handcuffs being clamped on me.  I was on the

8   ground.  One officer had his knee in the back, putting handcuffs

9   on me.  And the other one was standing on my neck with his foot.

10  Q   When did you realize this was police officers and not

11  robbers?

12  A   When I felt the handcuffs going on.

13  Q   So what did you do then?

14  A   I couldn't do nothing after that.

15  Q   So what did you do?

16  A   I just laid there.

17  Q   Okay.  And then what happened?

18  A   Then during that time, the officers picked me up from by

19  my -- by the back of my pants, like my -- the shoulders and the

20  handcuffs and threw me in the car.

21  Q   You say they threw you in the car.  Can you describe exactly

22  how they threw you in the car?

23  A   You know like you grab somebody and you open the door, you

24  (indicating) like throwing them in.

25          MR. SHILLER:  And for the record, he just did a motion,

Al Williams - Direct

1    kind of like an underhand sack of potatoes toss.

2         MR. JONES:  Judge, whatever he did, he did.  I don't

3    think I need Counsel's description.

4         THE COURT:  All right.  Well, for the record, we might

5    need it so ... if that's an objection, overruled.

6    BY MR. SHILLER:

7    Q    How tall are you?

8    A    Five three.

9    Q    How much do you weigh?

10   A    135 pounds.

11   Q    Okay.  And was that your height and weight in May of 2007?

12   A    Yes, sir.

13   Q    Now, what happened after you got tossed into the car?

14   A    During that time, one of the officer jumped in the back seat

15   with me.

16   Q    Okay.  As you sit here today in court, do you recognize

17   which one of those officers jumped in the back seat with you?

18   A    Yes, sir.

19   Q    Can you please point him out by an article of clothing or

20   saying where he is at the table?

21   A    The officer that's sitting right there, straight ahead, next

22   to my attorney.

23   Q    Okay.  Where in the line?

24   A    The first one right here.

25   Q    Okay.  And what does his tie look like?

Al Williams - Direct

1    A    Pardon?

2    Q    What does his tie look like?

3    A    I can't -- my vision is kind of -- I can't see.

4         MR. SHILLER:  For the record, he pointed out the first

5    one at the table.  We would like the record to reflect that he

6    pointed out Officer Rubald.

7         THE COURT:  Officer?

8         MR. SHILLER:  Rubald.

9         THE COURT:  All right.  Any objection?

10        MR. JONES:  No, Judge.

11        THE COURT:  The record may reflect the identification

12   of Officer Rubald.

13        MR. SHILLER:  Okay.

14   BY MR. SHILLER:

15   Q    And what happened after Officer Rubald jumped in the back

16   seat with you?

17   A    He proceeded to punch me several times in my stomach.

18   Q    Okay.  And then what happened?

19   A    After that, he punched me in my groin.

20   Q    Now, just to be clear, did you ever see who actually hit

21   you -- knocked you off your bike?

22   A    No.

23   Q    Did you ever see who actually hit you with that hard metal

24   object on your forehead?

25   A    No.

Al Williams - Direct

1   Q   Okay.  But you did see Officer Rubald when he punched you in

2   the car?

3   A   Yes, sir.

4   Q   Then what happened?

5   A   At that time, after he punched me in my groins, I told him

6   that he was trying to injure me, and he told me to shut my black

7   ass up, and proceed to call me Mr. Cataract.

8   Q   And then what happened?

9   A   That was it.  He rode to the police station in the back with

10  me.

11  Q   Okay.  What happened when you arrived at the police station?

12  A   When I got in the police station, after the interview, I was

13  taken to a room, and it was a room, a lock-up room, and they

14  were trying to put me back there.  And the lock-up guy that was

15  back there, he told me that I couldn't come back there because I

16  was injured and I needed to go to the hospital.

17  Q   Let's slow down.  You said after the interview.

18  A   Yes.

19  Q   What interview are you talking about?

20  A   When they had me sitting down for a couple hours talking

21  to -- writing up paperwork.

22  Q   And, again, what time did this happen on the street, your

23  best estimation?

24  A   Like 5:00, 5:15.

25  Q   Okay.  And when they interviewed you, what was -- was

Al Williams - Direct

1   this -- can you describe the room where they were interviewing

2   you at the police station?

3   A   I'm not really -- just a single room what I was in, with

4   like a bench, and they had me handcuffed to the wall.

