1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3   AL WILLIAMS,                  )      Docket No. 08 C 6409
                                  )
4                  Plaintiff,     )      Chicago, Illinois
                                  )      March 30, 2011
5           v.                    )      9:30 o'clock a.m.
                                  )
6   CITY OF CHICAGO, et.al.       )
                                  )
7                  Defendants.    )

8                           VOLUME 2-A
                    TRANSCRIPT OF PROCEEDINGS
9         BEFORE THE HONORABLE JOAN LEFKOW, and a jury

10  APPEARANCES:

11  For the Plaintiff:        SHILLER PREYAR LAW OFFICES by
                              MR. BRENDAN SHILLER
12                            MS. APRIL D. PREYAR
                              4554 North Broadway
13                            Suite 325
                              Chicago, IL  60640
14
    For the Defendants:       PUGH JONES JOHNSON & QUANDT PC by
15                            MR. WALTER JONES, JR.
                              MR. JORGE V. CAZARES
16                            MS. UMA CHANDRASEKARAN
                              180 North LaSalle Street
17                            Chicago, IL  60601

18
    Court Reporter:           GAYLE A. MCGUIGAN, CSR, RMR, CRR
19                            Official Court Reporter
                              219 South Dearborn Street
20                            Room 1944
                              Chicago, Illinois 60604
21                            (312) 435-6047

22

23

24

25

1                              I N D E X

2    WITNESS                                                  PAGE

3    AL WILLIAMS
          Cross Resumed By Mr. Jones ...........................99
4
     AL WILLIAMS
5         Redirect By Mr. Shiller .............................114

6    ERICA RUCKER
          Direct By Mr. Kosoglad .............................118
7
     ERICA RUCKER
8         Cross By Mr. Jones .................................129

9    ERICA RUCKER
          Redirect By Mr. Kosoglad ..........................133
10
     DEBBIE WILLIAMS
11        Direct By Mr. Kosoglad .............................135

12   DEBBIE WILLIAMS
          Cross By Mr. Jones ................................139
13
     WARREN EVANS
14        Direct By Mr. O'Brien .............................142

15   ARLANZA TOWNSEND
          Direct By Mr. Kosoglad .............................145
16
     ARLANZA TOWNSEND
17        Cross By Ms. Chandrasekaran ........................151

18   ARLANZA TOWNSEND
          Redirect By Mr. Kosoglad ..........................156
19
     JOHN BRUNDAGE
20        Direct By Mr. Shiller .............................161

21   JOHN BRUNDAGE
          Cross By Mr. Jones ................................180
22

23

24

25

1                               I N D E X

2

3     WITNESS                              PAGE

4

5     STEVEN BECHINA
          Direct By Ms. Preyar ................................185
6
      STEVEN BECHINA
7         Cross By Mr. Cazares ...............................200

8     STEVEN BECHINA
          Redirect By Ms. Preyar ............................203
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings heard in open court.  Jury out.)

2           THE CLERK:  Court is reconvened, come to order.

3           MR. KOSOGLAD:  Jared Kosoglad, Brendan Shiller, April

4      Preyar, and John O'Brien on behalf of Mr. Williams.

5           MR. CAZARES:  Good morning, your Honor.  Jorge Cazares

6      and Walter Jones on behalf of defendants.

7           THE COURT:  Morning.

8           MR. CAZARES:  Ms. Chandrasekaran is on her way here.

9           THE CLERK:  08 C 6409, Williams versus City of Chicago.

10          THE COURT:  All right.  Are we ready to go?

11          MR. KOSOGLAD:  We have a couple preliminary matters to

12     raise with the Court, if I may.

13          THE COURT:  If they're quick.

14          MR. KOSOGLAD:  The first one relates to the

15     cross-examination of the plaintiff.  They started to raise

16     issues related to the plaintiff's taxes yesterday.  And during

17     the pre-trial conference, Mr. Schiller raised the issue of

18     whether we need to file a motion in limine regarding

19     Mr. Williams' taxes, and Mr. Jones related that he wasn't going

20     to be going into that area at the time.  Of course, he did now.

21          In the second place, we didn't receive copies of the

22     defendant's exhibit books until this morning, just right now.

23          So all of these tax returns that they've been

24     discussing during the trial, we've actually never received a

25     copy of them until this morning, so we think it's a little late

1    to be producing discovery after the plaintiff testifies when

2    trying to impeach him using those documents.  We were completely

3    ignorant of any of the issues they're raising with respect to

4    this.

5            MR. CAZARES:  Judge, these tax returns were always

6    disclosed.  We subpoenaed them.  We obtained the authorization

7    to get these tax returns after Mr. Williams signed off on it,

8    Judge.  We subpoenaed them via third party service, which

9    made -- which gave notice to the plaintiff, if they want a copy.

10   They chose not to order a copy, Judge.

11           It's always been in our disclosures.  It was marked as

12   an exhibit from the very beginning from our pre-trial order,

13   Judge.

14           THE COURT:  What are you using it for?

15           MR. JONES:  Judge, the only thing I'm using it for is,

16   Judge, if you've been following, is impeachment.  I've used it

17   about -- about his -- he told everybody that he was -- the only

18   business he had for the last ten years -- the last question he

19   asked, the only business you had for the last ten years was the

20   moving business.

21           I have been restricting my impeachment with respect to

22   the moving business and to what counsel asked.

23           THE COURT:  Well, what in the world does this have to

24   do with what happened that day on the street?

25           MR. JONES:  Judge, it has everything to do with it.  He

1    gets on this -- he tells -- he tells these folks that -- and

2    he's like the nice little sunshine kid that I've been in the

3    moving business for ten years.  That's a lie.

4              THE COURT:  What do the tax returns show?

5              MR. JONES:  It shows that he never put down, ever, that

6    he was in the moving business.  And, Judge, when his lawyer

7    asked him yesterday, I might say this, he said, now,

8    Mr. Williams, you've been in the moving business for the past --

9    last ten years.  Did you file your tax returns with respect to

10   the moving business?  Remember that, Judge?  And Mr. Williams

11   says yes.

12             Judge, I have every right to cross-examine -- and then

13   he says to him, the only business that you have been in for the

14   last ten years is the moving business.

15             THE COURT:  Okay.  I don't know what he put down on his

16   tax return about his source of income or whether he filed or

17   didn't file, but it doesn't -- unless he has a W-2 from a

18   different employer, I would say it doesn't impeach him because

19   he could have gotten cash income from whatever business and it

20   wouldn't show up on his return, as far as I know.

21             MR. JONES:  No, no, no, Judge, when your lawyer looks

22   at you and you answer to the jury, the only business that you've

23   had for the last ten years is the moving business, and you want

24   this jury to believe that he is in the moving business, that he

25   said -- and, Judge, don't forget, I would love to have been able

1    to --

2            THE COURT:  Okay, wait a minute.  What does the tax

3    return show about the different source of income --

4            MR. JONES:  Yes, it shows that he never put down the

5    moving business.  That on two -- one occasion he puts down that

6    he's in the child support business, and on one occasion he puts

7    that he's in the hair business.  Okay?  This is in direct

8    contradiction to what he testified to yesterday.

9            And, Judge, we have every right to impeach him on this.

10   The tax returns are filed under oath.

11           THE COURT:  Well, it's obviously collateral because it

12   doesn't have anything to do with what happened on the street

13   that day.

14           MR. JONES:  It has everything to do with his

15   credibility, Judge.

16           THE COURT:  Well, that's why we have rules about

17   impeachment and proving up collateral matters.  So I suppose

18   I'll let you say -- ask him if he put down the hair business;

19   and if he denies it, then you can impeach him with the

20   document --

21           MR. JONES:  That's fine, Judge.

22           THE COURT:  That's it.  And the other one as well.

23           MR. SHILLER:  That was already done yesterday.

24           MR. JONES:  I did not.

25           THE COURT:  Did he admit it or --

1          MR. JONES:  No, I --

2          MR. KOSOGLAD:  What happened yesterday was -- is he

3     said, I didn't know if I put that down or not.  And counsel,

4     Mr. Jones, told Mr. Cazares to find the document.  They

5     proceeded to cross-examine him.  And I guess they couldn't find

6     it at the time, so they never showed it to him.  So we submit

7     those questions were asked and answered.

8          MR. JONES:  That's baloney.

9          MR. KOSOGLAD:  If anything, we should leave it alone at

10    this point.

11         MR. JONES:  I want to go right back there, Judge --

12         THE COURT:  This is what I'll let you do.

13         MR. JONES:  Ah-ha.

14         THE COURT:  You can show him the document that shows

15    that he put it down and if -- and then he'll probably say yes, I

16    did that.  And that's the end of it.

17         MR. JONES:  All right.

18         THE COURT:  Okay.  So that shows that he -- he -- on

19    another occasion, he stated something contrary to what he said

20    in open court yesterday.

21         MR. JONES:  Absolutely.

22         THE COURT:  All right.  I think we have an

23    understanding.

24         MR. JONES:  Now, one other thing, Judge -- for the good

25    that this is probably going to do me -- now, you know, Judge,

1    one of the things, the problems I've had here is, okay, you

2    foreclosed us from impeaching him on his felony conviction, but

3    one other thing.  He's got his cousin coming up here today who

4    is going to testify and you -- I just want to bring this up to

5    the Court one more time.  She's got a felony conviction.

6            I can understand how the Court might say with

7    respect --

8            THE COURT:  What is it for?

9            MR. JONES:  It's for drugs.

10           THE COURT:  Well, I have the same view of that.  It

11   doesn't -- it is not relevant to her credibility, so I rule the

12   same way.

13           All right, let's -- I told you to be here early if you

14   had preliminary matters, so let's bring the jury in.

15           MR. JONES:  Yeah, but you didn't see the line today,

16   Judge.  Something is going on today, Judge.

17           THE COURT:  Oh, that's right.  You're forgiven.  You're

18   forgiven.  I don't know what it is, but yes.

19       (Brief pause.)

20       (Jury enters courtroom.)

21           THE CLERK:  Please be seated.

22           THE COURT:  Good morning, Ladies and Gentlemen.

23           THE JURY:  Morning.

24           THE COURT:  All right.  I'm sorry we're off to a late

25   start.  I'm told there was a long line downstairs so it caused

1    some of us to be delayed.

2           All right.  Mr. Jones, you may continue with the

3    cross-examination.

4           Where is our witness?

5       (Witness resuming stand.)

6           THE COURT:  Morning, Mr. Williams.

7           THE WITNESS:  Morning, Your Honor.

8           THE COURT:  You've been sworn, and you're still under

9    oath, so just have a seat.

10                    CROSS-EXAMINATION (Resumed)

11   BY MR. JONES:

12   Q   All right.  Just two very quick things with respect to your

13   tax returns, Mr. Williams.

14          You recall that one of the very last things that your

15   counsel said to you yesterday before turning the

16   cross-examination over to me was that the only business that you

17   had for the last ten years was the moving business, and you said

18   that's true.  Is that correct?

19   A   Yes, sir.

20   Q   Yeah, but when you filed your 2005 tax return, you didn't

21   put anything about the moving business.  You put that you were

22   in the child care business, didn't you?

23   A   I don't recall that.

24   Q   Well, let me help you.

25          Let me show you what's been marked as Defendant's

Al Williams - Cross Resumed

1   Exhibit B -- 19B, which purports to be your tax return from

2   2005.

3       (Said document was tendered to the witness.)

4   Q   Take a look at it.

5           That's the first page.  Take a look at your social

6   security number on that.

7           That is your social security number, isn't it?

8   A   Yes, sir.

9   Q   Let me take you to the second page where it puts your

10  occupation.

11          You put child care business, don't you?

12  A   Yes, sir.

13  Q   In fact, when you filed your 2008 tax return business --

14  your tax return, you didn't put anything about the moving

15  business on it, but you put that you were in the hair care

16  business, didn't you?

17  A   I don't remember that.

18  Q   Let me help you.

19          MR. JONES:  Judge, if I may approach?

20          THE COURT:  You may.

21  Q   Let me show you 19C.

22      (Said document was tendered to the witness.)

23  Q   Look at the first page.

24          That's your social security number, isn't it?

25  A   Yes, it is.

Al Williams - Cross Resumed

1   Q   Let's go to the second page here.

2           It says under your occupation is hair care, doesn't it?

3   A   Yes, that's what it says.

4   Q   Now, with respect to the wound that you had on your head,

5   you never saw any doctor on your own about that wound on your

6   head, did you?

7   A   No, I didn't.

8   Q   Never had any stitches with respect to that wound, did you?

9   A   No.

10  Q   And when you went over to Cook County, you signed a form so

11  that they could actually take a look at you; isn't that correct?

12  A   I don't remember that.

13  Q   Well, showing our Defendant's Exhibit Number 11.

14          MR. JONES:  If I may approach the witness, Judge.

15          THE COURT:  Yes.

16      (Said document was tendered to the witness.)

17  BY MR. JONES:

18  Q   Let me show you Defendant's Exhibit 11 and draw your

19  attention to a signature that says "Al Williams," under "consent

20  for treatment."

21          That's your signature, is it not, sir?

22  A   Yes.  That's my signature.

23  Q   And that was your consent that they could treat you, is it

24  not, sir?

25  A   I believe so.

Al Williams - Cross Resumed

1    Q    All right.  And on this form that -- where they treated you,

2    they describe your injury, do they not, sir, as an abrasion to

3    your forehead?

4              MR. SHILLER:  Objection.  That's hearsay.

5              THE COURT:  Sustained.

6              MR. JONES:  All right.

7    BY MR. JONES:

8    Q    Well, did you know that that was what they found and

9    reported it as an abrasion to your forehead?

10   A    No, sir.

11   Q    Now, yesterday your counsel showed you some pictures where

12   you say you have injuries with respect to this incident that

13   were other than your forehead.

14             Do you recall that?

15   A    Yes.

16   Q    Of course yesterday was the first time that you've ever made

17   such an assertion; isn't that true?

18   A    No, sir.

19   Q    Isn't it true that in your deposition when you were asked as

20   a result of the occurrence, were there any additional injuries

21   other than to your head, you advised us that there were none.

22   Isn't that true?

23   A    I don't recall that.

24   Q    Well, let's go to page 98 of the deposition.

25             And we asked this question, and did you give this

Al Williams - Cross Resumed

1     answer?

2              Line 18.

3              "The next interrogatory question, Number 8, it asked

4     you to describe all the injuries that you suffered as a result

5     of the occurrence.  And the answer you provided is injury to the

6     head, right?

7              ANSWER:  Yes.

8              QUESTION:  And it says investigation continues.  Has

9     there been any other injury that you're aware of other than the

10    one to your head that's not listed here?

11             ANSWER:  No."

12             Do you recall being asked those questions and giving

13    those answers?

14    A    I don't remember that.

15    Q    Just to follow up on something before I begin the next area

16    with background, you remember that your lawyer asked you some

17    questions about your background, and he said that you had four

18    children, right?

19    A    Yes.

20    Q    Now, it's also to be said that of course you've never been

21    married in your life; is that right?

22             MR. SHILLER:  Objection, relevance.

23             MR. JONES:  Well, Judge, he asked.  I'm following up.

24             THE COURT:  Sustained.

25

104

Al Williams - Cross Resumed

1   BY MR. JONES:

2   Q    And with respect to your background, he mentioned that you

3   finished not quite a year at South Shore High School; is that

4   correct?

5   A    That's correct.

6   Q    All right.  Now, on the date of this incident, you

7   certainly, as you testified here, have one bad eye, but you have

8   one good eye; is that correct?