5   Q   Okay.  And what type of questions were they asking you?

6   A   My name and stuff like that.

7   Q   Okay.  And then you said how long did that take?

8   A   Maybe 30 minutes or so to an hour.

9   Q   Okay.  And then after that interview, then what happened --

10  I'm sorry, who was doing this questioning?

11  A   Officer Rubald.

12  Q   Okay.  And then after that, then what happened?

13  A   They took me back to go to the lock-up.

14  Q   Okay.  Who is "they"?

15  A   The officers.

16  Q   Which ones?

17  A   Officer Rubald and his partner.

18  Q   Okay.  Do you know his partner's name or can you point his

19  partner out?

20  A   I don't know his name.

21  Q   Is he at the defense table?

22  A   I -- yes.

23  Q   Okay.  Is he the first, second, or third one from you?

24  A   That would be the one behind Rubald.

25  Q   Okay.  And when those two officers took you to lock-up, what

Al Williams - Direct

1    happened?

2    A    The guy that was back there told me he couldn't accept me

3    back there because I was injured and I needed to go to the

4    hospital.

5         MR. SHILLER:  And for the record, sitting in the second

6    seat behind Officer Rubald is Officer Leck.

7         I forgot to say that.

8         THE COURT:  All right.

9         MR. JONES:  Judge, I really don't have any objection to

10   the conversation.  We could have a foundation.  You know, name,

11   description, something like that.

12        MR. SHILLER:  Well, he said he was the person sitting

13   right behind Officer Rubald.

14        MR. JONES:  No, no, no, that's not -- I'm talking about

15   the conversation about the alleged lock-up people.

16        MR. SHILLER:  Okay, we'll set that.

17   BY MR. SHILLER:

18   Q    What did this person look like, this lock-up keeper?

19   A    He was a black male.

20   Q    Young, old?

21   A    Young.

22   Q    Tall, skinny, short, fat?

23   A    I don't remember that.

24   Q    Okay.  Do you know his name?

25   A    No, sir.

Al Williams - Direct

1    Q    Okay.  And who was present when this person refused to take

2    you into the lock-up?

3    A    Officer Rubald and Officer Leck.

4    Q    And just at this point, had any pictures been taken of you?

5    A    No.

6    Q    Okay.  Had you been fingerprinted or anything?

7    A    No.

8    Q    Had you been told what you were charged with?

9    A    No.

10   Q    Okay.  What happened after this person refused to take you

11   into lock-up?

12   A    One of the officers, I don't know if it was Rubald or

13   Officer Leck, decided to go up front and get -- one of them said

14   to go get the desk sergeant or whatever, whoever he was.

15   Q    Okay.  And did somebody go get -- did somebody else come?

16   A    Yes.

17   Q    Where were you at this time?

18   A    I was still -- I was sitting out -- it's like -- it's not an

19   enclosed room, but it's like got a wall, like a bar in it with

20   another bench with -- with -- handcuffed to the wall.

21   Q    I'm sorry, which -- do you know which police station this

22   was?

23   A    78th and Halsted.

24   Q    Okay.

25           THE COURT:  All right.  It's time for recess.  We'll

Al Williams - Direct

1   take a 15-minute recess.

2        (Jury exits courtroom.)

3        (Recess from 3:14 p.m. to 3:33 p.m.)

4        (Jury enters courtroom.)

5            THE COURT:  You may be seated.

6   BY MR. SHILLER:

7   Q   Mr. Williams, at some point, you were eventually led into

8   the lock-up; is that true?

9   A   Yes, sir.

10  Q   How long was it before you were led into the lock-up?

11  A   Maybe three to five hours later.

12  Q   Three to five hours from what time?

13  A   From the time we arrived at the police station around about

14  5:00 -- about 6:00.

15  Q   Okay.  And when you finally were put in the lock-up, was it

16  the same person, the same officer guarding the lock-up as the

17  first go-around?

18  A   No, sir.

19  Q   Okay.  And what happened after you got -- what was the next

20  thing that happened to you after you got put in the lock-up?

21  A   I was fingerprinted and searched.

22  Q   Okay.  And then after you were fingerprinted and searched?

23  A   I was put into a lock-up room.

24  Q   Did they take mugshots of you?

25  A   Yes.

Al Williams - Direct

1   Q   Okay.

2           MR. SHILLER:  13B.

3           MR. JONES:  That's fine.

4       (Counsel conferring.)