9   A    That's correct.

10  Q    And the good eye is your right eye; is that right?

11  A    Right.

12  Q    And you've never worn glasses, have you?

13  A    No.

14  Q    Now, on this particular day of the incident, it is true that

15  these officers were in uniform; is that correct?

16  A    I guess so, that's correct.

17  Q    All right.  And they were in -- they weren't in an unmarked

18  squad car, they were in a regular police car, weren't they?

19  A    Yes.

20  Q    And I believe you testified that as you were on your

21  bicycle, you crossed 79th Street and you were heading east; is

22  that correct?

23  A    Yes.

24  Q    But your story is that --

25          MR. JONES:  Judge, I will have to reach -- give me -- I

Al Williams - Cross Resumed

1    have to reach under here.

2            Give me the other one.

3        (Counsel conferring.)

4            MR. JONES:  George, bring that over.

5            Do you want to put this one up to show -- maybe I'll

6    just do it the old-fashioned way, okay?

7    BY MR. JONES:

8    Q   All right.  I'm showing you what's been marked as

9    Defendant's Exhibit 3.

10           And you recognize this as being 79th Street; is that

11   correct?

12   A   Yes.

13   Q   All right.  Do you recognize this?  Do you see where it says

14   this is Greenwood over here, do you see that?

15           Do you recognize 79th and Greenwood; is that correct?

16   A   I can't see that from this far.

17   Q   Well, would you step down for just a second?

18           THE COURT:  You may step down.

19           MR. JONES:  I'm sorry, Judge.

20       (Witness complies.)

21   BY MR. JONES:

22   Q   All right.  Do you see this is 79th and Greenwood; is that

23   correct?

24   A   Yes.

25   Q   All right.  And looking at this map where this is Dobson

Al Williams - Cross Resumed

1   over here, will you agree that where I'm pointing is to the

2   sidewalk where the incident occurred?

3   A   I'm not for sure.  I'm confused by this poster.

4   Q   Let me show you another.  Maybe this one will help you.

5          Let me show you what's been marked as Defendant's

6   Exhibit 4.

7          Do you recognize this street and the sidewalk?

8   A   Yes.

9   Q   All right.  And this is the sidewalk where this occurred; is

10  that correct?

11  A   No.

12  Q   You tell me where it's the sidewalk where it occurred?

13  A   It's not on this poster.

14  Q   Oh, you don't see -- this is not the sidewalk?

15  A   No.

16  Q   All right.  Go back to the stand.

17     (Witness complies.)

18  Q   Let's put that aside.

19         Your testimony is that despite the fact that these

20  officers were in a marked squad car, that you never saw them

21  before you were taken off your bike; is that right?

22  A   That's correct.

23  Q   In fact, your testimony is that the officers were not in

24  front of you, but somehow they were in back of you; is that

25  correct?

Al Williams - Cross Resumed

1 A    That's correct.

2 Q    In fact, what you even told the jury in the underlying case

3 was that they used their car to hit you from behind, that's your

4 story, isn't it?

5 A    I told them I didn't know what it was.  I'm not for sure

6 what hit -- knocked me off the bike.

7 Q    Well --

8            THE COURT:  Mr. Jones, would you take those things

9 down?

10           MR. JONES:  Oh, yeah.

11           THE COURT:  This courtroom is so small, I ...

12           MR. JONES:  All right, Judge.

13           THE COURT:  -- can't see around it.

14           Thank you.

15           MR. JONES:  All right.

16      (Counsel conferring.)

17 BY MR. JONES:

18 Q    Now, about the car, the trial transcript --

19           MR. JONES:  Gentlemen, page 205, line 17.

20 BY MR. JONES:

21 Q    We asked this question, did you give this answer?

22           "Now, you said that a car hit you from behind?

23           "ANSWER:  Yes."

24           Now, do you recall telling the Ladies and Gentlemen of

25 the trial jury that they used their car to hit you from behind?

Al Williams - Cross Resumed

1    That's what you told that jury, isn't it?

2    A    That's what I thought it was.  I believe so.

3    Q    That's what you testified to under oath, didn't you?

4    A    I believe so.  That's what I thought it was.

5    Q    But yet your testimony is that you never saw them until you

6    fell off your bike; is that correct?

7    A    That's correct.

8    Q    Now, let me make sure that I get this.

9         Your story is also that when you were taken to the

10   lock-up, that you were seen by a lock-up keeper who refused to

11   admit you; is that correct?

12   A    That's correct.

13   Q    And when we talk about a lock-up keeper, that's the person

14   who takes the fingerprints; is that correct?

15   A    I believe so, sir.

16   Q    Well, you say that this particular lock-up keeper, this

17   unknown lock-up keeper, he refused to take you because of your

18   injuries; is that correct?

19   A    That's correct.

20   Q    But, nevertheless, you've never been able to find this

21   so-called unknown lock-up keeper, have you?

22   A    No, sir.

23   Q    And you know for a fact that you probably -- you're going to

24   hear testimony today from the lock-up people who took your

25   fingerprints --

Al Williams - Cross Resumed

1     MR. SHILLER: Objection. He doesn't know what

2     testimony he's going to hear today.

3     THE COURT: Sustained.

4     MR. JONES: I'm sorry.

5     THE COURT: You're not going to tell him what somebody

6     is going to testify to in the future.

7     MR. JONES: Well, okay. I'm sorry, Judge.

8     BY MR. JONES:

9     Q   Well, you -- you do know this. You know for a fact, sir,

10    that Mr. Townsend, who was the lock-up keeper, has testified in

11    the past that he asked you whether you wanted medical treatment

12    and that you told him that you didn't want medical treatment;

13    isn't that true?

14    MR. SHILLER: Objection, that's not --

15    THE WITNESS: That's not --

16    THE COURT: Sorry?

17    MR. SHILLER: That's not impeaching, what somebody else

18    testified to is not impeaching his testimony.

19    THE COURT: Sustained.

20    MR. JONES: All right.

21    BY MR. JONES:

22    Q   Well, maybe I'll reach it this way.

23        When you got to the lock-up, and the lock-up keeper who

24    took your fingerprints, did, in fact, ask you whether you wanted

25    medical treatment, did he not?

Al Williams - Cross Resumed

1    A    No, sir.

2    Q    And you remember that lock-up keeper because he is an

3    African-American male who is large, right?

4    A    Yes, sir.

5    Q    And so what you're telling the Ladies and Gentlemen of the

6    Jury that that lock-up keeper never even asked you whether you

7    wanted medical treatment?

8    A    No, sir.  He never did.

9    Q    All right.  Now, that lock-up keeper, just so that we

10   understand, that lock-up keeper, he wasn't out on the street

11   with these gentlemen, was he?

12   A    No, sir.

13   Q    All right.  You -- and he didn't have anything to do with

14   your arrest, did he?

15   A    No, sir.

16   Q    And do you remember that in the lock-up, there was also

17   another African-American who was in uniform, do you recall that?

18   A    Not for sure, sir.

19   Q    All right.  Do you recall that on the date of your arrest

20   that you were also interviewed by the watch commander himself,

21   Officer Brundage, do you recall that?

22   A    Yes, sir.

23   Q    And do you -- you recall being interviewed by

24   Officer Brundage; is that right?

25   A    He talked to me briefly.

Al Williams - Cross Resumed

1  Q   All right.  And do you recall also telling Officer Brundage

2  that you did not want to receive any medical treatment?

3  A   No, sir.

4  Q   All right.  In fact, what you're saying is you never told

5  Officer Brundage that; is that correct?

6  A   That's correct.

7  Q   All right.  All right.  I just have virtually one last thing

8  or so.

9          Mr. Williams, you recall yesterday that one of the last

10 things that your counsel asked you was about when you first knew

11 that you were going to be charged with narcotics, you remember

12 that, don't you?

13 A   Yes.

14 Q   And what you told the Ladies and Gentlemen of the Jury was

15 that the first time you knew that you were going to be charged

16 with lock-ups -- I mean with narcotics is when you went back

17 with the lock-up keeper; is that correct?

18 A   That's correct.

19 Q   Now, based upon the deposition testimony that you gave, you,

20 sir, know yesterday that testimony that you gave was a lie,

21 don't you?

22 A   No, sir.

23 Q   Isn't it a fact that during your deposition that -- didn't

24 you tell us that when you were being arrested that the police

25 advised you as you were being arrested that one of the reasons

Al Williams - Cross Resumed

1   you were being arrested is that because there was a woman who

2   had identified you as serving narcotics?

3   A    No, sir.

4           MR. SHILLER:  Objection.  This isn't impeaching, what

5   other people are telling him.

6           THE COURT:  Sustained.

7   BY MR. JONES:

8   Q    Did you, sir -- isn't it true that when the officers were

9   arresting you, they told you, sir, that there had been a person

10  who had identified you as serving narcotics; isn't that true?

11          MR. SHILLER:  Same objection.

12          THE WITNESS:  No, sir.

13          THE COURT:  He testified that he found out later.

14          MR. JONES:  Well, Judge --

15          THE COURT:  I'll overrule.

16          MR. JONES:  All right.

17  BY MR. JONES:

18  Q    Sir, I want you to go --

19          MR. JONES:  Gentlemen, page 158.

20  BY MR. JONES:

21  Q    And did you not, during the course of your deposition, say,

22  line 24, "And I was asking them what was the problem.  And they

23  told me somebody pointed me out.  Somebody pointed me out saying

24  I was serving.  That's what they said."

25          Isn't that what you told us in your deposition?

Al Williams - Cross Resumed

1          MR. SHILLER:  Objection.  I don't see where you're
2     talking about.
3          THE COURT:  You don't see what?
4          MR. JONES:  Right here, line 1 -- first of all,
5     starting with line 23.
6          MR. SHILLER:  Page 158, counsel?
7          MR. JONES:  Yeah, 157, 158.
8     BY MR. JONES:
9     Q    Isn't that what you told us in the deposition, that the
10    police officers, when they were arresting you, told you that
11    there had been a person who said that you were serving
12    narcotics?
13    A    I don't remember that, sir.
14    Q    And if that is true, based upon what you've told -- what
15    you've told us in the deposition, what you and your lawyers now
16    insinuate that these police officers went down to a station and
17    then fabricated a report about this, you know that's a lie
18    because they told you on the scene that a woman had identified
19    you as serving narcotics; isn't that true?
20    A    No, sir.
21         MR. JONES:  One moment, Judge.
22         (Counsel conferring.)
23         MR. JONES:  I don't have anything else, Judge.
24         THE COURT:  All right then.
25         MR. SHILLER:  One moment, your Honor, please.

Al Williams - Cross Resumed

1              (Counsel conferring.)

2                        REDIRECT EXAMINATION

3    BY MR. SHILLER:

4    Q    Good morning again, Al.

5    A    Good morning.

6    Q    Just a few things.

7              Remember yesterday and this morning --

8              MR. SHILLER:  Can we turn off the screen and just leave

9    the screen for the witness, please, your Honor?

10             THE COURT:  Yes.

11   BY MR. SHILLER:

12   Q    You were asked a bunch of questions about your

13   interrogatories.

14             Do you recall who filled out those interrogatories?

15   A    I'm not for sure.  Could you ask that, say that again?

16   Q    Yeah.  Do you know who filled -- who typed up those answers

17   to those interrogatories you were asked about?

18   A    I'm not for sure.

19   Q    Okay.  Was it you?

20   A    No.

21   Q    Okay.  But you did review them afterwards?

22   A    I believe so, yes.

23   Q    And you were asked specifically about one question -- about

24   one question and one response.  It was interrogatory Number 16.

25   I'm looking at Defendant's Exhibit 28.  I'm looking at

Williams - Redirect

1     interrogatory 16.

2             You actually -- you were asked about that question and

3     that response, but you weren't given an opportunity to read the

4     question yesterday --

5             MR. JONES:  Wait a minute, Judge.  I'm going to object

6     to his --

7             THE COURT:  Correct.  Sustained.

8             MR. SHILLER:  Okay.

9     BY MR. SHILLER:

10    Q    Let me ask you another question.

11            You remember those pictures we showed you yesterday

12    regarding your injuries?

13    A    Yes, sir.

14    Q    Okay.  And it was two different sets of pictures, do you

15    remember that?

16    A    Yes.

17    Q    And when was the second set of pictures taken, do you

18    recall?

19    A    The second set was taken when I was sent to the county jail,

20    26th and California.

21    Q    Okay.  And why was it that the -- there was a picture taken

22    of your shoulder?

23    A    Because there was an injury to it.

24    Q    How did the cameraman know there was an injury to your

25    shoulder?

Williams - Redirect

1    A    I showed it to him.

2    Q    Oh.  Why was there a picture taken of your elbow?

3    A    Pardon me?

4    Q    Why was a picture taken of your elbow?

5    A    Because there was an injury to it.

6    Q    How did the cameraman know there was an injury to your

7    elbow?

8    A    I showed it to him.  He asked me.

9    Q    The -- then we talked yesterday about you heard different

10   testimony from different times from these officers?

11   A    Yes.

12   Q    Do you remember when the issue of the sex of the informer

13   came up at the preliminary hearing?

14          MR. JONES:  Wait a minute, Judge.  I'm sorry.  What's

15   the question?

16          MR. SHILLER:  He asked about him being told about a

17   female informant.

18          THE COURT:  Uh-hum.

19          MR. JONES:  What?  Judge, I don't know what he's

20   talking about.  Female -- oh, about the tip from the concerned

21   citizen.  Oh.

22          What's the question?  I'm sorry.

23   BY MR. SHILLER:

24   Q    Do you remember when the gender of the concerned citizen

25   came up at the preliminary hearing?

Williams - Redirect

1   A   No, sir.

2   Q   Okay.  I have nothing further, your Honor.

3          THE COURT:  All right.  You may step down.

4          MR. JONES:  Whoa, Judge, Judge, just one second, one

5  second.

6      (Counsel conferring.)

7          THE COURT:  You may step down.

8          MR. JONES:  No, we have no questions, Judge.

9          THE COURT:  All right.

10      (Witness excused.)

11         MR. KOSOGLAD:  Plaintiff calls Erica Rucker.

12         MR. JONES:  Oh, I'm sorry.

13      (Counsel conferring.)

14         THE COURT:  Where is your witness?

15         MR. KOSOGLAD:  Mr. O'Brien went to get her.  I think

16  she's outside the courtroom.

17         THE COURT:  She should be ready.

18      (Witness enters courtroom.)

19         THE COURT:  Morning, ma'am.

20         THE WITNESS:  Good morning.

21         THE COURT:  Before you sit down, raise your right hand

22  and be sworn.  The court reporter will swear you in.

23      (Witness duly sworn.)

24         THE COURT:  Be seated.

25

                              Rucker - Direct

1                  ERICA RUCKER, PLAINTIFF'S WITNESS, SWORN

2                            DIRECT EXAMINATION

3       BY MR. KOSOGLAD:

4       Q    Good morning, Miss Rucker.

5       A    Good morning.

6       Q    Could you state and spell your name for the record?

7       A    Erica Rucker.

8       Q    Could you spell it for us?

9       A    E-R-I-C-A.  R-U-C-K-E-R.

10      Q    Where do you live?

11      A    1049 East 80th Street.

12      Q    What area is that in Chicago?

13      A    The Calumet area.

14      Q    How old are you?

15      A    How old am I?  23.

16      Q    Do you go to school?

17      A    Yes.

18      Q    Where?

19      A    Olive Harvey College.

20      Q    Do you know Al Williams?

21      A    Yes.

22      Q    How do you know Al Williams?

23      A    He's my oldest cousin.

24      Q    How long have you known him?

25      A    My whole life.

Rucker - Direct

1   Q   Do you know his kids?

2   A   Yes.

3   Q   Now, calling your attention to May 31st of 2007, do you

4   remember seeing Al Williams that day?