5           MR. JONES:  I have no trouble with either exhibit, so

6   they can be admitted.

7           THE COURT:  All right.

8       (Plaintiff's Exhibits 13A, 13B received in evidence.)

9           MR. SHILLER:  Publishing Exhibits 13B and A.

10          13B first.

11      (Said exhibit published to the jury.)

12  BY MR. SHILLER:

13  Q   Can you tell me what that's a picture of?

14  A   That's a picture of me.

15  Q   Okay.  And that's the picture that was taken in your

16  mugshot?

17  A   Yes, I believe so.

18  Q   Okay.  And did you have any injuries in that picture?

19  A   Yes.

20  Q   Can you point to them?

21  A   Right there on my forehead.

22  Q   Okay.  And how would you describe that injury?

23  A   It's like a knot with a gash in it.

24  Q   Okay.  And how did you get that knot with the gash in it?

25  A   When I was hit with the object.

Al Williams - Direct

1   Q   Okay.  And how did that knot with that gash feel?

2   A   It hurted a lot.

3   Q   Okay.  And was it bleeding at any time?

4   A   Yes.

5   Q   When was it bleeding?

6   A   From the time it happened until we got to the station.

7   Q   And what happened to that blood?

8   A   I got some tissue on it and wiping it off.

9   Q   Okay.  Let me show you now 13A, also admitted.

10         What's that a picture of?

11  A   That's a picture of me again.

12  Q   Okay.  Is that the front-way mugshot?

13  A   Yes, sir.

14  Q   And these were the photos taken after you finally got into

15  the lock-up area?

16  A   Yeah.

17  Q   And, again, what's your estimate in how long that was after

18  you were arrested?

19  A   Maybe three to five hours afterwards.

20  Q   Okay.  And then after you were fingerprinted and photoed,

21  what happened next?

22  A   I stayed in the lock-up overnight.

23  Q   Okay.  And then what happened?

24  A   The next morning, I was put on a bus and -- next morning, I

25  was put on a bus with quite a few other people.

Al Williams - Direct

1    Q    Okay.  Did you -- had you eaten yet --

2    A    No.

3    Q    -- from the time you were taken into custody?

4    A    Right, I hadn't.

5    Q    Okay.  And then where did this bus take you?

6    A    Took us all around to all the different stations to pick up

7    other guys.

8    Q    Okay.  Then where did it take you?

9    A    Down to 26th and California.

10   Q    What happened when you got to 26th and California?

11   A    We went through process again.

12   Q    What does that mean?

13   A    I was -- I had a cavity search in my body.

14   Q    Okay.  And then what happened?

15   A    After that, I spoke with an attorney.

16   Q    Okay.  Where were you when you spoke with this attorney?

17   A    In the bullpen.

18   Q    What were you doing in that bullpen?

19   A    Waiting.  Waiting for things to be processed.

20   Q    Okay.  And what, if anything, did this attorney do as a

21   result of that conversation with you?

22   A    I had more pictures taken of me.

23   Q    Okay.  And, again, this was the following day that those

24   pictures were taken?

25   A    Yes.

Al Williams - Direct

1    Q   Okay.  And this was at the bullpen, 26th and California.

2    A   Yes, sir.

3        (Counsel conferring.)

4    Q   I'm showing you Exhibit 13C, which is admitted by agreement.

5            Can you tell me what that's a picture of?

6    A   That's a picture of me showing my shoulder.

7    Q   Okay.  Why were you showing your shoulder?

8    A   Because there's an injury on there.

9    Q   How did you receive that injury?

10   A   During the arrest.

11   Q   Do you recall specifically how you received that injury?

12   A   I'm not for sure.  Maybe it was when I was knocked to the

13   ground.  I'm not for sure.

14   Q   Okay.  Did you have that injury prior to your arrest?

15   A   No, sir.

16   Q   Okay.  And I'm showing you what was previously marked as

17   Exhibit 13D, also entered by agreement.

18           Can you tell me what that's a picture of?

19   A   That's a picture of me holding my elbow up.

20   Q   Why were you holding your elbow up?

21   A   'Cuz there was another injury to the elbow.

22   Q   What was the injury?

23   A   It's another scar on the elbow.

24   Q   Okay.  And how did you receive that scar?

25   A   During the arrest.

Al Williams - Direct

1   Q   Okay.  Do you recall specifically how you got that scar?

2   A   No, sir.

3   Q   Okay.  Did you have it prior to your arrest?

4   A   No, sir.

5   Q   Okay.  What happened after these -- and then you saw the

6   picture that counsel referred to during opening?  Do you

7   remember the picture of you, the full-length picture?