5   A   Yes, I do.

6   Q   And where did you first see Al Williams?

7   A   At my home.

8   Q   And after you saw him at your home, did you see him at

9   another time?

10  A   Yes.  I was at Billy's fast food restaurant.

11  Pick-up-and-go.  I had to wait on my food.  So I seen him on his

12  way going back home.

13  Q   Okay.  And where is the fast food joint that you just

14  mentioned?

15  A   79th and Ellis.

16  Q   Now, I'm going to show you a picture, which has been

17  previously admitted into evidence and marked as Plaintiff's 14C.

18          MR. KOSOGLAD:   Thanks, Judge.

19  BY MR. KOSOGLAD:

20  Q   Now, could you please point out to the Ladies and Gentlemen

21  of the Jury where Billy's fast food joint is in this picture?

22  A   Under this yellow sign.

23  Q   Okay.  And where did you talk with Al Williams at?

24  A   Right in front of there.

25  Q   Now, I'm going to show you another picture, which has

                              Rucker - Direct

1    previously been admitted into evidence.  It's Plaintiff's 14D.

2              Can you show the Ladies and Gentlemen of the Jury where

3    Billy Bob's is in this picture?

4    A    Billy Boy's?  Under the yellow sign.

5    Q    When you say the sign, do you mean the awning?

6    A    Yes.

7    Q    Okay.

8              THE COURT:  Is fair to say that arrow doesn't have any

9    meaning?

10             THE WITNESS:  Right.  It's across the street.  It's --

11   BY MR. KOSOGLAD:

12   Q    Okay.  What was the weather like outside that day, do you

13   remember?

14   A    Nice.

15   Q    And how was the day like?

16   A    It was fine.

17   Q    Now, were you with anyone at Billy's fast food joint?

18   A    No.

19   Q    Now, can you describe Billy's fast food joint to the Ladies

20   and Gentlemen of the Jury?

21   A    They don't have any chairs, any tables.  Just have a rest

22   where you order through the window and you wait on your food.

23   The window is closer to the door where that you just walk in and

24   stand.

25   Q    Okay.  So when you spoke to Al Williams, had you already

Rucker - Direct

1    placed your order?

2    A    Yes.

3    Q    And where were you standing after you placed your order?

4    A    Right in front of the door.

5    Q    Okay.  Is that outside?

6    A    Outside, yes.

7    Q    And you said earlier, at some point you had a conversation

8    with Al?

9    A    Earlier?  Yes.  He -- when I was standing there in front, he

10   was on his way going back home, and I seen him cross --

11            MR. JONES:  Objection, Judge.  This is hearsay.

12            THE COURT:  Sorry, what -- I didn't understand what you

13   said.

14            THE WITNESS:  He was going -- I had talked to him when

15   he -- when I -- after I ordered my food.

16            THE COURT:  Okay.

17            THE WITNESS:  He was on his way home.

18   BY MR. KOSOGLAD:

19   Q    Okay.

20            THE COURT:  It is hearsay.  Jury disregard it.

21   BY MR. KOSOGLAD:

22   Q    Now, while you were standing outside the restaurant, did

23   something call your attention away?

24   A    Yes.

25   Q    And what was that?

Rucker - Direct

1   A    Officers messing with these two young boys on a bike.

2   Q    And did you know the boys on the bike they were messing

3   with?

4   A    Yes.

5           MR. JONES:  Judge, I'm going to object to any other

6   incident other than the incident in this case.

7           THE COURT:  This is part of the context of the

8   incident, so overruled.

9   BY MR. KOSOGLAD:

10  Q    What do you mean when you say you saw the officers messing

11  with them?  What did you see exactly?

12  A    The kids was riding their bikes on the side of the curb, and

13  an officer hopped out of the car and approached the kids.

14  Q    And could you see where that place is where those kids were

15  in this photo?

16  A    Yes.

17  Q    Could you show the Ladies and Gentlemen of the Jury where it

18  was the officers were messing with the kids?

19  A    (Indicating.)

20  Q    Could you make a bigger mark?

21  A    By the bus -- bus stop.

22  Q    Okay.  And what happened next?

23  A    After that, a few seconds later, the officers ran across the

24  street.  Al was on the corner where right here by the edge of

25  this gate, the second gate.

Rucker - Direct

1    Q    And did you know the two kids on the bike?

2    A    Yes.

3    Q    Who were they?

4    A    Lorenzo and Josh.  Joshua Taylor.

5    Q    And do you know where Lorenzo is now?

6    A    They moved out of town.

7    Q    Now, what did you see the officer do when he ran across the

8    street?

9    A    Attacked Al off his bike.

10   Q    And how did he take Al off his bike?

11   A    Like football-tackle him.

12   Q    Now, what did you do when you saw the officer tackle Al

13   Williams?

14   A    I walked across the street on the same side of the street.

15   Q    And did you have a conversation with anyone as you crossed

16   the street?

17   A    Lorenzo.

18   Q    And what did you tell Lorenzo?

19   A    To go get my mother.

20   Q    And what did you do after you told Lorenzo to go get your

21   mother?

22   A    I finished heading across the street towards Al.

23   Q    And what did you see as you were walking across the street?

24   A    The officer, on his back, with his knee in his back.

25   Q    I think you just said the officer on his back.  Did you mean

Rucker - Direct

1   Al on his back?

2   A   Al was on his chest.

3   Q   Okay.

4   A   The officer had his knee in Al's back.

5   Q   And did you see anything else?

6   A   After that, them putting the handcuffs on him.

7   Q   Okay.  And can you point out where it was on this picture

8   the officers put the handcuffs on Al Williams?

9   A   (Indicating.)

10  Q   Can everyone see that?

11          Now, did you hear the officers say anything as they

12  were running across the street?

13  A   No.

14  Q   How many officers did you see run across the street?

15  A   One.

16  Q   Did you hear anybody say, you know, "police, stop," or

17  anything like that?

18  A   No.

19  Q   And what happened when you got across the street?

20  A   I started to walk closer.  The officer -- one of the

21  officers told me to get the -- get back before my black ass join

22  him.

23  Q   Okay.  And what did you understand that to mean?

24  A   What do I understand that mean?  Stay back.  So I went

25  across the street.

Rucker - Direct

1    Q    And did you see the officers do anything else to Al Williams

2    during this time?

3    A    No, but as -- after they put him in the car.

4    Q    Okay.  Well, before that happened, did anybody come to the

5    scene of Al's arrest who you knew?

6    A    Yes.

7    Q    Who was that?

8    A    My mother.

9    Q    Okay.  And what happened when your mother got there?

10   A    She was yelling across the street, asking them what was they

11   doing to him and stop --

12   Q    What did your mom -- I'm sorry, continue.

13   A    And to stop doing that to him and why they doing him like

14   that.  Telling him that they knocked his shoe off his foot --

15           MR. JONES:  Judge, I'm going to object.  This is

16   hearsay.

17           THE COURT:  Telling -- this is hearsay -- I don't know

18   what she's saying --

19           MR. KOSOGLAD:  I'll just ask another question if that's

20   okay.

21   BY MR. KOSOGLAD:

22   Q    What's your mother's name?

23   A    Debbie Williams.

24   Q    Okay.  And about how long had the arrest been going on when

25   Debbie Williams arrived?

Rucker - Direct

1    A    Maybe four or five minutes.

2    Q    Okay.  Now, how many officers did you see at the scene of

3    Al's arrest?

4    A    Around four.

5    Q    And do you recognize any of the officers you saw at Al's

6    arrest here in the courtroom?

7    A    Yes.

8    Q    Who do you recognize as being at the scene of Al's arrest?

9    If you just point them out by an article of clothing or where

10   they're sitting at the table.

11   A    The one with the blue shirt on.  The one with the glasses.

12   And the one with the haircut.

13   Q    Can you show the one with the haircut, which one do you

14   mean?

15   A    He got sideburns.

16         MR. KOSOGLAD:  Okay.  Can the record reflect the

17   identification of the defendants, your Honor?

18         THE COURT:  Yes.

19         MR. KOSOGLAD:  Thank you.

20   BY MR. KOSOGLAD:

21   Q    Now, did you ever see -- did you see Al Williams being put

22   into the squad car?

23   A    Yes.

24   Q    And what did you see happen there?

25   A    They put the handcuffs on him.  They picked him up by the

Rucker - Direct

1    hoop of his pants and by his shoulder, and threw him in the back

2    seat.

3    Q   So how was -- so was Al standing when he was put into the

4    car?

5    A   No.

6    Q   He was off the ground?

7    A   Right.

8    Q   Okay.  What did you see happen after that?

9    A   They was riding off, taking him towards the police station

10   on 78th and Halsted.

11   Q   And did you see them as they were riding off?

12   A   Yes.

13   Q   And did you see anything going on inside the car --

14   A   Just --

15   Q   Let me hold that question for just a second.

16           Did you see anybody get into the car with Al Williams?

17   A   Yes.  The officer.

18   Q   How many officers got in --

19   A   One.

20   Q   And which --

21   A   One was driving, and one was in the back seat with Al.

22   Q   Okay.  And what did you see as the squad car left?

23   A   Just some going up and down in the back seat.

24   Q   And how would you describe the up and down you saw going on

25   in the back seat?

Rucker - Direct

1    A    Like this.  (Indicating.)

2              MR. KOSOGLAD:  Can the record reflect that the witness

3    raised her elbow in a punching motion downward?

4              MR. JONES:  Wait a minute, Judge.  I object to that

5    characterization.

6              THE COURT:  Would you make the gesture again, please?

7              THE WITNESS:  Yes, like this.  (Indicating.)

8              THE COURT:  All right.  Yes, the record may so reflect.

9              MR. KOSOGLAD:  Thank you.

10   BY MR. KOSOGLAD:

11   Q    When was the next time you saw Al Williams?

12   A    Like 45 days later.

13   Q    Okay.  Did you ever go to court for Al?

14   A    No.

15   Q    Did you go to his trial?

16   A    Yes, I did.

17   Q    And when you were at court -- do you remember ever getting

18   interviewed?

19   A    Yes.

20   Q    And who did you get interviewed by?

21   A    I think the State's Attorney.

22   Q    Now, do you know what happened at the trial?

23   A    No.

24   Q    Do you know what the outcome of the trial was?

25   A    No.

Rucker - Direct

1   Q    Do you know what the jury decided at the trial?

2              MR. JONES:  Judge, I'm going to object.

3              THE WITNESS:  No.

4              THE COURT:  She said no.  Sustained.

5              MR. KOSOGLAD:  Can I have just a moment, your Honor?

6              THE COURT:  Yes.

7         (Counsel conferring.)

8   BY MR. KOSOGLAD:

9   Q    Erica, do you know which one of these three officers you

10  identified did the punching motion?

11  A    The one sitting in the first chair.

12             MR. KOSOGLAD:  And may the record reflect that's

13  Officer Rubald, Judge?

14  A    Yes.

15             MR. KOSOGLAD:  Thank you.

16             No further questions.

17             MR. JONES:  Just a few, your Honor.

18                        CROSS-EXAMINATION

19  BY MR. JONES:

20  Q    Let me see.

21             Good morning, Miss Rucker.

22  A    Good morning.

23  Q    Miss Rucker, I gather that -- I'm going to show you, once

24  again, Defendant's Exhibit 3.

25             THE COURT:  Mr. Jones, I don't know if that exhibit is

Rucker - Cross

1   in evidence; but so far, you know, the witness hasn't identified

2   it as where this happened.

3        MR. JONES:  Well, I'm going to see if I can with this,

4   Judge.

5        THE COURT:  Okay.

6        MR. JONES:  Okay?

7        THE COURT:  But it shouldn't be shown to the jury, as

8   you know, until it's in evidence.

9        MR. JONES:  All right.  The gentlemen before -- all

10  right.  Maybe I can do it this way.

11  BY MR. JONES:

12  Q    You say you were standing on the corner of -- that this

13  building is on 79th and Ellis, right?

14  A    Yes.

15  Q    And 79th -- and you know where Dobson is, do you not?

16  A    Yes.

17  Q    And how many blocks is Ellis from Dobson?

18  A    One.

19  Q    All right.  So that was a whole block away.  So when you

20  were standing on Ellis, you were able to see what was going on

21  one block away; is that correct?

22  A    Yes.

23  Q    All right.  Now -- and I gather what you told me is that

24  Mr. Williams, he's your oldest brother; is that correct?

25  A    Cousin.

Rucker - Cross

1    Q    He's your oldest cousin?

2    A    Yes.

3    Q    All right.  You did not testify at the criminal trial, did

4    you?

5    A    No.

6    Q    All right.  And you say -- you're able, as you walk in here

7    today -- so the only time in life there that you ever saw these

8    gentlemen was that day on May 31st, 2007; isn't that right?

9    A    Yes.

10   Q    And what you want us to believe is -- and that of course was

11   years ago, right?

12   A    Yes.

13   Q    And that you can walk into this courtroom, and having only

14   seen them one time on the outside, years ago, that you recognize

15   them today?

16   A    Yes.  I don't forget no face.

17   Q    All right.  Now, your -- on this particular day, you say you

18   were at this Billy Boy's?

19   A    Yes.

20   Q    How long had you been at Billy Boy's?

21   A    I had just went to Billy Boy's.

22   Q    For the Ladies and Gentlemen of the Jury, what time are we

23   talking about?

24   A    It's around 4:00 or 5:00.  Between 4:30 and 5:00 o'clock.

25   Q    Now, are you sure?  It was round 4:30 and 5:00 o'clock?

Rucker - Cross

1    A    Yes.

2    Q    Is that right?

3    A    Yes.

4    Q    And so what you're telling us is that this incident that you

5    recall happened at 5:00 o'clock in the afternoon; is that right?

6    A    Between 4:30 and 5:00 o'clock, yes.

7    Q    All right.  And that one of the things that you did is that

8    you told somebody to go get your aunt, Debbie Williams --

9    A    My mother Debbie Williams.

10   Q    I'm sorry, your mother Debbie Williams.

11        And where did Debbie Williams live?

12   A    7833 Ingleside.

13   Q    And how many blocks -- in fact, that 7833 Ingleside, they

14   still got that old high school of mine Hirsch there?

15   A    Yes.

16   Q    And how many blocks is Ingleside --

17   A    That was around the corner.

18   Q    But how many blocks is that?  Isn't that about three or four

19   blocks?

20   A    No.

21   Q    How many blocks is Ingleside from Dobson?

22   A    Three.

23   Q    All right.  And that -- and Debbie Williams -- how old is

24   Debbie Williams?

25   A    46.

Rucker - Cross

1   Q   And that Debbie Williams was -- someone was able to go get

2   Debbie Williams, and Debbie Williams was able then to run back

3   three blocks before Mr. Williams was taken away?

4   A   From --

5   Q   Is that your testimony?

6   A   Yes.

7   Q   All right.

8       MR. JONES:  Just one second, Judge.

9       (Counsel conferring.)

10      MR. JONES:  Okay.  You're right.  All right.

11  BY MR. JONES:

12  Q   One more thing, Miss Rucker.

13      How many -- did you say there was one police car?

14  A   No, there was two.

15  Q   You saw two police cars.  All right.

16      (Counsel conferring.)

17      MR. JONES:  I don't have anything further, Judge.

18      THE COURT:  All right.  Redirect?

19                  REDIRECT EXAMINATION

20  BY MR. KOSOGLAD:

21  Q   Erica --

22      THE COURT:  Yes.

23  BY MR. KOSOGLAD:

24  Q   -- you saw -- you heard counsel ask you how somebody was

25  able to go get Debbie Williams and come back while the arrest

Rucker - Redirect

1    was still going on?