8   A   Yes, sir.

9   Q   Was that picture taken at the same time these other pictures

10  were taken?

11  A   I'm not for sure.

12  Q   Okay.  What happened after these pictures were taken?

13  A   Went to the preliminary or something like that.

14  Q   Okay.  By this, you mean there was like -- there was a court

15  hearing that day?

16  A   Yes.

17  Q   Okay.  Do you recall what, if anything, happened at that

18  court hearing?

19  A   Yes.

20  Q   What happened?

21  A   Excuse me.

22          Well, I was put in front of a monitor, and the State's

23  Attorney read from some papers, and the judge found probable

24  cause.

25  Q   Okay.  And then what happened?

Al Williams - Direct

1   A   And I was sent back to the bullpen.

2   Q   Okay.  Did you have a bond set that day?

3   A   Yes.

4   Q   Do you recall how much it was set for?

5   A   Yes.

6   Q   How much?

7   A   $20,000 D bond.

8   Q   What does that mean?  How much did you have to post in order

9   to get out of jail?

10  A   2,000 cash.

11  Q   Okay.  What happened after you -- after the bond hearing,

12  after you got sent back to the bullpen, where did you go then?

13  A   It's a very long lengthy part -- process, so we were still

14  downstairs in bullpens.

15  Q   Had you -- well, describe the process.

16          After you went -- how long were you downstairs in the

17  bullpen for?

18  A   Maybe a day or longer before I got -- before I got to where

19  I was supposed to go.

20  Q   Well, describe the process.  What happened?

21  A   We got -- we were searched again.  You know, a lot of guys

22  searched.  Stripped naked and searched in your private parts and

23  all that.

24  Q   Okay.  And then what happens?

25  A   Then finally, afterwards, after there, so we were shipped

Al Williams - Direct

1   to -- to the 26th and California, we were there, shipped into

2   cells.

3   Q   Were you interviewed and asked various questions during this

4   long process?

5   A   Yes.

6   Q   Okay.  And how long did you stay -- and how long did you

7   stay in the jail?

8   A   40 days.

9   Q   Okay.  And did you finally get out of the jail?

10  A   Yes, sir.

11  Q   How?

12  A   My employer put up the bond money.

13  Q   Now, going back, was there another court date -- when was

14  the next court date after that bond hearing, if you recall?

15  A   I believe it was the day afterwards.  I'm not for sure, but

16  I believe it was the day afterwards.

17  Q   Okay.  And -- okay.  What happened at the next court

18  hearing.  If you recall.

19  A   Officers testified against me, three officers.

20  Q   Was that the next court hearing or was that the trial?

21  A   That was the next court hearing.

22  Q   Okay.  Now, I want to go back for a minute.

23         Do you recall -- when we were talking about the

24  incident, you said you were riding a bike.

25  A   Yes.

Al Williams - Direct

1   Q   What happened to that bike?

2   A   I don't know.

3   Q   Okay.  Did you ever see that bike again?

4   A   No, sir.

5   Q   Whose bike was it?

6   A   It was my bike.

7   Q   Describe the bike.  What type of bike was it?

8   A   It was called a track bike, a 24-inch bike, a grown -- a

9   grown-up's bike.  And it was green and silver, like green and

10  chrome silver.

11  Q   Okay.  And when did you get that bike?

12  A   My grandma had bought it for me a while back for a present.

13  Q   Okay.  Do you recall how far back?

14  A   No, sir.

15  Q   What's your grandmother's name?

16  A   Alberta Williams.

17  Q   Now, do you recall that -- did you have an opportunity to

18  review your testimony in the criminal trial in this case?

19  A   I believe so.

20  Q   Okay.  Do you recall saying in the criminal trial that that

21  bike was your cousin's bike?

22  A   I might have, but I don't remember that.

23  Q   Okay.  Is it your cousin's bike?

24  A   No, sir.

25  Q   Okay.  Do you know why you would have said that at the

Al Williams - Direct

1   criminal trial?