2    A    Yes.

3    Q    Who went to get Debbie Williams, do you know?

4    A    Lorenzo.

5    Q    And how did he go get her?

6    A    He rode on his bike.

7    Q    Okay.  And Al Williams was riding a bike that day, too,

8    right?

9    A    Yes.

10   Q    Did you see what happened to Al Williams' bike?

11              MR. JONES:  Judge, this is beyond the scope --

12              THE WITNESS:  It was put in the trunk --

13              MR. JONES:  Excuse me, Judge.

14              THE COURT:  Sustained.

15              MR. KOSOGLAD:  No further questions.

16              THE COURT:  All right.  Then you're excused.  Step

17   down.

18              Thank you for your testimony.

19        (Witness excused.)

20              MR. KOSOGLAD:  Plaintiff calls Debbie Williams, your

21   Honor.

22        (Brief pause.)

23        (Counsel conferring.)

24              MR. JONES:  Bring her on in if the other guys are here.

25        (Witness entering courtroom.)

135

                          Rucker - Redirect

1              THE COURT:  Good morning, ma'am.

2              Before you sit down, please raise your right hand to be

3    sworn.  The court reporter will swear you in.

4          (Witness duly sworn.)

5              THE COURT:  Please be seated.

6              DEBBIE WILLIAMS, PLAINTIFF'S WITNESS, SWORN

7                        DIRECT EXAMINATION

8    BY MR. KOSOGLAD:

9    Q    Good morning, Miss Williams.

10   A    Good morning.

11   Q    Could you please state and spell your name for the record?

12   A    Debbie Williams.  D-E-B-B-I-E.  W-I-L-L-I-A-M-S.

13   Q    And do you know Al Williams?

14   A    Yes.

15   Q    How do you know Al Williams?

16   A    He's my nephew.

17   Q    How long have you known him?

18   A    Since he was born.

19   Q    All right.  And just calling your attention back to

20   May 31st, 2007, did you get any startling news that day?

21   A    Yes.

22   Q    And how did you get that news?

23   A    It was Lorenzo, my neighbor, he had came around to my house

24   and he told me that my daughter sent him around there to tell me

25   that the police had Al, Al Williams.

Debbie Williams - Direct

1   Q   And what did you do in response to this news?

2   A   I had went to go see what was going on.  And when we was

3   walking to go see what was going on, he had told me that the

4   police -- I says what happened --

5           MR. JONES:  Judge, I'm going to object --

6           THE COURT:  Wait for another question.

7           THE WITNESS:  Okay.

8   BY MR. KOSOGLAD:

9   Q   And what happened as you were going to see what was going

10  on?

11  A   Lorenzo told me that the police --

12          MR. JONES:  Objection, Judge.

13          MR. KOSOGLAD:  It's being offered for the effect on the

14  hearer, Judge.

15          THE COURT:  Sorry?

16          MR. KOSOGLAD:  It's being offered for the effect on

17  Miss Williams, Judge.

18          MR. JONES:  No, it's being offered for the truth --

19          THE COURT:  Overruled.

20  BY MR. KOSOGLAD:

21  Q   What happened?

22  A   Well --

23  Q   What did Lorenzo tell you?

24  A   Huh?

25  Q   What did Lorenzo tell you?

Debbie Williams - Direct

1    A    What did you say?

2    Q    What did Lorenzo tell you while you were going to see what

3    happened --

4    A    He was telling me that the police had -- was jumping on Al

5    Williams.

6    Q    And how did you respond to that?

7    A    I ran immediately around there.  I had panicked and started

8    running, just to find out what was going on.

9    Q    How would you describe your emotional state?

10   A    Nervous emotional state.  Upset.

11   Q    And what happened when you -- did you eventually get to the

12   scene of Al's arrest?

13   A    Yes, I did.

14   Q    And what happened when you got there?

15   A    When I got there, the -- I was trying to get over there to

16   the car to find out what was going on, and the officer told me

17   to get back, so I got back on the sidewalk.  And then I noticed

18   the other officer was in the back seat.  He was already in the

19   back seat of the car, and the officer was in there with him.

20   And I was trying to get over there again so I could see what was

21   going on, and he told me to get back again.  Then I had noticed

22   that his shoe was on the ground by the police car.  And I asked

23   him, I said, What's going on?  I say, What's going on?  Then I

24   said, You all supposed to serve and protect, what's going on?  I

25   said, What you all beat him out of his shoe or something?

Debbie Williams - Direct

1          And then by that time, the other -- the officer was in

2    the back seat with him.  He got out the car, and he picked up

3    the shoe off the ground, and he slung it in the car at my

4    nephew.  And then once he got back in the car, he -- they was

5    fittin' to drive off.  And at this time, I could see him raising

6    his hand hitting him.

7    Q    Okay.

8    A    Several times.

9    Q    Okay.  And did you ever see Al in --

10   A    And I --

11   Q    Did you ever see Al in handcuffs?

12   A    No, because by the time I got around there, he was already

13   in the car.

14   Q    Okay.  And where were you standing while you saw the officer

15   hitting --

16   A    I was on the sidewalk, and the car was like on the other

17   side, right across from me.

18   Q    How far away would you say?

19   A    About seven feets, eight feets.  Maybe a little more.

20   Q    Okay.  And do you recognize the officer who you saw hitting

21   Al Williams in the courtroom today?

22   A    It's been so long, I don't remember his face.

23   Q    Okay.

24   A    But I know it was the officer that was sitting in the back

25   with him.

Debbie Williams - Direct

1   Q   Okay.  Thank you.  No further questions, your Honor.

2            THE COURT:  All right.

3        (Counsel conferring.)

4                      CROSS-EXAMINATION

5   BY MR. JONES:

6   Q   Good morning, Miss Williams.

7   A   Good morning.

8   Q   All right.  Miss Williams, you say -- and, incidentally,

9   when you received this news, where was your house?

10  A   On 78th and Ingleside.

11  Q   All right.  And that's about, just about four blocks away?

12  A   No.  No, sir.  It's about --

13  Q   How many blocks do you say it is?

14  A   I'd say about almost two blocks, 'cuz it's Ingleside, then

15  it's Ellis, then it's Dobson.  It was between Dobson and Ellis.

16  Q   But you live exactly where on Ellis?  78 what?

17  A   7833.  About three houses off the corner of Ingleside.

18  Q   How many houses off the corner?

19  A   Three houses off the corner of Ingleside.

20  Q   Ah-ha.  So you received this news, and you manage to get

21  back to the scene before Mr. Williams was carried away?

22  A   Yes, sir.

23  Q   Did you run?

24  A   Yes, I ran.  I ran, and I stopped 'cuz I was kind of out of

25  breath.

Debbie Williams - Cross

1   Q    In fact, you ran -- would you say you were pretty much in

2   the same shape you are today?

3   A    What?  You talking about heavyset?

4   Q    I just said do you look the same way that you did --

5   A    Well, I wasn't that heavy back then.  That's been a long

6   time.

7   Q    All right.  But you ran?

8   A    Yes, I ran.

9   Q    Three blocks --

10  A    You would have ran, too, if you heard something was

11  happening to your family.

12  Q    And how many minutes did it take you to run this three

13  blocks?

14  A    Well, I'll say probably five minutes, at the most.

15  Q    Five minutes at the most.  Okay.

16  A    Probably.

17  Q    Now, when you got there, you say you saw the police.  All

18  right?  Did you see a police car?

19  A    Yes, I did.

20  Q    All right.  How many police cars did you see?

21  A    Probably two.

22  Q    Now, probably two or --

23  A    Well, two.

24  Q    All right.  Now, where --

25  A    I was focusing on the one my nephew was in.

Debbie Williams - Cross

1    Q    All right.  Well, can you describe for me where that police

2    car was?

3    A    Right -- like I'm standing on the sidewalk.  He was like

4    right there close to -- by the table right here.  (Indicating.)

5    Q    Was -- I want to know, you tell us where the police car was.

6    Was the police car on the street?

7    A    Closer like on the sidewalk on the street --

8    Q    All right.  And how -- was it parallel, was it diagonal?

9    How was it parked?

10   A    This way, 'cuz they was going towards Halsted when they took

11   him away to the police station.

12   Q    You said there was another police car.  Can you tell us

13   where that police car was?

14   A    I can't really just say because I was focusing on that

15   police car, where my nephew was in.

16   Q    All right.

17          MR. JONES:  I don't have anything else, Judge.

18          MR. KOSOGLAD:  Nothing based on that, your Honor.

19          THE COURT:  All right.  Thank you, Miss Williams.  You

20   may -- you are excused.  You may step down.

21      (Witness excused.)

22          MR. O'BRIEN:  Plaintiff calls lock-up keeper Evans.

23      (Counsel conferring.)

24      (Brief pause.)

25          MR. SHILLER:  Your Honor, it's 10:45.  Do you want to

Debbie Williams - Cross

1  take your mid-morning break now?

2        THE COURT:  No, I'll let you know when I'm ready for a

3  break.

4        MR. SHILLER:  I didn't mean -- I'm sorry.  Just ...

5     (Brief pause.)

6     (Witness entering courtroom.)

7        THE COURT:  Good morning, sir.

8        Please raise your right hand and be sworn.

9     (Witness duly sworn.)

10        THE COURT:  Please be seated.

11       WARREN EVANS, PLAINTIFF'S WITNESS, SWORN

12           DIRECT EXAMINATION

13  BY MR. O'BRIEN:

14  Q   Good morning, Mr. Evans.

15  A   Good morning.

16  Q   Could you please state and spell your full name for the

17  record?

18  A   Warren Conrad Evans.  W-A-R-R-E-N.  C-O-N-R-A-D.  E-V-A-N-S.

19  Q   Mr. Evans, what is your current occupation?

20  A   Police officer for the City of Chicago.

21  Q   And how long have you been a police officer for the City of

22  Chicago?

23  A   20 years.

24  Q   And were you working as a police officer on May 31st, 2007?

25  A   Yes.

Evans - Direct

1    Q    And what was your assignment on that day?

2    A    I was the lock-up keeper.

3    Q    And could you briefly describe what you were doing as a

4    lock-up keeper?

5    A    We processed the prison -- arrestees coming in, searched.

6    Ask them if they are sick, injured, taking any medication.

7    Fingerprint them.  Do a mug shot.  Offer them a sandwich, a

8    phone call.  And then put them in a holding cell.

9    Q    Mr. Evans, when did your shift begin on May 31st, 2007?

10   A    10:00 p.m.

11   Q    And on May 31st, 2007, do you recall seeing Al Williams?

12   A    Yes.

13   Q    Okay.  And when you observed Mr. Williams, did you observe

14   any physical injuries on him?

15   A    We observed a bruise on his forehead.

16   Q    So you observed a head wound?

17   A    Yes.

18   Q    Mr. Evans, did you provide any medical treatment for

19   Mr. Williams?

20   A    No.  He refused.

21   Q    Do you have any obligation as a lock-up keeper to provide

22   medical attention for injured arrestees?

23   A    Yes.

24   Q    And just to clarify, you did admit Mr. Williams into lock-up

25   on May 31st, 2007?

Evans - Direct

1  A   Yes.

2  Q   Do you recall approximately what time that was?

3  A   Approximately about 10:11 p.m.

4         MR. O'BRIEN:  If I can have just one moment, your

5  Honor.

6         THE COURT:  Yes.

7      (Counsel conferring.)

8  BY MR. O'BRIEN:

9  Q   Mr. Evans, how many people usually work in lock-up?

10 A   Two to three.

11 Q   Two to three?

12 A   Yes.

13 Q   Now, you said that you began your shift at 10:00 p.m. on

14 May 31st, 2007?

15 A   Yes.

16 Q   Isn't it true that you began your shift at 2:00 p.m. on that

17 day?

18 A   I'm -- 2:00 p.m.?  No.  10:00 p.m.

19 Q   Mr. Evans, approximately how many arrestees do you see

20 during a shift?

21 A   It can vary from 15 to 20.

22 Q   So you see approximately 15 to 20 people per shift?

23 A   Yes.

24 Q   But you specifically remember seeing Al Williams?

25 A   Not specifically, no.

Evans - Direct

1         MR. O'BRIEN:  No further questions, your Honor.

2         THE COURT:  Okay.

3      (Counsel conferring.)

4         MS. CHANDRASEKARAN:  Your Honor, we don't have any

5  questions.

6         THE COURT:  All right.  You are excused.

7         THE WITNESS:  Thank you.

8         THE COURT:  Thank you, Officer.

9      (Witness excused.)

10        MR. KOSOGLAD:  We call Officer Townsend.

11     (Brief pause.)

12     (Witness entering courtroom.)

13        THE COURT:  Good morning.

14        THE WITNESS:  Good morning.

15        THE COURT:  Raise your right hand to be sworn, please?

16        THE WITNESS:  Yes, ma'am.

17        THE COURT:  The court reporter will swear you in.

18     (Witness duly sworn.)

19        THE COURT:  Please be seated.

20       ARLANZA TOWNSEND, PLAINTIFF'S WITNESS, SWORN

21              DIRECT EXAMINATION

22  BY MR. KOSOGLAD:

23  Q  Sir, could you please state and spell your name for the

24  record?

25  A  Arlanza, A-R-L-A-N-Z-A.  Townsend, T-O-W-N-S-E-N-D.

Townsend - Direct

1   Q   Are you a police officer?

2   A   No, sir.  I'm a detention aide.

3   Q   What's the difference?

4   A   The difference is a detention aide is a civilian, and a

5   police officer is a sworn officer.

6   Q   Now, where do you work as a detention aide?

7   A   7808 South Halsted, Chicago Police Department, Sixth

8   District.

9   Q   How long have you worked there?

10   A   Ten years.

11   Q   Is there a specific part of the police station you work in?

12   A   That's correct.  That's the lock-up.

13   Q   And how many other people work with you in the lock-up?

14   A   Maybe two, three.  Depends on the manpower of that day.

15   Q   How many police officers?

16   A   One.

17   Q   Always one, right?

18   A   Not always one.  Once again, depends on the manpower.

19   Q   Okay.  Now, do you remember Al Williams?

20   A   Yes, that's correct.

21   Q   How many people do you see on -- during a certain shift?

22   A   It varies.  It depends anywhere from maybe 3 to 15.

23   Q   Okay.  So how do you remember Al Williams?

24   A   I was also on his other -- I was also on the case previously

25   before this, so I remember him from the case.

Townsend - Direct

1    Q    How many inmates would you say you've seen since you saw Al
2    Williams?
3    A    I cannot give you a number.
4    Q    Couple thousand maybe?
5    A    Once again, I can't give you a number.
6    Q    Do you remember the injury to Al Williams' head?
7    A    A small -- he had a slight cut to his forehead, to the right
8    side of his forehead.
9    Q    Was it bleeding?
10   A    No, it was not bleeding.
11   Q    Do you remember the injury?  Do you remember picturing it?
12   A    I can picture -- I can remember it, correct.
13   Q    Did you review any documents before you testified here
14   today?
15   A    Yes, I did.
16   Q    And where did you review those documents?
17   A    With the officer -- at the office of the city lawyer, I
18   believe.
19   Q    The attorneys sitting at the table right there?
20   A    I believe so.
21   Q    Well, were they there when you met with them?
22   A    Were they there?  Correct.
23   Q    Yeah.  Okay.  And how long did your meeting last?
24   A    Maybe about, I'm going to say a couple hours.
25   Q    You met with them for a couple hours?