2               MR. JONES:  Judge, I'll object.

3               THE COURT:  Overruled.

4               THE WITNESS:  I made a mistake.

5   BY MR. SHILLER:

6   Q   Okay.  Now, do you recall the criminal trial?

7   A   Yes.

8   Q   Who was your attorney?

9   A   Abigail Clough.

10  Q   Do you recall how -- do you recall how many times you had to

11  go to court leading up to the criminal trial?

12  A   I'm not for sure.  Maybe four or five.

13  Q   Okay.  And do you recall how long the criminal trial lasted?

14  A   Yeah, about -- about -- about a year and a half.

15  Q   No, how long the actual trial lasted.

16  A   Oh, two days.

17  Q   Okay.  And where did that trial occur at?

18  A   26th and California courthouse.

19  Q   Okay.  And was that a bench or a jury trial?

20  A   That was a jury.

21  Q   Okay.  Do you recall who testified at that trial?

22  A   Yes.

23  Q   Who testified?

24  A   Officer Rubald, Officer Leck, and I believe the other guy

25  that's behind Officer Leck, the other officer.

Al Williams - Direct

1   Q   Okay.  Actually let me go back.  And, I'm sorry, sometimes I

2   forget to ask questions.

3           When did you find out what you were being charged with

4   in this case?

5   A   After I was in the back, being fingerprinted.

6   Q   Okay.  And what did you find out?

7   A   At first they said I was being locked up for resisting

8   arrest; but when I got to the back, the guy that was locking me

9   up, I asked him what was I being charged with.  He told me for

10  possession of narcotics.

11  Q   And that was the first time you knew?

12  A   Yes.

13  Q   Okay.  And do you recall what, if anything, the three

14  officers said at your trial?

15  A   Yes, I do.

16  Q   What did they say?

17  A   They were saying I had drugs, but they were lying on me.

18          COURT REPORTER:  I didn't hear you.

19  A   I -- they were saying that I -- that I had possessed drugs,

20  but they were lying.

21  Q   And how did that make you feel?

22  A   I was angry and upset.

23  Q   And how long did that anger and upsetness last?

24  A   Well, it lasted for a long period of time until after the

25  trial, after the jury came back, 30 minutes after they left and

Al Williams - Direct

1    came back with a not guilty verdict, I felt relieved.

2            MR. SHILLER:  Can I have a moment, your Honor?

3            THE COURT:  Yes.

4        (Counsel conferring.)

5            MR. SHILLER:  Just a couple more questions.

6    BY MR. SHILLER:

7    Q    Do you -- in the last ten years, have you had any other

8    income besides the income you received from moving?

9    A    No, sir.

10   Q    Okay.  And how often do you get to work on moving?

11   A    Sometimes it will be three days.  Depends how fast.

12   Sometimes it will be three, sometimes maybe five or six days a

13   week.

14   Q    Okay.  And what did you do with your income?

15   A    Well, I helped Joyce pay the rent.  And during that time, we

16   was taking care of my niece and nephew, Devenus (phonetic) and

17   Demetrius Borders (phonetic).

18   Q    And why were you taking care of them?

19   A    Because they had -- they mother had lost custody of them for

20   a minute.

21   Q    Okay.  I have nothing further.

22           THE COURT:  All right.

23           MR. JONES:  May I --

24           THE COURT:  Sorry?

25           MR. JONES:  Remember tomorrow?

Al Williams - Direct

1          THE COURT:  We'll get started.

2          MR. JONES:  Judge, then can I have -- you know, that

3    was not our deal, Judge, but -- let me see -- I'm going to need

4    two minutes then, Judge.

5          THE COURT:  All right.

6       (Counsel conferring.)

7          MR. KOSOGLAD:  Your Honor, may I be excused for just

8    one moment?  I'll be right back.

9          THE COURT:  Yes.

10      (Mr. Kosoglad left courtroom and then returned.)

11      (Brief pause.)

12         MR. JONES:  Judge?

13         THE COURT:  You may proceed.

14                       CROSS-EXAMINATION

15   BY MR. JONES:

16   Q   All right.  Good afternoon, Mr. Williams.

17   A   Good afternoon, sir.

18   Q   Well, I want to start this last part that counsel went into.

19       You recall that prior to trial you were asked to state

20   any damages that you were claiming in this action.  Do you

21   remember that?