Townsend - Direct

1   A    I believe so.

2   Q    Now, what documents did you review in preparing for your

3   testimony?

4   A    The final arrest report.

5   Q    Anything else?

6   A    The final arrest report and the, what is it called, the

7   written report.

8   Q    Were you shown any pictures of Al Williams?

9   A    The report -- the picture that comes with the arrest report.

10  Q    Any others?

11  A    Just those.

12  Q    Was the picture in color that you were shown?

13  A    No, it was not.

14  Q    Okay.  Did seeing the picture help refresh your recollection

15  about the injury to Al Williams?

16  A    I actually saw -- I actually, once I was at work, I actually

17  went back to the database and seen it myself.

18  Q    In color?

19  A    Yes.

20  Q    And you don't remember that the wound was bleeding?

21  A    It was -- it was -- it -- it had blood on it, but it wasn't

22  breeding profusely, no.

23  Q    Okay.  So the bleeding had stopped?

24  A    It was just a regular cut, so it was -- you do see blood,

25  yes.

Townsend - Direct

1    Q    Okay.  And how much blood did you see?

2    A    It wasn't a lot of blood.  Maybe just like if you cut

3    yourself, you'll see blood.

4    Q    Now, when you work back in the lock-up when arrestees have

5    blood on them, do you usually clean them up before you take

6    their mug shot?

7    A    Do we clean them up?

8    Q    Are they given tissues?

9    A    If they ask for it, yeah, we do; but normally sometimes we

10   don't.  If it's not blooding profusely, just take the picture.

11   Q    Now, do you keep a record of the injuries you see on the

12   arrestees?

13   A    You put it into the log.  You put it into the arrestee log.

14   Q    Now, working the -- do you make the arrestees take off their

15   clothes?

16   A    No, we do not.  Only time you make them -- they may have

17   tattoos or distinguishing marks, you will have them, if it's

18   under their shirt, raise their sleeve or whatever may be.

19   Q    You mentioned that you reviewed the arrest report, right?

20   A    That's correct.

21   Q    You fill out part of the arrest report?

22   A    Yes, I do.

23   Q    As the detention aide?

24   A    Yes, I do.

25   Q    Which part do you fill out?

```
                            Townsend - Direct
```

1    A    It may say lock-up keeper's comments and arrestee's

2    appearance.

3    Q    And you make sure those records are accurate, right?

4    A    That's correct.

5    Q    Okay.  Now, did you have a chance to review the comments you

6    made about Al Williams' injury on May 31st, 2007?

7    A    Slight cut to the forehead.

8    Q    You reviewed it?

9    A    Yes, I have.

10   Q    Okay.  And you think it says slight cut -- slight cut to the

11   forehead?

12   A    It should say small cut to forehead.

13   Q    Small cut to the forehead?  Are you sure about that?

14   A    I'm not going to say correct -- I'm not going to say yes, I

15   am, but it should say small cut on the forehead.

16   Q    Well, let me show you Plaintiff's Exhibit Number 1, which

17   has been admitted by agreement, right?

18            MR. JONES:  Yes.  In fact, Judge, by agreement, all of

19   the police reports we've said are in.

20            MR. KOSOGLAD:  May I approach, your Honor?

21            THE COURT:  Yes.

22   BY MR. KOSOGLAD:

23   Q    Now, what is your comment on the arrest report --

24   A    Arrestee has swollen cut to right side of forehead, refused

25   medical attention.

Townsend - Direct

1    Q    It doesn't say small, right?

2    A    Like I said, yes, it doesn't.

3    Q    Did someone else tell you it was small?

4    A    No.

5    Q    Now, just calling your attention to the -- take it, I'm

6    sorry -- to the questionnaire at the top, one of the questions

7    is does the arrestee have obvious sign of injury, right?

8    A    That's correct.

9    Q    You said no.

10   A    That's correct again.

11   Q    Is that true?

12   A    No, it's not.

13        MR. KOSOGLAD:  No further questions.

14        THE COURT:  All right.  Cross-examination.

15        (Counsel conferring.)

16                     CROSS-EXAMINATION

17   BY MS. CHANDRASEKARAN:

18   Q    Good morning, Mr. Townsend.

19   A    How are you?

20   Q    Now, when you saw Mr. Williams that night, did you ask

21   Mr. Williams if he wanted medical attention?

22   A    That's correct.

23   Q    And what was his answer?

24   A    No, we just want -- I just want to get this over with.

25   Q    And did you document in the arrest report Mr. Williams'

Townsend - Cross

```
1   answer?
2   A   Refused medical attention.
3   Q   And did you observe any other injuries on Mr. Williams that
4   night?
5   A   No.  No, ma'am.
6   Q   Did Mr. Williams ever tell you he was injured that night?
7   A   No, ma'am.
8   Q   Did Mr. Williams ever tell you that -- how he happened to
9   get the injury to his head?
10  A   No, ma'am.
11  Q   Did Mr. Williams ever tell you that he had been beaten by
12  the officers who had arrested him?
13  A   No, ma'am.
14  Q   Did Mr. Williams ever tell you that he had been refused
15  medical treatment?
16  A   No, ma'am.
17  Q   Mr. Townsend, if someone is injured and requires medical
18  attention, what do you do?
19  A   We will -- we have these papers that's called hospital run
20  form.  Fill out the hospital run form.  Give that to the desk
21  sergeant and the watch commander.  And they would either have
22  the EMT see them or have a car take them to the hospital.
23  Q   And in this case, that didn't happen because Mr. Williams
24  didn't --
25  A   Refused medical attention.
```

Townsend - Cross

1   Q    Now, Mr. Townsend, do you personally have the ability to
2   refuse medical attention --
3   A    No, I do not.
4   Q    -- to the arrestee?
5        Now, that night, you were -- what shift were you
6   working?
7   A    What was considered first watch.
8   Q    And what hours were you working that evening?
9   A    10:00 o'clock at night to 6:00 a.m.
10  Q    And were you working with anyone else that night?
11  A    Yes, I was.
12  Q    And who was that?
13  A    Officer -- Officer Warren Evans.
14  Q    And was there anyone else other than Officer Evans working
15  with you during lock-up during those hours?
16  A    No, ma'am.
17  Q    Mr. Townsend, if you decided to refuse medical attention to
18  someone, what would happen to you?
19  A    If I received -- if I denied medical attention?
20  Q    That's right.
21  A    I cannot.
22  Q    And if you did, what would happen?  Would there be some sort
23  of consequence?
24  A    Once again, I couldn't tell you because I can't do that.  I
25  have -- I do not have the power to refuse anybody.

154

Townsend - Cross

1   Q    Now, Mr. Townsend, counsel showed you the Plaintiff's

2   Exhibit Number 1, which is the arrest report.

3   A    That's correct.

4   Q    And you testified you were responsible for completing

5   certain sections of the report?

6   A    That's correct.

7   Q    And do you have the report in front of you?

8   A    No, I do not.

9   Q    Okay.

10           MS. CHANDRASEKARAN:   Your Honor, may I approach the

11  witness?

12           THE COURT:   Yes.

13  BY MS. CHANDRASEKARAN:

14  Q    Now, Mr. Townsend, based on the report, can you tell when

15  Mr. Williams was released from lock-up?

16  A    Yes, you can.

17  Q    And what time was he released from lock-up?

18  A    6:00 o'clock in the morning.

19  Q    And do you know how Mr. Williams was released from lock-up?

20  A    He was put on the court wagon.

21  Q    And do you know where Mr. Williams was taken?

22  A    He was taken to his desired court -- I'm assuming with it

23  being a felony case, that would be 26th and California.

24  Q    And what's the procedure that the Sixth District follows

25  when it transfers prisoners to 26th and California?

Townsend - Cross

1   A    They are taken out of their cell.  They are -- actually

2   we -- they turn them over to -- or we have officers that are on

3   the, what's called the pick-up wagon.  So once they get in the

4   pick-up wagon, they're given other instructions by those

5   officers, and they are transported.

6   Q    And are the prisoners, are they asked any questions at that

7   time?

8   A    Once again, sick, injured, or taking medication.

9   Q    And if someone indicates that they are, what happens?

10  A    They will pull them back, and we would have to notify our

11  watch commander, and they will be taken to the hospital.

12  Q    And are there specific times that the bus arrives at the

13  station?

14  A    Anywhere between 5:00 o'clock and 6:00 o'clock a.m.

15  Q    And would that bus be the first available bus that

16  Mr. Williams would have been able to take in order to go to 26th

17  and California?

18  A    That's correct.

19  Q    And based on the report, do you know if Mr. Williams, in

20  fact, was transferred to 26th and California?

21  A    By this here?  Correct, he was put on the 6:00 o'clock bus.

22  Q    And do you know, as you sit here, whether that bus would

23  have left before you completed your shift that day?

24  A    Due to -- through, with this number, I would have still been

25  there when he left.

Townsend - Cross

1   Q   And Mr. Townsend, have you ever entered into a conspiracy to
2   refuse medical treatment to Mr. Williams?
3   A   No, ma'am.
4   Q   Do you even know any of the defendant officers in this case?
5   A   No, ma'am.
6           MS. CHANDRASEKARAN:  Just one moment, your Honor.
7       (Counsel conferring.)
8           MS. CHANDRASEKARAN:  No further questions.
9                       REDIRECT EXAMINATION
10  BY MR. KOSOGLAD:
11  Q   Sir, you said that Al Williams didn't tell you he was
12  injured.
13  A   No, he did not.  He didn't tell me.
14  Q   Did he have to?
15  A   Does he have to?
16  Q   Yeah.
17  A   If I --
18  Q   Couldn't you look at him and tell he was injured?
19  A   That's correct, but you just asked me a question --
20          MS. CHANDRASEKARAN:  Objection, your Honor.  Arguing
21  with the witness.
22          THE WITNESS:  You asked me did he ask me --
23          THE COURT:  Wait.
24          THE WITNESS:  I'm sorry.  I apologize.
25          THE COURT:  Just a second.  Let's just step back a

Townsend - Redirect

1    moment.  Ask your question.

2    BY MR. KOSOGLAD:

3    Q    Couldn't you just tell by looking at Al Williams that he was

4    injured?

5    A    Correct.

6    Q    So he didn't really have to tell you he was injured, did he?

7    A    No, but that's not the question you asked me, sir.

8    Q    You said that he told you, no, I just want to get this over

9    with.

10   A    That's correct.

11   Q    You remember that?

12   A    That's -- that's the reason I put down medical attention,

13   that's correct.

14   Q    But it's in your report, right?

15   A    No, we do not put it word -- word for word, no.  That is

16   also why we put refused medical attention.  That is the way --

17   that's the way we are told, that's the way we are -- we are

18   per se told to put our stuff down.

19   Q    Okay.  But when you said earlier -- I thought you said no --

20   Al told you that, no, I just -- you asked him if he wanted

21   medical treatment and Al said, no, I just want to get this over

22   with.  That was your testimony earlier, right?

23   A    Yeah.

24   Q    But when you mean that, you just say he refused medical

25   attention?

158

Townsend - Redirect

1   A    That's correct.  That's -- that's what that means, sir.

2   Q    So those weren't the words he used?

3   A    No, sir.

4   Q    Okay.  Do you remember anything he said that night?

5   A    No, I do not.

6   Q    In fact, your -- isn't your whole memory based on your

7   reports?

8   A    Excuse me?

9   Q    Isn't the entirety of your memory regarding Al Williams

10  based on the arrest report you filled out?

11  A    Majority of it is, correct.

12  Q    Isn't that one of the reasons that you create reports is so

13  that you can remember later, like when you have to testify in

14  court?

15  A    Correct.

16  Q    Okay.  Now, you talked earlier about the procedure --

17  A    That's correct.

18  Q    -- for sending someone to the hospital?

19  A    That's correct.

20  Q    And part of the procedure is that you have to send a form to

21  the desk sergeant or watch commander?

22  A    That's correct.

23  Q    So -- let me get the timeline straightened out here.

24       So you started your shift at 10:00 o'clock?

25  A    That's correct.

Townsend - Redirect

1    Q    And at 10:11, Al Williams was admitted into the lock-up?

2    A    That's correct.

3    Q    Do you know what time Al Williams arrived at the police

4    station?

5    A    No, I do not.

6    Q    You said also that you do not have the power to refuse

7    medical treatment to anyone.

8    A    I do not.

9    Q    Who does?

10   A    That would be the watch commander.

11   Q    Or the desk sergeant?

12   A    Desk sergeant, watch commander, anybody -- authority would

13   have that.  I don't have the authority to do that.

14   Q    So if Al Williams asked for medical treatment and the desk

15   sergeant came to lock-up and says no, we're not giving this guy

16   medical treatment, that can happen?

17   A    He would have to go -- he would also go to watch commander.

18   Watch commander would have to deny that.  Desk sergeant can't do

19   it.  The only person who can do it is the watch commander.

20   Q    But the desk sergeant could be involved in it?

21   A    He can be.

22   Q    Have you seen people refused medical treatment before?

23   A    By the watch commander?

24   Q    Or the desk sergeant.

25   A    Only by a watch commander.  I've never seen it by the desk

Townsend - Redirect

1    sergeant.

2    Q    But you have seen it happen?

3    A    Maybe once, yes.

4    Q    Thank you.

5              MR. KOSOGLAD:  No further questions.

6              THE COURT:  All right.  You are excused.

7              THE WITNESS:  Yes, ma'am.

8              Do I give this back?

9              THE COURT:  Just leave it there.

10             THE WITNESS:  Okay.

11             MS. CHANDRASEKARAN:  Just a few questions --

12             THE COURT:  Wait.  I -- I'm only --

13             MS. CHANDRASEKARAN:  Okay.

14             THE COURT:  -- permitting one redirect.

15             Go ahead.

16             MS. CHANDRASEKARAN:  Thank you, your Honor.

17        (Witness excused.)

18             THE COURT:  It's time for our morning recess, so we'll

19   resume in 15 minutes.

20        (Recess from 11:10 a.m. to 11:30 a.m.)

21        (Jury enters courtroom.)

22             THE COURT:  Please be seated.

23             MR. SHILLER:  Your Honor, plaintiff calls Lieutenant

24   Brundage.

25             THE COURT:  Good morning.

Townsend - Redirect

1    THE WITNESS:  Morning.

2    THE COURT:  Raise your right hand and be sworn.

3    (Witness duly sworn.)

4    JOHN BRUNDAGE, PLAINTIFF'S WITNESS, SWORN

5    DIRECT EXAMINATION

6    BY MR. SHILLER:

7    Q    Good morning.  My name is Brendan Schiller.  I represent the

8    plaintiff.

9    A    Good morning.

10   Q    It's nice to meet you.

11        Could you state your name and spell it for the record,

12   please?

13   A    John Brundage.  B-R-U-N-D-A-G-E.

14   Q    And what -- Mr. -- Officer Brundage, what is your title?

15   A    I'm presently retired.  I retired as a lieutenant from the

16   Chicago Police Department November 1st of 2010.

17   Q    As a retiree, do you prefer to be called Lieutenant or Mr.?

18   A    It doesn't matter.

19   Q    Okay.  And what was your job before you retired?

20   A    I was a lieutenant.

21   Q    Okay.  For who?

22   A    Assigned to the Sixth District, Chicago Police Department.

23   Q    Okay.  And is that where you were working -- where were you

24   working, excuse me, May 31st, 2007?

25   A    The Sixth District, Chicago Police.

Brundage - Direct

1   Q   Okay.  And is part of your job as lieutenant, is it safe to

2   say, to review arrest reports and approve probable cause?