22   A   I'm not for sure.

23   Q   Well, do you recall --

24         MR. JONES:  I'm going to show him what's been marked as

25   Exhibit 2B.  Answers to Interrogatories.

Al Williams - Cross

1    BY MR. JONES:

2    Q    I want to show you -- well, here, first let me ask you this:

3              Do you recall in answer to one of the interrogatories,

4    you stated that the only damages that you were claiming related

5    to the fact that you lost your bicycle on account of this

6    incident.

7              Do you recall that?

8    A    No, sir.

9    Q    Here, let me show you the answer to --

10             MR. JONES:  If I may approach the witness, Judge?

11             THE COURT:  You may.

12   BY MR. JONES:

13   Q    All right.  I'm going to show you your Answers to

14   Interrogatories.  And this would be Number 16.

15             Do you see -- this is Number 16.  And this is your

16   answer to Number 16.

17   A    Okay, I see it.

18   Q    All right.  Do you see that?

19   A    Yes, sir.

20   Q    Now, does that refresh your recollection that that's the

21   answer that you gave in your interrogatories?

22   A    I guess so, yes.

23   Q    All right.  And even -- and you recall that even in your

24   deposition in this case, you also told Mr. Cazares, who,

25   remember, he conducted your deposition in this case, you also

Al Williams - Cross

 1   told Mr. Cazares the same thing --

 2           MR. SHILLER:  Page and line number?

 3           MR. JONES:  It would be page 120 of the deposition, and

 4   it would be I believe -- let me just check.

 5           MR. SHILLER:  I'm objecting to improper impeaching.

 6   I'm not sure what he's impeaching right now.

 7   BY MR. JONES:

 8   Q   Well, I'm just getting at some facts here.

 9           You also remember telling --

10           THE COURT:  All right.  That's not impeachment then.

11   BY MR. JONES:

12   Q   Well, do you also remember telling Mr. Cazares that the only

13   damages you were claiming were in relationship to the bicycle?

14   A   I don't remember that.

15   Q   Well, do you recall being asked this question and giving

16   this answer?

17           MR. SHILLER:  Objection.

18           THE COURT:  Wait.

19           MR. SHILLER:  Objection.  This isn't proper

20   impeachment.  He said he doesn't remember.

21           MR. JONES:  Well, then, that's what, Judge, I want to

22   impeach him --

23           THE COURT:  Overruled.

24   BY MR. JONES:

25   Q   Do you remember being asked this question and giving this

Al Williams - Cross

1   answer?

2         "QUESTION:  Can we direct your attention to

3   Interrogatory Number 16?

4         "Okay.

5         "Number 16 asked you to identify and list any expenses

6   or damages you've incurred as a result of this incident.

7         "All right.

8         "And you've listed that you lost your bicycle.

9         "ANSWER:  Yes."

10        Do you recall being asked that question and giving that

11  answer?

12  A   I might have, but I don't recall.

13  Q   All right.  Now, with respect to the bike you claim as a

14  loss, you told Mr. Cazares, and I gather it was your testimony

15  that the bike was lost after your arrest; is that correct?

16  A   Yes.

17  Q   And you were also asked by Mr. Cazares, were you not,

18  that -- whether -- you were asked whether any cousins of yours

19  had taken the bike for you on the day you were arrested.  Do you

20  recall that?

21  A   No, sir.

22  Q   Well, you denied, did you not, that any cousins had taken

23  that bike for you; isn't that right?

24  A   Can you ask me that question again, please?

25  Q   All right.  Mr. Cazares asked you whether any cousins had

Al Williams - Cross

1   taken that bike for you on the date that you were arrested, and

2   you told him that none had taken it for you; isn't that correct?

3        MR. SHILLER:  Again, improper impeachment.  That's not

4   impeaching.

5        THE COURT:  Sustained.

6   BY MR. JONES:

7   Q   All right.  It's your story now that the bike was lost; is

8   that correct?

9   A   Yes, sir.

10  Q   And that you don't know anything about any cousin taking

11  that bike on the date that you were arrested; isn't that

12  correct?

13  A   Yes, sir.

14  Q   All right.  Now, the reason we've gone through this is

15  because the truth of the matter is you've known all along that

16  that story about the bike is a lie, you've known that; isn't

17  that correct?

18  A   No, sir.

19  Q   Isn't it a fact that during your criminal trial, you were

20  sworn under oath, like you are today, isn't that right?