3   A   Yes.

4   Q   Okay.  And in doing that job, you look to the reports to see

5   what facts the officers put in those reports?

6   A   Yes, I do.

7   Q   And then you apply those facts to the law that you're aware

8   of, the criminal laws that you're aware of?

9   A   Yes.

10  Q   And so -- and you need to approve probable cause in felony

11  cases in order for a felony case to be initiated; is that fair

12  to say?

13  A   Well, I have to approve probable cause for narcotics cases

14  that does not have to be reviewed by a State's Attorney.

15  Q   Okay.  And so in order for there to be a criminal complaint

16  signed off on and to initiate the court case in felony

17  narcotics, you have to approve probable cause?

18  A   Yes.

19  Q   And you do that by relying -- by reading the police reports

20  given to you?

21  A   I basically just read the narrative of the arrest report.  I

22  typically do not have the case report in front of me.

23  Q   Okay.  So you read the narrative of the arrest report?

24  A   Yes.

25  Q   And so you expect your officers to put in whatever is

Brundage - Direct

1   relevant to probable cause in that arrest report?

2   A   Yes.

3   Q   And as we said earlier, you apply those facts to the law.

4           Is it safe to say there's different types of drug laws

5   in the State --

6   A   Yes.

7   Q   -- the State of Illinois?

8           So there's, like, a simple possession, which is the

9   lowest level, right?

10  A   Correct.

11  Q   And then there's a possession with intent, which is a little

12  higher?

13  A   Yes.

14  Q   And then there's an actual drug delivery, which is a little

15  higher, correct?

16  A   That's true.

17  Q   And then there's a drug delivery within 1,000 feet of a

18  school, which is the highest law you can break in the State of

19  Illinois, right?

20  A   School or church, I believe.

21  Q   Okay.  So obviously if there was a drug delivery within

22  1,000 feet of the school, any of those facts, that would be

23  relevant for probable cause because that would be a higher

24  charge; is that fair to say?

25  A   That would be an element to the offense for charging

Brundage - Direct

1   purposes, yes.

2   Q    And if there's witnesses to such an offense, then that's

3   something you would want to know to approve probable cause;

4   isn't that fair to say?

5   A    Typically that might not be in the arrest report, but it

6   should be in the case report.

7   Q    Okay.  So if there's witnesses to, let's say, a delivery

8   within 1,000 feet of a school, that's something you would expect

9   to see on the vice case report?

10  A    Yes.  But I might not see that actual report.

11  Q    Okay.  Now, I'm showing you what's been admitted by

12  agreement.  This is Plaintiff's Exhibit 1.  This is the arrest

13  report.  I'm going to just go to page 2 of that arrest report.

14  Actually first I'm going to go to page 3.

15          MR. SHILLER:  Can we publish this, your Honor?

16          THE COURT:  Yes.  Is this in evidence?

17          MR. SHILLER:  Yes, this is in evidence.

18          THE COURT:  Hold on a second here.

19  BY MR. SHILLER:

20  Q    While we're waiting for that, let me ask you a couple other

21  questions.

22          One of the reasons we talked about that officers write

23  their narrative is so that somebody like, in narcotics cases, is

24  so a lieutenant can look at it and see if there's probable cause

25  for a felony drug charge, correct?

Brundage - Direct

1    A    Correct.

2    Q    There's other reasons as well, correct?  Do officers rely on

3    those reports --

4    A    Oh, absolutely, yes.

5    Q    Okay.  And they'll rely on those reports in case they've got

6    to go to court to refresh their recollection of what happened?

7    A    Yes, that's true.

8    Q    And they rely on those reports in case they have to do other

9    investigations based on what information is in that report?

10   A    Yes.

11   Q    Okay.  No?

12            THE COURT:  I have it turned on.  I don't know -- can

13   you help me?

14            MR. JONES:  We have it.

15            MR. SHILLER:  Can you see what's on your screen?

16            THE WITNESS:  I'm seeing what you're seeing there.  I

17   did see the arrest report there momentarily, but then it got

18   switched off.

19            There we go.

20            THE COURT:  It's operator error, sorry.

21            THE WITNESS:  I see it now.  Okay.

22   BY MR. SHILLER:

23   Q    This is page 3 of Exhibit 1.

24            Do you see where, on the bottom line, it says "approval

25   of probable cause," and then it has the name Brundage?

Brundage - Direct

1  A   Yes, that would be my electronic signature.

2  Q   Okay.  And there's an actual PC number right next to your

3  name, so that, by electronic signature, that means you had to

4  log in --

5  A   Correct.

6  Q   -- to a computer, correct?

7  A   Yes.

8  Q   And you had to use a unique number, that PC number, to log

9  in?

10  A   And password, yes.

11  Q   Okay.  And only you had that number and password?

12  A   Correct.

13  Q   And by your name being there, that means you reviewed

14  probable cause -- you reviewed the narrative in this case and

15  approved probable cause, correct?

16  A   Yes, I compared the narrative with the charges.

17  Q   Okay.  And so I'm going to show you page -- same exhibit.

18  Page 2 now.

19       Was that the narrative you reviewed on that day?

20  A   I -- my signature is on the arrest report, so I don't

21  actually remember the narrative, but it is my signature on the

22  arrest report, which indicates that I did review it at the time.

23  Q   Okay.  So -- but you have no reason to believe that anybody

24  altered the --

25  A   No.

Brundage - Direct

1    Q    -- the arrest report?

2    A    Not at all.

3    Q    And then you would have reviewed it before you signed off on

4    it?

5    A    Absolutely.

6    Q    Okay.  And do you see anywhere in there the gender of the

7    concerns -- do you see where it refers to a concerned citizen?

8    On the second --

9    A    Yes, I do.

10   Q    Do you see anywhere in there where there's anything

11   mentioned about a gender of that concerned citizen?

12   A    No.

13   Q    Do you see anywhere in there where there's a mention of the

14   arrestee running into a bike -- I'm sorry, a pole, a bus pole?

15   A    No, I don't.

16   Q    Okay.  And do you see anywhere in there information about

17   the name of the concerned citizen?

18   A    No.

19   Q    The address of this concerned citizen?

20   A    No.

21   Q    Phone number?

22   A    No.

23   Q    Now, would it be safe to say that if there's a high school

24   about 500 feet away from 79th and Ellis and somebody was

25   delivering drugs on 79th and Ellis and a witness saw that, that

Brundage - Direct

1   would be a witness to a Class X felony in the State of Illinois?

2          MR. JONES:  Judge, I'm going to object.  This has no

3   relevance to this case.  No school.

4          MR. SHILLER:  Well, two points, your Honor.

5          Counsel in his ubiquitous knowledge of the Chicago

6   Public Schools.  He mentioned that Hirsch High School earlier

7   was at 78th and this Ellis.

8          MR. JONES:  Four blocks away.

9          MR. SHILLER:  And second --

10         THE COURT:  Well, it sounds a little bit collateral

11  here.

12         MR. SHILLER:  Your Honor, they claim to have an

13  informant that they've never been able to produce.  If they had

14  a concerned witness who had viewed a drug deal on 79th and

15  Ellis, it would have been --

16         THE COURT:  All right.  Then overruled, I'll let

17  you ...

18  BY MR. SHILLER:

19  Q   Is it safe to say that if somebody had viewed a drug deal at

20  79th and Ellis within 500 feet of a school, they would have been

21  a witness to a Class X felony?

22  A   Yes.

23  Q   And would that be some information you would want your

24  officers to obtain, their name, address, phone number, so that

25  they could be a witness in court?

Brundage - Direct

1   A    If they would be willing to provide it.  Most of the time

2   they aren't.

3   Q    Okay.  Now, are you familiar with what a TRR is?

4   A    Very.

5   Q    Okay.  Tactical Response Report, correct?

6   A    Yes.

7   Q    Can you tell the members of the jury what a Tactical

8   Response Report is?

9   A    Well, it's called a Tactical Response Report, and we fill it

10  out -- the officer is supposed to fill it out whenever there's

11  a, what they call a use of force, other than a routine arrest.

12           And once they fill it out, their sergeant has to review

13  it, and then I have to also review it, and I interview the

14  arrestee.

15  Q    Okay.  How are you informed that -- how generally does it

16  come about that the officers are told that they have to fill out

17  a TRR?  How is it decided?

18  A    Well, normally they -- it's the officer's responsibility to

19  notify their sergeant that they used force to effect the arrest.

20  Q    Okay.

21  A    And typically either the sergeant or the police officer

22  would come in as a courtesy and tell me.

23  Q    And do you actually have to sign off on the TRR?

24  A    Yes, I do.

25  Q    What do you do before you sign off on it?

Brundage - Direct

1    A    Well, I review the use of force.  I have to make a

2    determination that the use of force was in the guidelines of the

3    department.  And I also am required to attempt to interview the

4    arrestee.

5    Q    Okay.  And when you review the use of force, are you talking

6    about you actually review the report that it was produced by the

7    officer that used the force?

8    A    That's correct.  And basically taking the officer's account

9    of the incident, what the arrestee did, and what level of

10   resistance the arrestee provided, and you can only use a certain

11   amount of force, depending on what classification the arrestee

12   was using force to resist arrest.

13   Q    And is it safe to say that if there's -- that TRR needs to

14   include that information about force as well if there's any

15   injuries, that's part of the TRR?

16   A    They have a series of check boxes.  Yes, it's meant to be a

17   very, like, brief report, but you are supposed to record or note

18   any injuries on that report.

19   Q    Okay.  And would it be safe to say that if there's a TRR

20   filled out by an officer and they claim that there was some

21   injuries but maybe some injuries by accident, that that would

22   somehow come up in the discussion regarding the TRR?

23   A    Yes.

24   Q    So if somebody ran into a pole, that would come up into

25   discussion of the TRR?

Brundage - Direct

1   A   Well, they would have to note whether he was injured or not,

2   arising out of the use of force.  And typically when I would

3   attempt to interview them, I would ask them about any injuries

4   that I witnessed.

5   Q   Okay.

6           MR. SHILLER:  I'm going to show you Plaintiff's

7   Exhibit 3 admitted by agreement.

8       (Counsel conferring.)

9           MR. SHILLER:  It's Plaintiff's Exhibit 3.

10  BY MR. SHILLER:

11  Q   I'm showing you the first of two pages of Plaintiff's

12  Exhibit 3.  It's been admitted by agreement.

13          Can you tell me what that is?

14  A   Looks like a Tactical Response Report for 31st of May, 2007.

15  Q   Now, let me ask you a couple questions.

16          What's the time on that Tactical Response Report?

17  A   The time is 20:30 hours, which would be 8:30 p.m.

18  Q   Okay.  And is that time supposed to reference the time the

19  report was filled out or the time the incident allegedly

20  happened?

21  A   That's the date of the incident, the date of the use of

22  force.

23  Q   Okay.  So that's not an automated time, right?

24  A   No.

25  Q   That's the time somebody puts into there?

Brundage - Direct

1    A    Correct.

2    Q    Okay.  Now, is this -- actually let me -- before I come

3    back, let me show you page 2.

4              Do you see the bottom of page 2 there?

5    A    Yes.

6    Q    Is that your signature on the bottom of -- your electronic

7    signature on the bottom of page 2?

8    A    Yes, it is.

9    Q    Is that you signing off on this TRR?

10   A    Yes.

11   Q    And that time is an automated time on the date and time

12   completed; is that correct?

13   A    It is automated.  It's filled in automatically.

14   Q    And that was filled in at 9:56?

15   A    Yes.

16   Q    21:56?

17   A    Yes.

18   Q    For those of us who have never been in the military.

19             Now, going back to page 1.

20             In addition to the things we talked about, they asked

21   some things like about the weather conditions.  Is that safe to

22   say?

23   A    Yes.

24   Q    You see line 44?

25   A    Yes.

Brundage - Direct

1   Q   Do you see where it says the weather conditions?

2   A   Yes.

3   Q   What does it say?

4   A   Says clear.

5   Q   Do you see where it says the lighting conditions?

6   A   Yes.

7   Q   What does it say?

8   A   Daylight.

9   Q   Now, when -- I'm sorry, you say after you review this

10  record, you then go talk to the arrestee, correct?

11  A   Yes.

12  Q   Okay.  Do you recall, without looking at anything, do you

13  recall if you talked to the arrestee in this case?

14  A   Just vaguely.

15  Q   Okay.  Do you remember him?

16  A   Again, just vaguely.

17  Q   Okay.  Do you recall what he said?

18  A   Not exactly, no.

19  Q   Okay.  Well, I'm going to go ahead and show you page 2.

20          Who typed in those words in that box on page 2 of the

21  TRR, the top box -- I mean the second-to-top box?

22  A   I fill it out.

23  Q   Okay.  And where it says, "Subject stated he was riding his

24  bike when the police stopped him.  He fell off -- he fell off

25  the bike when the police pulled up.  Subject sustained an

Brundage - Direct

1    abrasion to his forehead but refused immediate attention."

2         Do you see that?

3    A    Yes.

4    Q    Okay.  I have a few questions.

5         Is that your summation of your investigation?

6    A    That's my summation of his statement to me.

7    Q    Okay.  So it's -- based on what's in here, his statement was

8    to you that he fell off the bike and he suffered an abrasion

9    from falling off a bike?

10   A    That's what he apparently told me.

11   Q    Okay.  Did you ever follow up with that, the fact he fell

12   off the bike and hit an abrasion (sic.) with your officers?

13   A    No, that was -- once he told me that, I was satisfied.

14   Q    Okay.  But here's my question:

15        If a TRR is filled out because the officers are

16   admitting they used force to commit -- that resulted in an

17   injury, doesn't that seem like an inconsistent response from the

18   arrestee if he's saying the injury was entirely an accident?

19   A    They aren't necessarily saying that he was injured due to

20   their use of force, just that he was injured.  That's the way I

21   interpreted it.

22   Q    Okay.  So -- but the Tactical Response Report is a report

23   not for injuries, it's a report for use of force, correct?

24   A    Correct.

25   Q    Okay.  Here's my next question.

Brundage - Direct

1    "Subject sustained an abrasion to his forehead, but

2    refused immediate attention."

3        Does that mean he asked for attention -- what does that

4    mean?  What does that mean, "immediate attention"?

5    A   Well, it means at the time -- and this is before he was

6    admitted into lock-up, he was still in the processing area

7    there -- he did not request medical attention.

8    Q   Okay.

9    A   Immediate medical attention.

10       And I also make an independent observation.  If

11   somebody has an injury that I feel needs immediate medical

12   attention, even though they didn't want it, I would insist that

13   they -- they get it.

14   Q   So that's not to say he doesn't need medical attention,

15   that's just he doesn't need immediate medical attention?

16   A   Correct.

17   Q   Now, even though these things are admitted, just totally for

18   foundational purposes, I'm going to show you Exhibit 4, which

19   is -- just to confirm that there's -- because it's going back.

20       MR. JONES:  Okay.

21   BY MR. SHILLER:

22   Q   I'm showing you what was previously marked as Exhibit 4.

23       Maybe.

24       Do you recognize this?

25   A   This is a draft form of the Tactical Response Report.  It's

Brundage - Direct

 1    not the official form.

 2    Q    Okay.  Is it safe to say this is like a print-out of the

 3    actual computer screen?

 4    A    Pretty much, yes.

 5    Q    Okay.  And so this is what it looks like when you're filling

 6    it out?

 7    A    Yes.

 8    Q    And, again, I'm not hiding the ball on you, this is just

 9    going back to the jury, so I just want you to explain to the

10    jury what this document is.