21  A   Yes, sir.

22  Q   And you were sworn to tell the truth, right?

23  A   Yes, sir.

24  Q   And you gave testimony about that bike in your criminal

25  trial, did you not?

Al Williams - Cross

1   A   I believe so, sir.

2   Q   In fact, what you've told that jury in the criminal trial

3   was that that bike had been -- it was -- in fact, you told the

4   jury in the criminal trial that the bike was not yours.  Didn't

5   you tell the jury that?

6   A   I don't recall that, sir.

7   Q   Well, let's take a look.

8           Can I have the last question read back, just so that

9   I --

10          THE COURT:  Yes.

11      (The record was read by the reporter as requested.)

12  BY MR. JONES:

13  Q   Yes, do you remember -- page 218.  Line 5.

14          Told the jury, you were asked -- were you asked this

15  question?

16          "What happened to your bike?

17          "ANSWER:  It belonged to my little cousin."

18          Do you remember telling that jury that?

19  A   I don't recall that, sir.

20  Q   All right.  And do you recall being asked this question and

21  giving this answer?

22          MR. SHILLER:  Judge, I'm unclear whether this is

23  impeachment or --

24          THE COURT:  All right.  Let's have a sidebar.

25      (Proceedings heard at sidebar:)

Al Williams - Cross

1        THE COURT:  This courtroom is impossible.  Move it

2   back.

3        Did he testify about ownership of the bike?

4        MR. SHILLER:  Yes.  This is definitely something to

5   impeach him about.  I just can't tell whether he's trying to

6   refresh his recollection or impeach him.

7        MR. JONES:  I don't have to refresh his recollection.

8   Judge, he lied about the bike.  He told us in the deposition it

9   was his bike.  He told the criminal trial jury that it was his

10  cousin's bike.  And I'm going right to the heart of it.

11       THE COURT:  But what did he say here today?

12       MR. SHILLER:  He said today it was his bike, and he

13  lost it.  He said at the criminal trial that it was his cousin's

14  bike.  I got no problem with the impeachment.  I was just

15  talking about the form of the impeachment.

16       MR. JONES:  But the form of the impeachment is always,

17  Judge, were you asked this question, if he denies it, and did

18  you give this answer.

19       THE COURT:  Right, but you have to --

20       MR. JONES:  How else am I going to impeach him?

21       THE COURT:  This is true, but I just want to make sure

22  that what you're impeaching him on is his testimony here in

23  court, not inconsistent testimony he gave at his deposition --

24       MR. JONES:  And at trial.  He said today that the bike

25  is his bike.  He told the criminal jury it was his cousin's

Al Williams - Cross

1    bike.

2              THE COURT:  And he told -- in the deposition, he gave a

3    different answer.  Is that right?

4              MR. JONES:  In the deposition, he says it was his bike.

5              MR. SHILLER:  His deposition was consistent with his

6    testimony today.  That's why --

7              MR. JONES:  But I can impeach him on the fact that he

8    lied and told the jury an entirely different story at his

9    criminal trial, when he's under oath.

10             THE COURT:  Right.  Okay.  So you've done that.  So now

11   where are we going?

12             MR. JONES:  I have one more question on this that I

13   want to ask him.  Just this one more.

14             THE COURT:  What is it?

15             MR. JONES:  So -- because in his deposition, he says

16   that -- where I ask him about the -- he told the criminal jury

17   that a cousin did come and pick up the bike.

18             THE COURT:  Now, wait a minute.  Did he testify about

19   that today?

20             MR. JONES:  Yes.

21             MR. SHILLER:  He said he didn't know what happened to

22   the bike today.

23             THE COURT:  Okay.  All right.  So you can ask him.

24             MR. JONES:  All right.

25        (Sidebar proceedings concluded.)

Al Williams - Cross

1          MR. JONES:  May I proceed?

2          THE COURT:  You may.

3   BY MR. JONES:

4   Q   You told the criminal jury that the bike was your cousin's

5   and that your cousin came and picked it up, didn't you?

6   A   I don't remember that, sir.

7   Q   Well, you know, this is -- this is a crucial piece -- how

8   could you forget it?

9   A   I don't remember, it's been so long, I don't remember.

10  Q   Is it because you tell so many lies that you can't keep up

11  with the lies?