11             And so when you -- and this is page 2.

12             When you look at this, in this draft form, this is just

13    what you see on the computer screen, what we were looking at

14    earlier is just the print-out that comes off the computer; is

15    that fair or not fair?

16    A    I'm trying to remember what form I see it.

17    Q    Okay.

18    A    I think I actually see the, like, finalized form; but when

19    the officer is filling it out, this is what they see.

20    Q    I see.

21    A    But I don't know if I actually see this.  I think I see the

22    finalized -- like the form that prints out, that's what I pretty

23    much see.

24    Q    Okay.  Well, are you familiar with this form?

25    A    Yes, it -- all the information on there should be reflected

Brundage - Direct

1   on the print-out, the final official form.

2   Q   Okay.  Is it safe to say these are just like boxes that you

3   can take the mouse on and click --

4   A   Exactly.  It's meant to be filled out quickly.

5   Q   Okay.  So you see where it says, under "active resistor," it

6   says "subject's actions," says "fled" and a check mark?

7   A   Yes.

8   Q   So that meant that the officer who filled this out believed

9   that the offender had fled; is that fair to say?

10  A   Yes.

11  Q   And then, again, they're the ones -- the officer filling

12  this out was the one who types in the lighting condition and the

13  weather condition; is that right?

14  A   The officers do, yes.

15  Q   Okay.  And the reporting member is, in this case, Officer

16  Zachary Rubald, correct?

17  A   Correct.

18  Q   And him -- he's just like you, he has his own unique log-in

19  number and password?

20  A   Yes.

21  Q   So that's how you know that he's the one, that's his

22  electronic signature, right?

23  A   Correct.

24  Q   Now, in a narcotics case, after you've signed off on

25  probable cause -- well, I'm sorry, just to be clear, you don't

Brundage - Direct

1  think you saw the vice case report in this case or do you know?

2  A   I probably did not see it.

3  Q   Why not?

4  A   'Cuz they're typically still working on that.  My main

5  concern is with the arrest report and whether the narrative of

6  the arrest report establishes probable cause.  So their sergeant

7  normally signs off on the case report.  The lieutenant or watch

8  commander does not have to sign off on the case report.

9  Q   Okay.  Well, I'm going to show you Plaintiff's Exhibit 2.

10        And do you recognize this?

11        In general, do you recognize it?

12 A   In general, it looks like a department vice case report,

13 which would be used to report a narcotics violation.

14        MR. SHILLER:  And, again, for the record, this is

15 Defense Exhibit 2, and it's in by an agreement.

16        THE COURT:  Okay.

17 BY MR. SHILLER:

18 Q   Is there a place for the name and information of a witness

19 on a vice case report?

20        MR. JONES:  Judge, I'm going to object because he said

21 he didn't review this report.

22        MR. SHILLER:  My question was in general in a vice case

23 report.

24        THE COURT:  Overruled.

25

Brundage - Direct

1   BY MR. SHILLER:

2   Q   In general, in the vice case report, is there a location for

3   a name of a witness?

4   A   You know what, I don't see a place.

5   Q   Okay.  It's real bad writing.  Is it safe to say the second

6   line down is generally where you would put somebody who may be a

7   witness, the second --

8   A   Oh, okay.  Yes, I do see that now.

9   Q   Okay.  And is there a place for an approval from somebody, a

10  sergeant or lieutenant, whether it was you or not?

11  A   A supervisor approving, yes, and that's typically their

12  sergeant that would do that.  It's down at the bottom right

13  corner.

14  Q   Can you tell who that was that approved that from that

15  signature?

16  A   It looks like Sergeant Bechina approved it.

17  Q   Now, is it safe to say that after you approved probable

18  cause, then the criminal process is initiated, the court -- the

19  criminal court process is initiated?

20  A   Yes.  I mean, it's all part of the processing, his arrest

21  processing.

22  Q   Well, at some point in time, somebody has to sign a criminal

23  complaint to begin the process, right?

24  A   Oh, yes.  That's correct.

25  Q   And I'm going to show you now what's been marked as -- it's

Brundage - Direct

1   in by agreement.  Defendant's Exhibit 5.

2          Do you recognize that?

3   A   Looks like a misdemeanor complaint form.

4   Q   Okay.  And I'm going to show you now what's been marked as,

5   and is in by agreement, Defendant's Exhibit 6.

6          Do you recognize that?

7   A   Looks like a felony complaint form.

8   Q   Okay.  Is it safe to say that after you approve, at least on

9   a narcotics case, after you approve, the next step is the felony

10  complaint form is signed off by somebody, and then the criminal

11  process is then initiated?

12  A   Right.  Normally the paperwork is actually reviewed by the

13  desk sergeant before they can even get to me.  And I only review

14  the arrest report.

15  Q   Okay.

16         MR. SHILLER:  Can I have a moment, your Honor?

17         THE COURT:  Yes.

18     (Counsel conferring.)

19  BY MR. SHILLER:

20  Q   Thank you very much, Lieutenant.

21                   CROSS-EXAMINATION

22  BY MR. JONES:

23  Q   Good afternoon, Mr. Brundage.

24  A   Good afternoon.

25  Q   Somehow you sound like a lawyer.  Are you one?

Brundage - Cross

1    A    I am one, yes.

2    Q    Now, counsel asked you some questions about probable cause,

3    and he showed you the arrest report.

4         MR. JONES:  Can you flash this up for me?  Can you make

5    it clearer?  Just right there.

6    BY MR. JONES:

7    Q    This is part of the arrest report that was filled out.  And

8    the things that are in this arrest report, are they not, is that

9    Officer Rubald points out that a concern -- they got a tip from

10   a concerned citizen.  That's in this summary, is that right?

11   A    Correct.

12   Q    And, incidentally, I see this little box.  Are these --

13   what's in here, are they meant to be summaries or are they meant

14   to be the most exhaustive thing known to man?

15   A    It's meant to be a summary, and the only thing I'm concerned

16   about is does it establish the minimum necessary for probable

17   cause.

18   Q    All right.  And then what else this summary says is that --

19   it says that the -- that after receiving the tip from the

20   concerned citizen, that the officer saw an offender matching the

21   description that had been given by the concerned citizen; isn't

22   that correct?

23   A    Yes.

24   Q    And that when they saw him, that they saw that he dropped a

25   substance to the ground, which they believed was white crack

Brundage - Cross

1    cocaine; is that correct?

2    A    Correct.

3    Q    And that they retrieved that bag, and then they had an

4    occasion to retrieve another bag of crack cocaine from him; is

5    that correct?

6    A    Yes.

7    Q    And when you read all that summary, in your mind, was that

8    enough to establish probable cause?

9    A    Yes, it was.

10   Q    Now, counsel asked you some question about, you know,

11   getting names from concerned citizens.

12           What has been your experience about concerned citizens

13   giving you their name?

14   A    In that area, the concerned citizens wish to remain

15   anonymous.

16   Q    And that's for a variety of different reasons; is that

17   correct?

18   A    Yes.

19   Q    And if you start pressing concerned citizens for their names

20   and addresses, do you think you'd get any more information?

21   A    No, I don't.

22   Q    Now, I want to show you --

23           MR. JONES:  Where is that tactical report?  This --

24   yeah, can you get that for me?  At the top, yeah.  I'm not good

25   on this modern thing.  Stop right there.

Brundage - Cross

1    BY MR. JONES:

2    Q    As I gather from the examination by counsel, whenever there

3    is any use of force, the watch commander has to do -- he's

4    called into action; is that correct?

5    A    Yes.

6    Q    And one of the things that the watch commander himself has

7    to do is that he's got to go interview the person in the

8    lock-up; is that correct?

9    A    That's true.  Typically it would be in the processing area

10   before they hit the lock-up.

11   Q    Now, on this particular form, you indicated that you did

12   interview Mr. Williams; is that correct?

13   A    Yes, I'm required to do that by general order.

14   Q    All right.  And you wrote a narrative of what you best --

15   when you wrote the narrative at the time, was the narrative, of

16   course, correct?

17   A    Yes.

18   Q    All right.  And this is the narrative that you wrote

19   regarding Mr. Williams; is that correct?

20   A    Yes, it is.

21   Q    And let me -- this narrative, would it be true to say that

22   Mr. Williams at no time told you that he wanted to receive

23   medical attention?

24   A    That's correct.  I would have noted that in this report if

25   he did.

184

Brundage - Cross

1   Q   And let me ask you this:

2           This report doesn't say anything about Mr. Williams

3   telling you that he had been punched in the groin and punched in

4   the stomach by officers; is that correct?

5   A   Correct.  He didn't mention that to me.

6   Q   And if he had, what would have been your obligation?

7   A   Well, my obligation would have been to initiate what they

8   call a complaint register number, typically known as a CR

9   number, and that would be for excessive force.  That's part of

10  the purpose of my interviewing the arrestee.

11  Q   And can I take it because that's not in your report that

12  Mr. Williams never told you that?

13  A   That is correct.

14  Q   Now, I want you -- at the time this report was made out, I

15  want you to look at my officer's -- Mr. -- Officer Rubald and

16  Leck and Corcoran, were you familiar with these officers at the

17  time?

18  A   To the best of my recollection, no.  They weren't assigned

19  to my district, so I -- I may have recognized them just by

20  sight, but not really by name.

21  Q   All right.  So you wouldn't exactly say that these were your

22  boys?

23  A   No, I wouldn't.

24  Q   All right.  And let me just ask you this.  When you wrote

25  this report out, were you, sir, in some kind of conspiracy with

Brundage - Cross

1   these officers to take away the rights of Mr. Williams?

2   A   No, I wasn't.

3           MR. JONES:  Let me have one second, Judge.

4       (Counsel conferring.)

5           MR. JONES:  I don't have anything further, Judge.

6           THE COURT:  Okay.  Redirect?

7           MR. SHILLER:  Thank you very much.

8           THE COURT:  Thank you for your testimony.

9       (Witness excused.)

10          MS. PREYAR:  At this time, we'll call Sergeant Bechina

11  to the stand.

12      (Counsel conferring.)

13      (Brief pause.)

14      (Witness enters courtroom.)

15          THE COURT:  Good morning.

16          THE WITNESS:  Morning.

17          THE COURT:  Good afternoon.

18          THE WITNESS:  Good afternoon.  Morning.

19          THE COURT:  Raise your right hand to be sworn.

20      (Witness duly sworn.)

21          STEVEN BECHINA, PLAINTIFF'S WITNESS, SWORN

22                      DIRECT EXAMINATION

23  BY MS. PREYAR:

24  Q   Good morning, sir.  My name is April Preyar, and I'm one of

25  the attorneys for the plaintiff, Al Williams.

Bechina - Direct

1          Can you state your name for the record, spelling your

2    last name?

3    A    Sergeant Steven Bechina, B-E-C-H-I-N-A.  Star --

4    Q    I'm sorry, I was going to ask what your star number was.

5    A    1795.

6    Q    Thank you.

7          And by whom are you employed?

8    A    Chicago Police Department.

9    Q    And how long have you been so employed?

10   A    17 years.

11   Q    And you indicated you were a sergeant.

12         Was there any special training required in order to

13   become a sergeant?

14   A    No.

15   Q    Did you take any special test?

16   A    Yes.

17   Q    And when did you take that test?  Roughly.

18   A    I don't know.  2000 possibly.

19   Q    And what was your title prior to becoming a sergeant in the

20   Chicago Police Department?

21   A    Police officer.

22   Q    Okay.  And on the date of May 31st, 2007, were you so

23   employed as a Chicago police officer?

24   A    I was a sergeant then, yes.

25   Q    Okay.  And at that time, when you were working as a

Bechina - Direct

1   sergeant, what were your general duties?

2   A   I was assigned to a unit that went to high crime areas.

3   Q   And was part of your job supervising the guys who worked in

4   that unit?

5   A   Yes.

6   Q   And the three defendant officers here in court today, did

7   all three of them report to you?

8   A   Yes.

9   Q   Now, during the course of your tenure as a police officer

10  and then a sergeant, have you become familiar with Chicago

11  Police Department reports?

12  A   Yes.

13  Q   Specifically, have you become familiar with vice case

14  reports?

15  A   Yes.

16  Q   And who normally fills out a vice case report in a

17  possession of a controlled substance case?

18  A   The arresting officer.

19  Q   And what type of information does that report normally

20  contain, in your experience?

21  A   Arrestee's name, address, date of birth, charges, narrative,

22  addresses of occurrence.

23  Q   And once these police reports are filled out, what are they

24  normally used for?

25  A   I don't understand the question.

Bechina - Direct

1   Q   Say the police officer or the arresting officer who fills

2   out the report, what would he or she use those reports for?

3   A   Evidence.

4   Q   When you say evidence, what do you mean?  Would they use

5   them in court?  Would they use them to keep on file with the

6   Chicago Police Department?  What would those reports be used

7   for?

8   A   Yeah, use them for court and keep on file.

9   Q   And when they use them for court, would it be safe to say

10  that they use it to refresh their memory on that particular

11  arrest?

12  A   Yes.

13  Q   Okay.  And during the course of your involvement with this

14  particular arrest of Mr. Al Williams, did you become familiar

15  with his individual vice case report?

16  A   Yes.

17  Q   Okay.  I'm showing you what's been previously marked and

18  admitted as Plaintiff's Exhibit 2.

19          Sir, it will appear on your screen.

20          Does that appear on your screen?

21  A   Yes.

22  Q   And do you recognize what that is?

23  A   Yes, the vice case report.

24  Q   And this is the first page of the vice case report; is that

25  correct?

Bechina - Direct

1    A    Yes.

2    Q    And this is the second page; is that safe to say?

3    A    Yes.

4    Q    And does your name appear anywhere on this particular

5    report?

6    A    No.

7    Q    Does it appear on the second page?

8    A    No.

9    Q    Showing you the next part of the same exhibit, can you tell

10   me what this document is?

11   A    Vice case report.

12   Q    And what's the difference between this document and the one

13   I just showed you?

14   A    This one I've reviewed and signed.

15   Q    Okay.  And where does your name appear?  Can you just touch

16   the screen?  It will leave a mark.

17   A    (Indicating.)

18   Q    And there's the printed name and below your print name, is

19   that your signature?

20   A    Correct.

21   Q    Showing you the second page of that same exhibit, do you

22   also see your signature there?

23   A    Yes.

24   Q    Now, why does your signature appear on this document?

25   A    When I receive the document, I'm to review it to make sure

Bechina - Direct

1   that the boxes are correctly filled out and it's legible.

2   Q   And the document that I showed you, is that a true and

3   accurate copy of this particular report as it appeared on the

4   day you first received it?

5   A   It appears so, yes.

6   Q   As far as you can tell, has it been changed in any way or

7   has your name been altered in any way?

8   A   No.

9   Q   Now, sir, drawing your attention to the second page of that

10  report, what -- there are several lines appearing above your

11  signature; is that correct?

12  A   Yes.

13  Q   And that handwriting, what is that?

14  A   That's the narrative that the arresting officer placed in

15  the report.

16  Q   And in your experience, what are officers taught to include

17  in the narrative section of a vice case report?

18  A   The summary.  The court should be added in there.  The

19  charges.  Brief summary of the incident.  And inventory numbers.

20  And what's being inventoried.

21  Q   Okay.  And in the narrative section, you see here there are

22  several blank lines, is that safe to say, beneath the

23  handwritten section?

24  A   Yes.

25  Q   Now, I'm going to give you a few seconds to read over the

Bechina - Direct

1    narrative, and I want you to see if anywhere in that vice case

2    report you see a mention of a pole.

3    A    A pole?

4    Q    A pole.  P-O-L-E.  Yes.

5         (Brief pause.)