12         MR. SHILLER:  Objection, argumentative.

13         THE COURT:  Sustained.

14  BY MR. JONES:

15  Q   Now, you've told the Ladies and Gentlemen of this jury that

16  you were employed; isn't that correct?

17  A   Yes, sir.

18  Q   Told them that you -- in fact, what you told the jury at the

19  criminal trial was that you were a professional mover, isn't

20  that what you told them?

21  A   Yes, sir.

22  Q   Now, the truth of the matter is you don't possess a single

23  document showing that you ever did a day's work in your life;

24  isn't that true?

25  A   That's true, sir.

Al Williams - Cross

1    Q    That, of course, would mean you have no documents showing

2    that you ever did any work in 2007; isn't that correct?

3    A    That's correct, sir.

4    Q    And when your counsel asked you today whether you file tax

5    returns on your income, you boldly told this jury a lie, did you

6    not?

7    A    No, sir.

8    Q    Well, you remember that you filed -- you gave us permission

9    to pull your tax returns, you recall that, don't you?

10   A    Yes, sir.

11   Q    And the truth of the matter is you didn't even file a tax

12   return for 2007; isn't that correct?

13   A    Yes, that's correct.

14   Q    And is that what you call filing -- is that what you meant

15   when you told the Ladies and Gentlemen of the Jury just now that

16   you file your income for professional mover, is that what you

17   meant?

18   A    No, sir.

19   Q    And, you know, you say you were a professional mover.  But

20   if we go back and take a look at your income tax returns, you

21   didn't file an income tax return for the year 2003, did you?

22   A    No, sir.

23   Q    And you didn't file an income tax return for the year 2004,

24   did you?

25   A    No, sir.

Al Williams - Cross

1   Q    And this is all the years when you want this jury to believe

2   that you're some kind of professional mover, right?

3   A    No, sir.

4   Q    And when you finally did file an income tax return in 2005,

5   you listed that you made 19 -- $9,000, and you stated that you

6   had earned that income from taking care of your nephews.  Isn't

7   that what you put in that 2005 income tax return?

8   A    Yes, sir.

9   Q    That didn't say one word about being a professional mover,

10  did it?

11  A    No, it didn't.

12  Q    And even the year before you're supposed to be this

13  professional mover, you didn't file income tax returns for 2006,

14  did you?

15  A    No, sir.

16  Q    Now, your lawyer asked you, well, the only business that you

17  ever had was the moving business; isn't that right?

18  A    Yes, sir.

19  Q    And you boldly told the jury another lie.  You said that

20  that's the only business you had, right?

21  A    Yes, sir.

22  Q    But how come is it that in 2008 when you filed a federal

23  income tax return, you don't list moving, but you list $11,000

24  and say it came from a hair care business?  Isn't that what you

25  did?

Al Williams - Cross

1   A   I don't recall that, sir.

2            MR. JONES:  Here, pull the tax return for me.

3   BY MR. JONES:

4   Q   And while he's looking for that, why don't you tell the

5   Ladies and Gentlemen of the Jury, have you ever had a hair care

6   business?

7   A   No, I haven't.

8   Q   And while they're looking for that, maybe I can ask you a

9   few more.

10           You claim that you're a professional mover for ten

11  years, right?

12  A   Yes, sir.

13  Q   Truth of the matter is, once again, you never had a bank

14  account in your life, have you?

15  A   No, sir.

16  Q   And I guess I could go further.

17           You never had a checking account in your life, have

18  you?

19  A   No, sir.

20  Q   You never had any credit cards, right?

21  A   No, sir.

22  Q   And you never even had a telephone service in your name,

23  have you, sir?

24  A   No, sir.

25           MR. JONES:  How much further do I have to go, Judge?

Al Williams - Cross

1    Because you know you caught me by surprise.

2            THE COURT:  We won't talk about it in front of the

3    jury.

4            All right, we'll recess for the day, and we'll resume

5    tomorrow at 9:30.

6            Thank you, and have a good evening.

7            Remember not to talk about the case with anybody at

8    home.

9                          - - - - - -

10                   C E R T I F I C A T E

11      I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13
     /s/Gayle A. McGuigan                    Date:  May 18, 2011
14

15      _____        _____

16      GAYLE A. McGUIGAN, CSR, RMR, CRR        Date
        Official Court Reporter
17

18

19

20

21

22

23

24

25