6    A    No.

7    Q    Specifically do you see any mention of Mr. Williams running

8    into a pole while riding his bike?

9    A    No.

10   Q    Do you see any mention of Mr. Williams' head striking a pole

11   anywhere in that narrative section?

12   A    No.

13   Q    Now, Officer, where do -- I'm sorry, Sergeant, where do

14   officers first get trained on how to fill out police reports?

15   A    In the training academy.

16   Q    And how long is the training academy?

17   A    Approximately six to eight months, I believe.

18   Q    And in that time, you're taught to include pertinent

19   details; is that safe to say?

20   A    Should.

21   Q    Important details?

22   A    Yes.

23   Q    Unusual details?

24   A    Yes.

25   Q    And in your own estimation, would you say somebody running

Bechina - Direct

1   into a pole and injuring himself would be an unusual detail?

2   A   Possibly, yes.

3   Q   Now, I would also like to draw your attention to the same

4   narrative, to the last two lines, the two handwritten lines.

5          Now, the narrative does mention how Mr. Williams

6   received an abrasion to his head.  Do you see that?

7   A   Yes.

8   Q   And the narrative says that that was during an emergency

9   take-down; is that correct?

10  A   Correct.

11  Q   Can you explain to the jury what emergency take-down is?

12  A   If the suspect is defeating the arrest, you place him in arm

13  bar or whatever you have to do to take him to the ground or

14  place him in handcuffs.

15  Q   Arm bar is kind of a technical term.  Can you explain that,

16  in layman's terms, what an arm bar is?

17  A   You grab his wrist and you place it behind his back and

18  bring him to the ground.

19  Q   Okay.  And so that maneuver doesn't involve a bicycle?

20  A   No.

21  Q   Okay.  Doesn't involve a pole?

22  A   No.

23  Q   Just physical contact between the officer and the offender;

24  is that correct?

25  A   Correct.

Bechina - Direct

1   Q   Now, you indicated you signed these in order to approve

2   these reports; is that correct?

3   A   Yes.

4   Q   And why is your approval required on your officers' reports?

5   A   'Cuz a sergeant approves the reports.

6   Q   Okay.  And after you approve the reports, what happens next?

7   A   The report?

8   Q   What happens in the criminal -- sorry, criminal process?

9   A   Copies are made and one is sent with the inventory arrest

10   and one is filed in the station.

11   Q   Okay.  And now, based on -- now, you weren't at the scene of

12   this arrest of Mr. Williams; is that safe to say?

13   A   Correct.

14   Q   Okay.  And so the information that you reviewed in regards

15   to Mr. Williams was all based on what you read in the reports,

16   correct?

17   A   Yes.

18   Q   And did you also speak to your officers about it briefly?

19   A   I don't recall if I did or not.

20   Q   Okay.  And based on what's written in their narrative

21   section of this report and -- did you review any other reports

22   in this matter?

23   A   I don't recall.

24   Q   Okay.  So based on the narrative section written in the vice

25   case report, you used the facts in order to decide which laws

Bechina - Direct

1    apply; is that safe to say?

2    A    Yes.

3    Q    And you decide which charges to seek based on, in your

4    belief, which laws apply based on the facts; is that also

5    correct?

6    A    Yes.

7    Q    So if one of your officers indicated that they believed the

8    arrestee was serving or selling narcotics, that might affect

9    what charge you would seek against that individual; is that

10   correct?

11   A    Not necessarily, no.

12   Q    Well, Officer, would you agree that there are various drug

13   crimes in the State of Illinois?

14   A    Sure.

15   Q    You can have a drug conspiracy, correct?

16   A    Yes.

17   Q    Class X case?  Carrying 6 to 30 years in prison; is that

18   correct?

19   A    Yes.

20   Q    And that would be different than the simple possession case,

21   which carries one to three years, and is probationable; is that

22   also correct?

23   A    Yeah.

24   Q    And so since you weren't at the scene, and the only thing

25   you have to go on is the narrative that your officers provide,

Bechina - Direct

1   it's important for you to know the facts so that you can decide

2   whether to charge a drug conspiracy or charge a simple

3   possession; is that correct?

4              MR. CAZARES:  Objection, Judge.  This is -- she's

5   asking for conclusions.

6              THE COURT:  I think he can handle it.  Overruled.

7              THE WITNESS:  The question again, please?

8   BY MS. PREYAR:

9   Q    You use the facts to decide which laws apply, correct?

10  A    Myself?  No.

11  Q    No, you don't?  You don't make any recommendation to the

12  lieutenant who reviews it later?

13  A    On a case report?  No.

14  Q    So in order -- what is the process for approving a police

15  report?

16  A    The case report?  I approve the case report and then it --

17  that's where it ends.

18  Q    Have you ever not approved a vice case report?

19  A    Yes.

20  Q    What would be the basis for not approving one?

21  A    If there was certain information not included, if the boxes

22  weren't properly filled out, if it was illegible.

23  Q    So if there was a witness -- if you were aware that there

24  was a witness in a particular case and the witness's name was

25  not filled out, would that be reason for rejecting approval?

496

Bechina - Direct

1    A    No.

2    Q    No, it wouldn't.  It would go through anyway.

3    A    Yes, 'cuz I'm just reviewing the case report.

4    Q    Okay.  Now, in your experience as a sergeant, have you also

5    become familiar with what's called a Tactical Response Report?

6    A    Yes.

7    Q    And what is a TRR?

8    A    It's basically a report that's filled out if there's some

9    kind of a use of force or -- basically use of force.

10   Q    And who fills out the TRR?

11   A    The arresting officers.

12   Q    And, again, because you were not present on scene of this

13   particular case, it would be those officers' responsibility to

14   report any use of force to you; is that correct?

15   A    Correct.

16   Q    Because you're their supervisor --

17   A    Yes.

18   Q    -- correct?

19        And in this particular case, did you become familiar

20   with Mr. Al Williams' TRR -- the TRR filled out in Mr. Al

21   Williams' case?

22   A    Did I become familiar with it?

23   Q    Yes.

24   A    Yes.

25   Q    And -- does that appear on your screen?

                              Bechina - Direct

1    A    Yeah.

2    Q    It's a little blurry.

3              And, in general, what type of information does a TRR

4    include?

5    A    The address of the occurrence.  The date and the time it

6    happened.  Arrestee's name.  And RD number, report number.

7    Charges.

8    Q    And what are these reports used for by the officer who

9    filled them out?

10   A    To document the incident.

11   Q    Okay.  And your name also appears on this document; is that

12   safe to say?

13   A    Yes.

14   Q    And where does it appear?

15   A    (Indicating.)  Left corner.

16   Q    And actually next to your name, there's -- it's kind of

17   blurry.

18             Next to your name, they have a box that says

19   "signature."

20             Now, that's not actually your physical signature,

21   correct?

22   A    Correct.

23   Q    What is that?

24   A    It's my log-in number.

25   Q    So it's -- would it be safe to say it's an electronic

Bechina - Direct

1    signature?

2    A    Yes.

3    Q    And that's what you placed on the documents because most of

4    them are computerized now?

5    A    Yes.

6    Q    And in reviewing this document, you also had to approve or

7    not approve it; is that correct?

8    A    I don't approve it.  I review it, and then I submit it to my

9    watch commander.

10   Q    Okay.  And in this report, it's also two pages; is that

11   correct?

12   A    Yes.

13   Q    And there's no narrative section, per se; is that also

14   correct?

15   A    There's a narrative.

16   Q    A very brief narrative; is that safe to say?

17   A    Yes.

18   Q    Okay.  And on the second page, in fact, it's an interview

19   between your watch commander and the arrestee; is that correct?

20   A    Correct.

21   Q    And you didn't conduct that interview; is that correct?

22   A    Correct.

23   Q    What I will ask you, since you reviewed this document, to

24   review that statement.

25          Can you see it clearly on your screen?

Bechina - Direct

1  A    No.

2  Q    I need to zoom it.

3        Do you see the statement under "subject statement

4  regarding the use of force"?

5  A    Yes.

6  Q    Okay.  And in that statement, you can take your time, do you

7  see any mention of a pole?

8  A    No.

9  Q    Do you see any mention of Mr. Williams running his --

10  running into a pole while riding his bike?

11  A    Running into a pole?  No.

12  Q    And do you see any mention of Mr. Williams' head striking a

13  pole?

14  A    No.

15  Q    Now, Officer, did you review or approve any other reports in

16  this matter?

17  A    I don't remember.

18  Q    Okay.  I'm going to draw your attention to what's been

19  previously marked and admitted as Plaintiff's Exhibit 4.

20        Do you recognize this document?

21  A    No.

22  Q    No, you don't?  You haven't seen it before in this format?

23  A    I know what it is.  It's the preliminary that the officers

24  do.

25  Q    Okay.  And in this specific case, you did not see this

                        Bechina - Direct

1   report?

2   A    No.

3            MS. PREYAR:  One moment, please.

4        (Counsel conferring.)

5   BY MS. PREYAR:

6   Q    Now, Officer, one last question.

7            In the narrative section of the vice case report, would

8   that be somewhere you would list if there was an informant in a

9   drug case?

10  A    No.

11  Q    No?  Where would you list it?

12  A    You may not want to.

13  Q    You may not want to list the informant?

14  A    No.

15  Q    Okay.  Would that be the place where you list any witnesses

16  in a drug matter?

17  A    Yes, you could.

18  Q    Okay.  Thank you.

19           MS. PREYAR:  No further questions.

20           MR. CAZARES:  I just have a couple questions, Judge.

21           THE COURT:  All right.

22                       CROSS-EXAMINATION

23  BY MR. CAZARES:

24  Q    Good afternoon, Sergeant.  How are you?

25  A    I'm fine.

Brundage - Cross

1   Q    Now, you were asked some questions about the, what's called

2   a TRR, which is the Tactical Response Report.

3            Do you remember those questions?

4   A    Yes.

5   Q    And let me put it on the screen for you.

6            MR. CAZARES:   I'm not sure what plaintiff exhibit it

7   is, but this is the same document.

8            MS. PREYAR:   Yes.

9   BY MR. CAZARES:

10  Q    And you recall that you testified that you had signed off on

11  this report?

12  A    Correct.

13  Q    And when you sign off on this report, what are you signing

14  off on?

15  A    That I reviewed it and that it's legible and it's complete.

16  Q    As a matter of fact, let me draw your attention to the box

17  right above where you electronically signed the document, can

18  you read that for us?

19  A    "Reviewing supervisor will ensure the legibility and

20  completeness of this report and attest by entering the required

21  information below."

22  Q    And, again, you testified you have no personal knowledge of

23  this incident, right?

24  A    Correct.

25  Q    You were not there?

Brundage - Cross

1    A    I was not there, no.

2    Q    So basically what you're doing is ensuring legibility and

3    completeness, correct?

4    A    Correct.

5    Q    Now, you were also asked some questions about the vice case

6    report.  Do you remember those questions?

7    A    Yes.

8    Q    And, again, you signed off on this vice case report,

9    correct?

10   A    Yes.

11   Q    Let me show you.

12        Can you point to where your signature is?

13   A    (Indicating.)

14   Q    Okay, so this is the first time I get to use this.  So ...

15   would you say -- where I drew the circle, that's where your

16   signature is?

17   A    Yes.

18   Q    Now, I'm going to show you -- see if you can read this.

19        Right next to your signature, there's a box there.  Do

20   you see that?

21   A    Yes.

22   Q    And can you read that?  Is that clear?

23   A    Yeah, I can read it.  It's "I have read this report and by

24   my signature indicate that it is acceptable."

25   Q    Okay.  So, again, you're reviewing this report to make sure,

Brundage - Cross

1    what, that it's legible and complete, right?

2    A    Correct.

3    Q    No more questions.  Thank you.

4                         REDIRECT EXAMINATION

5    BY MS. PREYAR:

6    Q    Just briefly, Sergeant, you were asked several questions

7    just now about completeness.

8              Now, if a document was not complete, you would make the

9    officer redo it or complete it; is that correct?

10   A    Possibly just add something that -- if a box wasn't

11   completed, just to properly fill it out.

12   Q    Okay.  And if there wasn't enough room, say, on a vice case

13   report to add something, you could fill out or that officer

14   could fill out a supplemental report; is that correct?

15   A    I suppose, sure.

16   Q    Okay.  And if you were aware, after your review of two

17   different reports in one case, that had completely different

18   information, would you deem the reports complete?

19   A    The question again?

20   Q    Well, Sergeant, if you're reviewing a case or you're

21   reviewing a vice case report and a TRR and the two contained

22   information that doesn't match, would you then deem the TRR

23   complete?

24              MR. CAZARES:  Objection, Judge.

25              MS. PREYAR:  I'll withdraw the question, Judge.

Brundage - Redirect

1        No further questions.

2              THE COURT:  All right, you are excused.

3              THE WITNESS:  Okay.  Thank you.

4        (Witness excused.)

5              MS. PREYAR:  At this time, we'll call Abigail Clough.

6              THE COURT:  All right.  I think we should break for

7    lunch now, so we will resume at quarter of -- what is that?

8    2:00.  1:45.

9              Thank you all for your attention this morning.

10       (Jury exits courtroom.)

11             MR. JONES:  Judge, the only reason I call you back is

12   the next witness, based upon what the Court says, I assume it's

13   going to be short, it's the public defender.

14             THE COURT:  Uh-hum.

15             MR. JONES:  You gave a very short leash for that.  So

16   the question now becomes, and we are asked, okay, you rest and

17   you call the officers?  What do you do?

18             MR. SHILLER:  We are resting after we call Miss Clough.

19             THE COURT:  Okay.  There's your answer.

20             MR. JONES:  Well, I love answers, Judge.

21             MR. SHILLER:  Mr. Jones could have asked me that

22   without the court reporter --

23             MR. JONES:  No, no, I think -- I think I get a more

24   definitive answer here.

25             THE COURT:  All right.  One way we could move things

Brundage - Redirect

1   along, is this your last witness?

2          MR. SHILLER:  Yes.

3          THE COURT:  If you want to make your anticipated motion

4   in advance so that we can go straight into the defense case,

5   assuming --

6          MR. JONES:  Judge, I can't do that because I have to

7   talk with my folks real quick to see what I'm missing.

8          THE COURT:  All right.  Well, then I will probably

9   reserve --

10         MR. JONES:  I understand.

11         THE COURT:  Make it at the sidebar, and I'll reserve,

12  because I want to go straight to the defense case.

13         MR. JONES:  I understand, Judge.

14         THE COURT:  Okay.

15         MR. SHILLER:  We do have one issue.

16         We're going to move to certify this into evidence at

17  the close -- it's all in evidence, but there's a line on the

18  disposition that refers to a violation of a protective order

19  that we would like redacted.

20         It's only a two-page certified disposition.

21         THE COURT:  All right.  Is this something I'm involved

22  in or just a discussion between the two of you?

23         MR. JONES:  I haven't seen it, so if he shows it to

24  either myself or George, we'll probably have an answer.

25         MR. SHILLER:  Okay.  Never mind.  Sorry.

Brundage - Redirect

1        MR. KOSOGLAD:  We'll work it out.  Thank you, Judge.

2        THE COURT:  All right.  We're in recess then.

3        MR. JONES:  All right.

4                        - - - - - -

5                  C E R T I F I C A T E

6        I certify that the foregoing is a correct transcript from

7   the record of proceedings in the above-entitled matter.

8

    /s/Gayle A. McGuigan                    Date:  May 20, 2011

9

10

    _____      _____

11   GAYLE A. McGUIGAN, CSR, RMR, CRR       May 20, 2011
     Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25